**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 23, 2015.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**
_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 13-50724-CAG |
| | § | |
| AZIZ ALI and MUMTAZ ALI, | § | |
| | § | CHAPTER 13 |
| Debtors. | § | |

_____

| | | |
|---|---|---|
| AZIZ ALI and MUMTAZ ALI, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADVERSARY NO. 13-05083-CAG |
| | § | |
| SALIM A. MERCHANT and | § | |
| ELECTRO SALES & SERVICE, INC., | § | |
| Defendants. | § | |

### MEMORANDUM OPINION and
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

# TABLE OF CONTENTS

PROCEDURAL HISTORY …………………………………………….……… 5

JURISDICTION, CONSTITUTIONAL AUTHORITY AND VENUE ……………………………..… 6

RELIEF REQUESTED …………………………………………………………...…… 8

EVIDENCE PRESENTED ……………………………………………………..…… 9

    *Trial and Exhibits* ……………………………………………………… 9

    *Witnesses and Credibility* …………………………………………… 10

    *Timeline of Events* ………………………………………………...… 12

        *i.*      *Events Occurring Prior to April 2010* …………………………..... 13

        *ii.*     *The "Falling Out" of April 2010* ………………………………… 41

        *iii.*    *Events Occurring After April 2010* ……………………………… 42

        *iv.*    *Post-Bankruptcy Petition Date Events* …………………………… 59

    *Miscellaneous Evidence Presented* ……………………………………….…… 60

ANALYSIS OF DEFENDANTS' CLAIMS …………………………………………… 60

    *Bankruptcy Court Jurisdiction and Authority* ……………………………… 60

    *Burden of Proof* ………………………………………………………... 61

    *Proof of Claim No. 7-2* ……………………………………………….. 63

    *Proof of Claim No. 8-2* …………………………………………...…… 67

    *Proof of Claim No. 9-3* ……………………………………………….... 71

    *Proof of Claim No. 10-3* ……………………………………………….… 73

    *Proof of Claim No. 11-2* ……………………………………………… 81

    *Proof of Claim No. 12-2* ……………………………………………… 83

    *Proof of Claim No. 13-2* ……………………………………………… 88

*Proof of Claim No. 14-2* …………………………………………………………. 90

*Proof of Claim No. 15-3* …………………………………………………………. 94

*Proof of Claim No. 16-1* …………………………………………………………. 97

*Proof of Claim No. 17-1* …………………………………………………………. 99

ANALYSIS OF PLAINTIFFS' ADVERSARY CLAIMS………………………………………… 101

*Breach of Fiduciary Duty* ……………………………………………………….. 101

*Fraud in the Inducement* ………………………………………………………... 109

*Abuse of Process* ………………………………………………………………… 114

*Usury* ……………………………………………………………………………….. 122

*Breach of Partnership, Accounting of Partnership & Suit to Quiet Title* ………. 127

*Violation of the Automatic Stay* ………………………………………………… 127

CONCLUSIONS ……………………………………………………………………… 134

1.      This Memorandum Opinion and Proposed Findings of Fact and Conclusions of Law ("Memorandum Opinion") resolves the adversary proceeding of *Aziz Ali and Mumtaz Ali v. Salim A. Merchant and Electro Sales & Service, Inc.*, Adv. No. 13-05083-cag.  Additionally, this Memorandum Opinion resolves eleven Objections to Claim[1] filed by Aziz and Mumtaz Ali ("Plaintiffs") in the underlying bankruptcy case.[2]  The claimant in each of the filed Proofs of Claim is Salim Merchant ("Merchant") and/or Electro Sales & Service, Inc. ("Electro") (collectively "Defendants").  As a result of the continuity of involved parties and interrelatedness of the issues, the Adversary Proceeding and all eleven Objections to Claim were consolidated for trial.

2.      This Court conducted a six day trial before taking the matter under advisement.  Trial was concluded on June 23, 2014.  The parties submitted post-trial proposed Findings of Fact and Conclusions of Law as well as Deposition and Transcript Excerpts on July 23-24, 2014.

3.      The Court has reviewed the entire record before it; including all admitted exhibits and the weight of the testimony and credibility of all witnesses.  Additionally, the Court has carefully considered all evidentiary objections raised and sustained in making its findings of fact.

---

[1] The parties have filed numerous amendments to Proofs of Claim, Objections to Claim and Responses.  This Memorandum Opinion resolves the following most current ECF pleadings in the underlying bankruptcy case:  (1) Second Amended Objection to Claim No. 7 (BK ECF No. 98) and Response thereto (BK ECF No. 112); (2) Third Amended Objection to Claim No. 8 (BK ECF No. 105) and Response thereto (BK ECF No. 116); (3) Third Amended Objection to Second Amended Claim No. 9 (BK ECF No. 101) and Response thereto (BK ECF No. 117); (4) Third Amended Objection to Claim No. 10 (BK ECF No. 106) and Response thereto (BK ECF No. 118); (5) Amended Objection to Claim No. 11 (BK ECF No. 102) and Response thereto (BK ECF No. 119); (6) Amended Objection to Claim No. 12 (BK ECF No. 103) and Response thereto (BK ECF No. 120); (7) Amended Objection to Claim No. 13 (BK ECF No. 104) and Response thereto (BK ECF No. 121); (8) Second Amended Objection to Claim No. 14 (BK ECF No. 95) and Response thereto (BK ECF No. 113); (9) Third Amended Objection to Claim No. 15 (BK ECF No. 111) and Response thereto (BK ECF No. 122); (10) Amended Objection to Claim No. 16 (BK ECF No. 97) and Response thereto (BK ECF No. 114); and (11) Second Amended Objection to Claim No. 17 (BK ECF No. 100) and Response thereto (BK ECF No. 115).

[2] References to electronically filed documents in Bankruptcy Case No. 13-50724-cag are denoted as "BK ECF No."

## PROCEDURAL HISTORY

4.      The various claims in this Adversary Proceeding and allegations raised in the Objections to Claim arise from a long history of personal and business connections between Plaintiffs and Defendants.

5.      Plaintiffs filed the underlying Chapter 13 bankruptcy case on March 20, 2013 (the "Petition Date").

6.      Defendants filed eleven proofs of claim on May 15, 2013 (Claims Register Nos. 7–17), to which Plaintiffs filed, and subsequently amended, objections to each of Defendants' claims, disputing their amount and validity.  On September 16, 2013, Defendants responded to each of Plaintiffs' Objections. [3]

7.      Plaintiffs commenced the Adversary Proceeding by the filing of their Complaint on October 16, 2013.  (Adv. ECF No. 1).[4]  Defendants filed their Answer on November 15, 2013. (Adv. ECF No. 3).  Thereafter, Plaintiffs twice amended their Complaint on January 31, 2014 and March 4, 2014.  (Adv. ECF Nos. 9 & 20).

8.      Prior to filing their Answer to the Second Amended Complaint, however, Defendants filed a Motion for Partial Summary Judgment and for Judgment on Plaintiffs' Pleadings/Failure to state a Claim (hereinafter "Summary Judgment Motion") on March 12, 2014, to which Plaintiffs responded on March 28, 2014.  (Adv. ECF Nos. 27 & 29).  Defendants also filed a Reply in support of the Summary Judgment Motion on April 11, 2014, (Adv. ECF No. 39), and Plaintiffs filed a Surreply on April 30, 2014.  (Adv. ECF No. 47).

---

[3] *See supra* note 1.

[4] References to electronically filed documents in Adversary Proceeding No. 13-05083-cag are denoted as "Adv. ECF No."

9.     The parties agreed to submit the Summary Judgment Motion to the Court for a ruling on the pleadings without the need for a hearing.  On June 10, 2014, the Court delivered its oral ruling on the record and entered the Order granting, in part and denying, in part the Summary Judgment Motion.  (Adv. ECF No. 52).  Pursuant to the Court's oral ruling and Order, the Court dismissed Plaintiffs' claims for intentional infliction of emotional distress for lack of statutory authority.  The Court also dismissed Plaintiffs' claim for breach of contract due to Plaintiffs' lack of standing.  Additionally, the Court dismissed, without prejudice, Plaintiffs' claims for violations of the Texas Deceptive Trade Practices Act, violations of the Texas Debt Collections Act, conversion, and malpractice so that the parties could proceed on those claims in state courts where identical claims were already asserted.

10.    The Court ordered the parties to proceed to trial on the following remaining claims: (1) breach of fiduciary duty, (2) fraud in the inducement, (3) abuse of process, (4) usury, (5) breach of partnership, (6) accounting of partnership, (7) suit to quiet title, and (8) violations of the automatic stay.  Additionally, the Court ordered the parties to proceed to trial on Plaintiffs' Objections to Claim for Proofs of Claim numbers 7 through 17.

11.    This Court conducted a six day trial before taking the matters under advisement. [5]  Trial was concluded on June 23, 2014, and the Court allowed the parties to submit post-trial proposed Findings of Fact and Conclusions of Law as well as Deposition and Transcript Excerpts.

### JURISDICTION, AUTHORITY AND VENUE

12.    As a preliminary matter, it is necessary for this Court to examine its subject-matter jurisdiction and constitutional authority to enter a final order in any of Plaintiffs' claims.  Federal courts have an ongoing duty to examine their subject matter jurisdiction, whether the issue is

---

[5] Trial was conducted on June 16, 2014, through June 20, 2014, and June 23, 2014.

raised by the parties or *sua sponte* by the court. ***MCG, Inc. v. Great W. Energy Corp.***, 896 F.2d 170, 173 (5th Cir. 1990).

13.     In ***Stern v. Marshall***, the United States Supreme Court held that a bankruptcy court must have *both* statutory and constitutional authority to enter final judgment on certain state law claims. ***Stern v. Marshall***, 131 S. Ct. 2594, 2611 (2011) (finding that the bankruptcy court lacked the "judicial Power of the United States" under Article III of the United States Constitution to enter final judgment on a state law counterclaim).

14.     The United States Supreme Court again weighed in on the issue of constitutional authority of the bankruptcy court in ***Executive Benefits Insurance Agency v. Arkinson***, 134 S. Ct. 2165 (2014). In an unanimous opinion, the Supreme Court reaffirmed its holding in ***Stern*** and further explained that ***Stern*** claims—which are those claims where the bankruptcy court maintains statutory authority to enter final judgment but lacks the constitutional authority to do so—may be heard by the bankruptcy judge, who must in turn submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment. ***Id.*** at 2173; *see* 28 U.S.C. § 157(c)(1) (2015).

15.     While this case remained under advisement with the Court, the United States Supreme Court determined that parties could consent to bankruptcy court adjudication of ***Stern*** claims without raising constitutional concerns. ***Wellness Int'l Network, LTD, et al. v. Sharif***, 135 S. Ct. 1932 (2015). The Supreme Court held that litigants may submit to bankruptcy court adjudication through express or implied consent. ***Id.***

16.     At the time of trial in this case, the Fifth Circuit remained under the precedent of ***Frazin v. Haynes & Boones, L.P. (In re Frazin)***, 732 F.3d 313 (5th Cir. 2013), and ***BP RE, L.P. v. RML Waxahachie Dodge, L.L.C. (In re BP RE, L.P.)***, 735 F.3d 279 (5th Cir. 2013), which

prohibited parties from consenting to bankruptcy court adjudication in *Stern* claims.  As such, the Court finds that the parties in this case could not have consented prior to trial and presentation of evidence to bankruptcy court adjudication in either an express or implied manner. As such, the Court shall treat this Memorandum Opinion and Proposed Findings of Fact and Conclusions of Law as though the parties could not consent.

17.      Both parties assert a number of claims, counterclaims and objections that have been consolidated for purposes of trial.   In the interest of clarity and specificity, the Court shall address its statutory and constitutional authority to enter a final judgment, or lack thereof, under each claim or cause of action heading.

18.      To the extent, however, that this Court finds it lacks authority to enter a final judgment on a claim or cause of action, or a reviewing court finds that this Court lacks authority to enter final judgment, this Memorandum Opinion may be construed as the Court's Proposed Findings of Fact and Conclusions of Law made pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9033, subject to *de novo* review and entry of final Judgment by the District Court in accordance with 28 U.S.C. § 157(c)(1).

19.      Venue in the instant case is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409 (2015).

## RELIEF REQUESTED

20.      Plaintiffs seek equitable relief in the form rescission of a Second Mortgage Note in the amount of $95,000 because, they argue, the Second Mortgage Note would not have been part of the closing documents in the sale of the Greenway Real Estate and would have not been signed by Plaintiffs absent Defendants' breach of their fiduciary duties (relating to Proof of Claim No. 10).

21.     Plaintiffs seek a judgment from this Court that Defendants take nothing from this suit, awarding Plaintiffs all costs incurred in its defense against Defendants' Proofs of Claim, and awarding the following remedies against Defendants for their actions and the actions of their agents, officers, and employees:

      a.     Offset of damages owed to Plaintiffs as determined by State Court;

      b.     Statutory penalties;

      c.     Actual economic and mental anguish damages;

      d.     Treble damages/Exemplary/Punitive damages;

      e.     Pre-judgment and post-judgment interest as provided by law;

      f.     Reasonable attorney's fees;

      g.     Costs of suit; and

      h.     Such other and further relief to which Plaintiffs may be justly entitled.

22.     Defendants request that all relief requested by Plaintiffs be denied and that all Claims asserted by Defendants be allowed in their entirety.

## EVIDENCE PRESENTED

**<u>Trial and Exhibits</u>**

23.     The Court conducted a six day bench trial before taking the matters under advisement. Trial was concluded on June 23, 2014, and the Court allowed the parties to submit post-trial proposed Findings of Fact and Conclusions of Law as well as Deposition and Transcript Excerpts.

24.     The Court admitted Plaintiffs' Exhibits Pl. 1through Pl. 9, Pl. 11 through Pl. 14, Pl. 16 through Pl. 21, Pl. 24, Pl. 26 through Pl. 28, Pl. 31, Pl. 32, Pl. 36 through Pl. 40, Pl. 43, Pl. 49, Pl. 54, Pl. 56 through Pl. 58, Pl. 60, Pl. 67, Pl. 69, Pl. 71, Pl. 79 through Pl. 82, Pl. 91 through Pl. 94, Pl. 96, Pl. 102, Pl. 116, Pl. 133, Pl. 170, Pl. 188 through Pl. 191, Pl. 212, Pl. 227, Pl. 232, Pl.

239, Pl. 259, Pl. 261, Pl. 264 through Pl. 267, Pl. 269, Pl. 270, Pl. 282 and Pl. 283. The Court also admitted Defendants' Exhibits Def. A through Def. C, Def. D (excluding pages 34 through 47), Def. E through Def. K, Def. BB, Def. FF, Def. GG, Def. HH, Def. JJ, Def. KK, Def. MM, Def. RR, Def. SS, Def. ZZ, Def. CCC, Def. HHH, Def. AAAA, Def. BBBB, and Def. CCCC.

## Witnesses and Credibility

25.     During the course of trial, the following ten witnesses testified:

(A) <u>Salim Merchant</u> ("Merchant"). Merchant is one of the Defendants and Creditors in this dispute. He is also the president and sole owner of Electro Sales and Service Inc., the other Defendant and Creditor in this dispute. Any actions taken on behalf of Electro Sales and Service Inc. as it relates to the facts of this case were taken by Merchant. Merchant is one of the primary witnesses. The Court finds that much of Merchant's testimony lacked credibility. His trial testimony was impeached by his prior deposition testimony on several occasions and he contradicted himself within the six days of trial more than once. It appears his perceived version of the facts continues to change whenever it suits his purposes. Additionally, English is not Merchant's first language and—although his English comprehension appears more advanced than that of Plaintiffs—at times, his testimony or choice of words lacks clarity. As a result, the Court gives little probative value to much of Merchant's testimony.

(B) <u>Aziz Ali</u> ("Aziz"). Aziz is one of the Plaintiffs and Debtors in this case. He is also the husband of Mumtaz, the other Plaintiff and Debtor. The Court finds that, although credible, much of Aziz's testimony lacked clarity based on his comprehension of English as a second language. His choice of words was often confusing and his answers often did not address the question asked. The Court finds that it should give limited credibility to the testimony of Aziz.

(C) <u>Mumtaz Ali</u> ("Ali"). Mumtaz is one of the Plaintiffs and Debtors in this case. She is also the wife of Aziz, the other Plaintiff and Debtor. The Court finds that, although her English comprehension is more advanced than Aziz, her word choice was often confusing but clarity could be achieved in many cases when clarifying questions were asked of Mumtaz. Her testimony was consistent although a number of times her answers did not address the question asked. The Court finds that Mumtaz's testimony was generally credible with some limitations.

(D) <u>Teresa Britts</u> ("Britts"). Britts is a non-party expert witness in the area of accounting. She is a Certified Public Accountant ("CPA") with 33 years of experience. Britts testified regarding a Written Report she prepared on behalf of Plaintiffs reviewing Claims 7, 8, 14 and 15. (*See* Pl. 261). She also testified regarding industry accounting practices. The Court finds her testimony credible but will also be required to evaluate her conclusions based on the evidence she was given by Plaintiffs to prepare her Written Report.

(E) <u>Officer Martin Phelan</u> ("Officer Phelan"). Officer Phelan is a non-party witness and a Lieutenant with the Comptroller of Public Accounts for the State of Texas (hereinafter "Comptroller's Office") – Criminal Investigation Division. Officer Phelan investigated Merchant in 2010 and testified regarding his Report of Investigation for the Comptroller's Office. (*See* Pl. 60). The Court finds that Officer Phelan was a credible witness.

(F) <u>Emma Fuentes</u> ("Fuentes"). Fuentes is a non-party witness and twenty-five year employee of the Comptroller's Office. Fuentes testified regarding the procedures involved and the effect of a Certificate of No Tax Due letter and audit policies within the Comptroller's Office. The Court finds that Fuentes was a credible witness.

(G) <u>Beatrice Sepulveda</u> ("Sepulveda"). Sepulveda is a non-party witness and current Trustee of the Muzquiz Family Trust. Sepulveda testified regarding her knowledge of the

mortgage associated with the Lucky Food Mart real property after she became Trustee in 2001. The Court finds that Sepulveda was a credible witness.

(H) <u>Richard Muzquiz</u> ("Muzquiz").  Muzquiz is a non-party witness and is one of the owners/beneficiaries of the Muzquiz Family Trust.  He testified regarding his knowledge of the Lucky Food Mart real property sale transaction and his knowledge of the Lucky Food Mart in 2011.  The Court finds that Muzquiz was a credible witness.

(I) <u>Shahab Butt</u> ("Butt").  Butt is a non-party witness and former business partner of Merchant and Aziz at the Lucky Food Mart store.  Butt testified regarding his involvement in PAA Investments Inc. and his work at the Lucky Food Mart.  The Court finds that Butt was a credible, albeit cautious, witness.

(J) <u>Armando Barbosa</u> ("Barbosa").  Barbosa is a non-party expert witness in the area of real estate lending.  He owns a mortgage company and has been in real estate lending for 35 years.  He testified for Defendants regarding calculation of interest a Promissory Note under Proof of Claim No. 10.  Although credible, the Court finds that Barbosa's testimony was of limited value.

**<u>Timeline of Events</u>**

26.     The timeline of events in the case span from 1994 through the present.  The parties had a long business and personal relationship that took a sharp decline in April 2010.  Throughout the approximately twenty year relationship, the parties conducted a number of business ventures together, bought and sold property, lent money to one another, and handled government affairs together.  All of these events overlap in time but are alleged to constitute different claims.  In an attempt to accurately portray the facts and clearly address the numerous claims, the Court has prepared a layout of the voluminous evidence presented based on transaction occurrences while

keeping in mind the overarching timeline of events. Generally, the events will be addressed in four clearly delineated parts: (1) the evidence regarding events occurring prior to April 2010, (2) the evidence surrounding the parties' "falling out" in April 2010, (3) the evidence regarding events occurring after the decline of the relationship from April 2010 to the Petition Date, and (4) events occurring after the Petition Date. The Court shall state its formal Findings of Fact when addressing each individual cause of action or claim.

## I.     Background Facts

27.     Aziz was born in India where he also married Mumtaz. They moved to New York in 1985. Plaintiffs' native language is Hindi.

28.     The Court heard testimony regarding Aziz's level of English comprehension from both Aziz and Merchant. At trial, Merchant testified that Aziz did not have trouble with English and that he understood technical accounting. Merchant's previous deposition testimony, however, includes Merchant's statements that Aziz would not understand English and would not understand accounting in English. During trial, Aziz testified that his English was poor upon moving to the United States and that he improved his English through interactions with vendors, with help from other employees, and by taking classes in 2005 or 2006. In his prior deposition, Aziz testified that he took an English class in India but clarified at trial that this class was only two to three months and not substantial. Having heard a substantial volume of Aziz's testimony in English at trial, the Court concludes that Aziz's English comprehension remains limited and shall incorporate this finding into its consideration of the transactions at issue in this case.

29.     The Court finds that Mumtaz does have a higher level of English comprehension than Aziz. She testified that she took an English class in India and also took English classes in the United States.

30.     Merchant was also born in India and was raised in Pakistan.  He holds a bachelor's level accounting degree from SM College in Pakistan and a second accounting degree from the London Chamber of Commerce in Pakistan.  Merchant moved to New York in 1978 and later moved to San Antonio, Texas in 1990.  In San Antonio, Merchant held himself out as an accountant doing complex accounting work.

31.     From 1985 to 1994, Plaintiffs lived in New York where they worked in numerous newsstands and convenience stores.  During this time, Aziz testified that he was a 25% owner of a store and also worked in the business operation.

32.     In 1994, Plaintiffs moved their family to San Antonio, Texas in search of a better climate for their child's health.  At this time, Aziz sold his business interests in New York.

33.     Upon moving to San Antonio, Plaintiffs met Merchant through Aziz's nephew and their shared attendance at a mosque.

34.     In 1994, Aziz began working for Merchant at Shopper's Mart.  Mumtaz began working at Shopper's Mart in 1995.

35.     Although the parties disagreed regarding whether Aziz held the title of "manager" at Shopper's Mart—Aziz, Merchant and Mumtaz all testified that Aziz held managerial responsibilities, such as bookkeeping, ordering inventory and dealing with customers, at some point during his time working at the Shopper's Mart.  Merchant also testified that Aziz handled the bank deposits and paid himself in cash every fifteen days by taking his pay out of the cash register and making a notation on the cash payout for that day.

## II.     Purchase of Lucky Food Mart Real Property and Store (September 12, 1996)

36.     One of the properties at issue in the case is real property located at 12966 N IH 35, Frio County, Moore, Texas.  This real property shall be referred to as the "Lucky Real Property."

14

Located on the Lucky Real Property is a convenience store that shall be separately referred to as the "Lucky Food Mart."

37.     The parties put forward two competing versions regarding the initial purchase of the Lucky Real Property and the accompanying Lucky Food Mart.  Merchant contends that he purchased the Lucky Real Property alone and he owns the whole interest.  Merchant also argues that Aziz and Amin Pirani only operated the Lucky Food Mart on a lease arrangement. Plaintiffs, on the other hand, contend that Aziz and Amin Pirani purchased the Lucky Real Property and the accompanying Lucky Food Mart with Merchant so that each owned a one-third interest in the property.  Plaintiffs argue that the Lucky Food Mart was initially operated under a partnership owned by Merchant, Aziz and Amin Pirani.

38.     The Court heard varied testimony regarding the Lucky Real Property purchase and a number of exhibits pertaining to the purchase were admitted.  The evidence received by the Court is analyzed below.

39.     The parties agree that Merchant is the person who identified the Lucky Real Property as available for sale in 1996 and introduced Aziz and Amin Pirani to the owner, Pete Musquiz of the Musquiz Family Trust.  The sale also included the Lucky Food Mart.

40.     The parties agree that there is no written agreement between Merchant, Aziz and Amin Pirani evidencing their agreement to purchase the Lucky Real Property together.

41.     <u>Merchant's Testimony</u>:  Merchant's testimony regarding ownership of the Lucky Real Property varied throughout trial.  At one point, Merchant stated that he, Aziz and Amin Pirani purchased the Lucky Real Property as a joint venture and that the three were "partners" in the business venture.  Merchant also testified that buying a store— although unspecified which store at this point—was initially Aziz and Amin Pirani's idea but that they involved Merchant because

15

Aziz and Amin Pirani did not have the money for a down payment. Later in his testimony, however, Merchant stated that he alone owned the Lucky Real Property and pointed to his tax returns claiming the entire mortgage interest deduction amount as proof of this fact. (Def. C; Pl. 37). Merchant admitted, however, that the mortgage interest statement in Plaintiffs' Exhibit 37 were not being paid from his personal funds, but rather from the "rent payment" derived from the funds earned by the Lucky Food Mart.

42. <u>Down Payment</u>: The parties agree that a $50,000 down payment for the Lucky Real Property was required but disagree regarding where the money for the down payment originated.

43. Merchant testified that he contributed $35,000 and that Aziz contributed the remainder as a loan to Merchant, which Merchant then repaid. Merchant contends that proof of repayment is attached to his Proof of Claim No. 9 in the form of check copies. (Def. C). Merchant contends that Amin Pirani contributed nothing to the down payment.

44. Aziz refuted Merchant's testimony regarding the down payment, stating that each partner paid an equal share of the $50,000 down payment. Aziz testified that he gave Merchant cash for his own share and for Pirani's share so that Merchant could write one check for the full down payment. Aziz testified that Pirani did contribute to the down payment and gave his portion, in cash, to Aziz, which Aziz then passed along to Merchant.

45. Defendants' Exhibit C is Proof of Claim No. 9 and contains a number of checks with the following three being dated September 12, 1996. Cashier's Check 3382418 from Salim Merchant and written to the payment of Frio County Abstract Company is in the amount of $29,000. Cashier's Check 5141016760 from Aziz Ali and written to the payment of Frio County Abstract Company is in the amount of $15,000. Cashier's Check 5141015762 from Aziz Ali and written to the payment of Frio County Abstract Company is in the amount of $1,000.

16

46.    Alleged Repayment Checks:  Merchant specified that Check Numbers 9015, 9016 and 9027 constituted repayment of the down payment loan from Aziz.  (Def. C).  Check 9015 is dated September 18, 2007, and written out to Fort Sam Grocery in the amount of $2,000.  Check 9016 is dated September 19, 2007, and written out to Greenway Grocery in the amount of $3,000.  Check No. 9027 is dated November 14, 2007, and written out to Greenway Grocery in the amount of $2,900.

47.    Warranty Deed:  Plaintiff's Exhibit 36 is a copy of the Warranty Deed with Vendor's Lien executed on September 12, 1996, conveying the Lucky Real Property to Salim Merchant, Aziz Ali and Amin Pirani.

48.    Merchant testified that Amin Pirani's name was put on the Warranty Deed—although Merchant denies that Amin Pirani contributed to the down payment—because he was the individual running and managing the store.  Merchant stated that he did not want Amin Pirani to "run away" because his lease payment was being used to pay the mortgage.  Merchant also testified that Aziz's name was put on the Warranty Deed because Merchant wanted them to "continue there" until the loan was paid.

49.    Aziz maintained that all three names were put on the Warranty Deed because all three individuals were partners in purchasing the Lucky Real Property and each owned a one-third interest in the property.  Mumtaz also confirmed that this partnership to purchase the Lucky Real Property was formed and testified that she was present during the negotiations and at closing on the property.

50.    Partnership Formation:  The parties agree that an entity named "SAA Lucky Food Mart Inc." was created to run the Lucky Food Mart.  Merchant admitted that the documents listed

Aziz, Merchant and Amin Pirani as stockholders and that he had joined in this partnership for the purpose of operating the Lucky Food Mart.

51.     <u>Purchase of Initial Inventory:</u>  Merchant testified that the initial inventory for Lucky Food Mart was included in the Lucky Real Property purchase.  Aziz testified that the inventory was paid for by all three partners.

52.     <u>Initial Operation of Lucky Food Mart</u>:  The parties agree that Amin Pirani operated the Lucky Food Mart from the time of purchase until he was deported.  The parties did not present evidence of the exact date Amin Pirani was deported but, from the parties' testimony, the Court concludes that this was sometime between 1998 and 2000.

53.     The parties disagree on whether Amin Pirani operated Lucky Food Mart under a business association at this time.  Merchant contradicted himself in his testimony on this point.  First, Merchant stated that SAA Lucky Food Mart Inc. was created to run the Lucky Food Mart and testified that the documents listed Aziz, Merchant and Amin Pirani as stockholders.  Later, however, Merchant testified that no entity was involved in the operation of Lucky Food Mart while Amin Pirani operated the store.

54.     Aziz testified that Amin Pirani operated the Lucky Food Mart under the partnership SAA Lucky Food Mart.

55.     <u>Payment of Mortgage and Partnership Profits</u>:  Aziz testified that Amin Pirani paid the mortgage on the Lucky Real Property each month from the Lucky Food Mart profit. Additionally, Aziz testified that Amin Pirani took out his minimum wage salary each month. Aziz testified that Lucky Food Mart was profitable enough to pay all of its bills at this time with any remaining profits remitted to the partnership each year.

56.     Merchant, on the other hand, testified that Amin Pirani's operation of the store was under an oral leasing agreement.[6]  Merchant testified that the mortgage payment for the Lucky Real Property came from the rent payment made by the Lucky Food Mart under this lease agreement and was either paid directly to the mortgagee or indirectly, by giving the rent payment to Merchant first.  Merchant also testified that Amin Pirani did not report any profits to him and never turned over any profits to him.

57.     <u>Purchase and Installment of Mobile Home</u>:  The parties agree that Plaintiffs purchased a mobile home and put it on the Lucky Real Property.  The date of the Security Agreement for the Mobile Home is October 4, 1996.  (Pl. 259).  Aziz testified that the purpose of purchasing the Mobile Home was so that Amin Pirani could live there while he operated the property.  The parties agreed that there was not a mobile home on the property when it was first purchased.

## III.     Purchase of Fiesta Food Mart (later known as Fort Sam Grocery) (1998)

58.     In 1998, Aziz purchased Fiesta Food Mart located at 2111 Harry Wurzbach Road from Mumtaz's nephew.  Aziz did not purchase the real property on which the Fiesta Food Mart sits but rather, entered into a lease for the real property.  The landlord for this property was Bill Eng.

59.     Aziz testified that Shahab Butt started as a fifty percent investor in the Fiesta Food Mart but sold his interest to Aziz in 2002 or 2003.  Aziz also testified that Plaintiffs ran the Fiesta Food Mart at all times.

60.     Aziz testified that Merchant assisted him in purchasing the Fiesta Food Mart by reviewing the documents for the purchase.

61.      Mumtaz testified that herself, Aziz, Merchant and Bill Eng were all present at the time Plaintiffs purchased the Fiesta Food Mart from her nephew.

---

[6] Merchant repeatedly referred to "rent" being paid from the Lucky Food Mart.  The only written lease agreement, however, produced at trial pertaining to the Lucky Food Mart is not dated until September 1, 2010.  (Pl. 39).

## IV.     Other Events of 1998

62.     Around this time in 1998, both Aziz and Mumtaz ceased working for Merchant at the Shopper's Mart.

63.     Also in 1998, Plaintiffs purchased their first home for approximately $115,000 and testified that Merchant helped them through the home-buying process.

## V.     Purchase of Greenway Grocery Real Property and Store (2000)

64.     Another property at issue in the case is real property located at 11050 U.S. Highway 181 South.  This real property shall be referred to as the "Greenway Real Property."  Located on the Greenway Real Property is a convenience store that shall be separately referred to as the "Greenway Grocery."

65.     The Court heard varied testimony regarding the Greenway Real Property purchase and a number of exhibits pertaining to the purchase were admitted.  The evidence received by the Court is analyzed below.

66.     <u>Purchase by Merchant in 1999</u>:  It is undisputed that Merchant purchased the Greenway Real Property in 1999 for $210,000.  (Pl. 67).

67.     The parties agreed that, at the time Merchant purchased the property, the Greenway Grocery was empty and not operating; he had no employees and he had no tenants.

68.     Aziz testified that, at the time Merchant purchased the Greenway Real Property, Aziz did not know how much Merchant paid for it.

69.     <u>Business Arrangement While Merchant Owned Greenway Real Property:</u>  The parties agreed that, at the time Merchant owned the Greenway Real Property, Plaintiffs worked on getting the Greenway Grocery up and running.

70.     Merchant testified that the arrangement was for Plaintiffs to lease the Greenway Grocery from him and they would operate the store.  Merchant also testified that there was no written agreement for the lease when Plaintiffs first took over the Greenway Grocery.  Aziz did testify, however, that a lease was entered into for the Greenway Grocery at some point before Merchant offered to sell them the Greenway Real Estate.  No copy of this lease is provided in the parties' exhibits, however.

71.     Plaintiffs testified that Merchant approached Plaintiffs about operating the Greenway Grocery for a little while and then they would talk about leasing the property.  Plaintiffs testified that they did not originally agree to buy the Greenway Real Property but that Plaintiffs did pay all the expenses to make Greenway Grocery operational before having a lease.  These expenses included original inventory and fixtures.

72.     Mumtaz testified that they opened Greenway Grocery after approximately one month and continued to add to the store over the next six months, at which time Plaintiffs considered the set-up complete.

73.     Merchant testified that Plaintiffs did not purchase the initial inventory or pay to get the store going.  Rather, Merchant testified that he paid for the inventory himself, in cash.

74.     Check to McClellan & Associates:  Plaintiffs' Exhibit 18 is a check dated December 20, 1999, and made payable to McClellan & Associates in the amount of $50,000.  The parties agree that this check represents a loan from Abjal Budwani—a relative of Plaintiffs—to Merchant.

75.     Merchant's testimony regarding the purpose of this loan is inconsistent.  First, he testified that the loan was meant to assist in paying mortgage arrears on the Greenway Real Property.  Later, he changed his testimony stating that the loan was to assist in making the down payment on the Greenway Real Property.

76.    Aziz testified, that sometime around December 1999, Merchant told him that he had been struggling to pay his mortgage and asked for Aziz's help.  Aziz testified that he obtained the $50,000 loan from Budhwani on Merchant's behalf.  Aziz also testified that there is no signed agreement regarding repayment for this check.

77.    Mumtaz testified that, at the time this $50,000 loan was made, there had been no discussion of Plaintiffs purchasing the Greenway Real Property.

78.    <u>Gas Pump Lease(s)</u>:  On March 27, 2000, Mumtaz signed a lease for gas pumps to be installed on the Greenway Real Property.  (Pl. 17).  Mumtaz testified that her corporation, "MA Fiesta Food Mart, Inc. d/b/a Greenway Grocery," is the responsible party on the lease and that she signed the lease as President.  Mumtaz also provided a personal guaranty for the lease. Mumtaz testified that, as of trial, the lease is paid off.  This gas pump lease requires five years repayment in the monthly amount of $567.17.

79.    Aziz and Mumtaz also testified that there were actually two gas pump leases made for the length of five years each.  A second lease is not contained in the parties' exhibits but this assertion is also not contested by Merchant.

80.    Although the lease was executed on March 27, 2000, Mumtaz testified that the pump work did not commence until about June 2000.

81.    Merchant testified that Plaintiffs did not ask his permission to enter into the gas pump lease.  Plaintiffs, however, testified that Merchant suggested obtaining the pumps to improve the property because there were no gas pumps when Plaintiffs commenced operating Greenway Grocery.  Mumtaz testified that Merchant approached her about putting in the pumps stating that he could not lease them himself because he had credit issues at the time.  Mumtaz testified that it was Merchant who contacted the leasing company and directed them to use her name in the lease

22

documents. Mumtaz also admitted that the purpose of signing the lease was to increase business at Greenway Grocery—which Plaintiffs planned to purchase at the time, while leasing the Greenway Real Property from Merchant.

82.     Offer to Sell: Merchant testified that he approached Plaintiffs about purchasing the Greenway Real Property in March 2000. Mumtaz testified that, at the time Merchant offered to sell the Greenway Real Property, Aziz was working on the Greenway Grocery while she continued to work at Fiesta Food Mart.

83.     Merchant testified that he only communicated with Aziz—not Mumtaz.[7]

84.     Aziz testified that Merchant offered to sell the Greenway Real Property to Plaintiffs after they signed a lease for the Greenway Grocery because Merchant was struggling to make the mortgage payment. Aziz also testified that Plaintiffs did not make the decision to purchase the property until after Mumtaz had signed the gas pump lease(s).

85.     Financing and Closing of Greenway Real Property Sale to Plaintiffs: Once Plaintiffs made the decision to purchase the Greenway Real Property, the parties agree that Merchant assisted Plaintiffs in seeking financing for the purchase.

86.     The parties disagree on the amount of the final purchase price for the Greenway Real Property. Merchant alleges that the purchase price was $295,000, while Plaintiffs allege that it was only $200,000.

87.     There are two mortgages on the property. The First Mortgage was originally held by First Federal Savings Bank in the amount of $150,000 and will be referred to as the "First

---

[7] In general, Merchant testified that he never dealt with Mumtaz directly, pointing to the culture of their shared religious community that would not permit business involvement by a woman. Plaintiffs contradicted this testimony stating that Mumtaz was a part of the Greenway purchase and that Mumtaz would interact with Merchant on her own as well. Examining the testimony at trial and the sequence of events in this case, it is clear that Merchant's assertions regarding Mumtaz's involvement are untrue. The Court finds that Mumtaz was involved in certain negotiations, events and transactions that occurred throughout this case and will not exclude the possibility of her involvement based solely on Merchant's testimony that he did not interact with her.

Mortgage." (Pl. 91-94, 96, 133). The Second Mortgage was originally held by Salim Merchant in the amount of $95,000 and will be referred to as the "Second Mortgage." (Pl. 82, 102). Both mortgages are claimed as secured debts by Merchant in Claim Numbers 8 and 10, respectively.

88.     Plaintiffs argue that only the First Mortgage is a proper debt[8] and that the Second Mortgage given to Merchant was not part of their agreement to purchase the Greenway Real Property. Merchant argues that both the First and Second Mortgage evidence the purchase price of the Greenway Real Property, were signed by Plaintiffs, and were included in the closing documents.

89.     Plaintiffs testified that Merchant dealt with the bank on behalf of Plaintiffs in trying to obtain financing for the purchase price. Plaintiffs testified that the purchase price for the Greenway Real Property was $200,000 total but would be set off by the $50,000 loan that Aziz obtained for Merchant from Budwhani and that Merchant had agreed to accept as a down payment. As such, Plaintiffs argued that they only needed to finance the remaining $150,000. Plaintiffs, however, asked Merchant to get financing for another $95,000 in order to pay off the gas pump leases in an effort to lengthen the repayment period of that debt.

90.     Aziz testified that, approximately one or two weeks before the closing date, Merchant told Plaintiffs that the bank would only approve the $150,000 loan amount. Aziz testified that Merchant stated he would have the title company and bank fix the documents as a result.

91.     Merchant, on the other hand, testified that the purchase price was always $295,000 and that he simply decided to owner-finance the remainder of the purchase price when the bank would only approve a $150,000 loan. Merchant testified that his Second Mortgage was

---

[8] Plaintiffs do contest the amount claimed still owing in the Proof of Claim No. 8 but do not contest the underlying basis for the original loan.

structured so that Plaintiffs would not begin repayment of the Second Mortgage until the gas pump leases were paid off in 2005.

92.     Merchant admitted to signing Mumtaz's name on several loan-related documents prior to obtaining the financing from the bank.

93.     Plaintiffs' Exhibit 19 is a copy of a $95,000 Note dated April 27, 2000 with a signature dated May 10, 2000—before the closing held on June 26, 2000.  Merchant admits to signing Mumtaz's name on this $95,000 Note.  At one point in his testimony, Merchant stated that he did not know why he signed Mumtaz's name on this Note.  At another point, Merchant testified that he signed Mumtaz's name because he had permission from Aziz to do so.  Merchant testified that Aziz did not want to sign his own name due to credit problems.  Merchant also testified that this Note is different than the one which was signed at the closing by Mumtaz herself.  Merchant testified that the purpose of this Note was to use it to obtain the larger loan from the bank.

94.     Aziz, however, denied that he authorized Merchant to sign Mumtaz's name.  Mumtaz also denied that she ever gave Merchant permission to sign her name on any documents.

95.     Plaintiffs' Exhibit 20 is an Earnest Money Contract for the purchase of the Greenway Real Property.  Merchant also testified that he signed Mumtaz's name on this Earnest Money Contract under direction from Aziz.  Merchant testified that he did not put Aziz's name on the Earnest Money Contract because the bank wanted Mumtaz's signature, not Aziz's signature.

96.     Aziz denied that he gave Merchant permission to sign Mumtaz's name on the Earnest Money Contract.  Mumtaz testified that she did not sign an Earnest Money Contract and did not give anyone permission to sign on her behalf.

97.     The Earnest Money Contract lists a purchase price of $275,000—not $295,000.  (Pl. 20). Merchant testified that this was because inventory of $20,000 was excluded from the Earnest

Money Contract. Merchant testified that he—rather than Plaintiffs—purchased the initial inventory for the Greenway Grocery and that he paid in cash, except to a wholesaler who would take credit due to a pre-existing relationship. Merchant stated that this Earnest Money Contract was prepared before March 31, 2000, because that was the originally scheduled date for closing.

98. Aziz testified that he knew that Merchant had paid $210,000 for the Greenway Real Property in 1999 at the time Merchant sold the property to Aziz. Mumtaz also testified that Plaintiffs would not have agreed to pay $295,000 for the property knowing that Merchant only paid $210,000. Mumtaz further testified that Plaintiffs had already put $25,000 to $30,000 worth of improvements into the Greenway Grocery by the time of their purchase.

99. Merchant testified that, at the time of sale, he told Aziz that the property had only appraised for $200,000. Merchant also testified that he would not have sold the property for $200,000 because he would have been selling at a loss.

100. Merchant's testimony regarding who was in attendance at the closing held on June 26, 2000, lacks credibility. Merchant first testified that Mumtaz, Aziz, a title escrow agent, and himself were all present in the room. In later testimony, however, Merchant denied that he and Plaintiffs were ever in the same room together at the closing. In yet another point in testimony, Merchant testified that closing was really held on June 29, 2000; not June 26, 2000. Plaintiffs' counsel was further able to impeach Merchant's testimony by pointing to his previous deposition where Merchant admitted that "everyone was there."

101. In addition to all parties and the title escrow agent, Aziz also testified that the bank vice president and a notary public from the title company were in the room.

102. Plaintiffs testified that, at the closing, Merchant explained the documents to Plaintiffs in their native language. Plaintiffs also testified that they did not read the documents and that

Merchant did not go through every page with Plaintiffs but rather, only went through the pages Plaintiffs needed to sign. Plaintiffs testified that they just signed all the documents where Merchant directed because they trusted him and did not understand English well enough to go through the documents on their own.

103.    Aziz testified that, at the time of closing, he did not know that there were two mortgages on the property. Defendants' counsel, however, impeached Aziz on this point because he testified in a prior deposition that he knew there was a loan for $95,000 at the time of the closing.

104.    Both Aziz and Mumtaz admitted that they did actually sign the First and Second Mortgages at the closing—even if they did not read the documents or know exactly what they were signing at the time.

105.    Defendants' Exhibit CCCC is a certified but unsigned copy of the Settlement Statement for the Greenway Real Property sale obtained from Alamo Title Company. Mumtaz testified that she did not review this document until 2010 and that she does not recall seeing the final two pages of the document, which are the Final Closing Statements for the Buyers and Sellers. Throughout the Settlement Statement, the principal loan amount from the bank is stated as $150,000 and a second loan in the amount of $95,000 is reflected. The inventory price is also listed as $20,000. The final two pages summarize these facts as presented in the earlier pages of the document and confirm that the second trust deed in the amount of $95,000 was given to Merchant. Plaintiffs' Exhibit 116 is a signed copy of the same Settlement Statement from Alamo Title Company but does not contain the final two pages provided in Defendants' Exhibit CCCC. The first three pages, however, are identical in all but the presence of signatures.

106.    Plaintiffs' testimony regarding where and how they received their copies of the closing documents was murky at best. From the testimony, it also appears that Plaintiffs received some

of the closing documents on the day of the closing and received a full packet of documents at a later date either by mail or by delivery from Merchant. In either circumstance, Plaintiffs testified that they did not read the documents after receiving them but rather, put the package away until 2010.

**VI.    Operation and Events at Greenway Grocery from 2000 to 2010.**

107.    Plaintiffs owned and operated the Greenway Grocery during this time.

108.    Merchant admitted that, in 2006, he signed three documents intended to dissolve Greenway Grocery, Inc. and further admitted that he signed Aziz's name on all three of these documents. (Pl. 4). Aziz testified that GG Trading LLC operated Greenway Grocery but that another corporation operated Greenway Grocery at some point prior to that.

109.    On February 27, 2007, the First Mortgage Note was transferred to American Business Lending, Inc. (Pl. 227).

110.    Aziz testified that GG Trading, LLC forfeited its charter due to a tax forfeiture on July 24, 2009, but that the charter was subsequently reinstated on April 9, 2010. Aziz testified that this is the only time GG Trading, LLC lost its charter.

**VII.    Operation and Events at Lucky Food Mart from Amin Pirani's departure to 2010**

111.    The parties disagree regarding who operated or managed the Lucky Food Mart after Amin Pirani's deportation sometime between 1998 and 2000. Plaintiffs assert that Merchant managed the Lucky Food Mart and hired employees to conduct the actual operation of the store. Merchant, however, asserts that Aziz operated the store and that he hired some employees during this time. Both parties agree that one or more entities were created during this time for the purpose of operating the Lucky Food Mart as a business entity.

112.    SAA Lucky Food Mart, Inc.:  Aziz testified that, until 2002, SAA Lucky Food Mart, Inc. is the entity which operated the Lucky Food Mart.  As previously stated, Merchant's testimony regarding SAA Lucky Food Mart, Inc. was contradictory throughout trial.

113.    Aziz testified that Merchant hired a person named "Ram" to physically operate the store after Amin Pirani left.  Aziz testified that Ram operated the store for approximately two years under SAA Lucky Food Mart, Inc.

114.    PAA Investment, Inc.:  The parties agree that, in 2002, PAA Investment, Inc. was created for the purpose of operating the Lucky Food Mart.

115.    Aziz testified that Merchant set up the company PAA Investment, Inc. in 2002 and placed Shahab Butt's name on the corporate documents for his good credit.  Aziz asserted that neither Butt, nor PAA Investment, Inc., paid anything for the inventory at the Lucky Food Mart.

116.    Merchant testified that, between 2002 and 2010, PAA Investment, Inc. was the entity operating the Lucky Food Mart with Aziz physically working in the store.  Merchant testified that Butt's name was only on the corporate documents for the purpose of using his good credit so the business could operate lottery machines at the store.

117.    Aziz controverted Merchant's testimony, stating that Butt ran the Lucky Food Mart for three to five weeks after PAA Investment, Inc. was formed but that Aziz never operated the store with Butt.  Aziz also testified that, after Butt left, Merchant brought in different people to operate the store.

118.    Butt's testimony confirmed that he was listed as an officer for PAA Investment, Inc. in 2002 and that he only worked at the Lucky Food Mart for approximately three or four weeks.

119.    Mumtaz also testified that, between 2000 and 2010, Merchant managed Lucky Food Mart and hired a number of different people to work there.  Mumtaz testified that she and Aziz only

visited the Lucky Food Mart every once in a while during these years for Merchant to update them and to examine the property.

120.    Aziz testified that, during this time, the mortgage was being paid on the property by the various people that Merchant hired to run the store.  As such, he chose not to interfere with the operations.  Aziz also testified that, after Amin Pirani left, the other store operators lived in the mobile home that Aziz and Mumtaz had purchased and placed on the property.  Aziz testified that he did not know who was living there at any given time because he did not visit the mobile home after 2002.

121.    Merchant, on the other hand, testified that Aziz operated the store and paid the bills during the years of 2002 to 2010.

122.    Merchant also admitted that, between 2002 and 2010, he filed all of the Texas Comptroller Tax Reports and federal tax returns for Lucky Food Mart on behalf of PAA Investment, Inc. as the operator.

123.    The Court admitted the following seven checks written to PAA Investment, Inc. from the Texas Comptroller contained in Plaintiffs' Exhibit 5.  Merchant testified regarding each of the checks listed below.[9]

| Dated | Check (Warrant) No. | Amount | Testimony |
|---|---|---|---|
| 01/13/2004 | 104423349 | $285.57 | Merchant signed but he does not know into which account he deposited it. |
| 05/14/2005 | 108577430 | $100.02 | Stamped for deposit and Merchant does not know into which account it was deposited. |
| 10/04/2006 | 112436670 | $80.09 | Merchant signed but he does not know into which account he deposited it. |

---

[9] Plaintiffs' Exhibit 5 also includes three checks from the Texas Comptroller to Aftan Enterprises Inc.  The Court, however, did not receive an explanation regarding why these checks are relevant to Plaintiffs' claims or PAA Investment Inc.  Accordingly, the Court did not consider these checks in the evidence presented.

| 05/16/2009 | 119763295 | $50.00 | Stamped for deposit to Lucky Food Mart account. Merchant testified that he did not deposit the check and the deposit must have been completed by Aziz or Butt. |
| 10/24/2009 | 120917610 | $134.30 | Merchant signed and testified it was deposited to his account. |
| 12/04/2009 | 121188359 | $135.00 | Merchant signed and testified it was deposited to his account. |
| 08/06/2010 | 122805204 | $180.00 | Merchant signed but stated that the account number where it was deposited is PAA Investment, Inc.'s account. |

124.    <u>Evidence Regarding Signs for the Lucky Food Mart</u>:  Defendants' filed Proof of Claim No. 13, seeking to recover for a Default Judgment entered in favor of Lonestar Logos & Signs, LLC and against SA Lucky Food Mart, Inc. d/b/a Lucky Food Mart for non-payment of rent relating to a highway sign.  (Pl. 232; Def. G).  Regarding this claim, Merchant testified that the highway sign was first put up around 2005 or 2006 and that he signed the rental agreement at that time under direction from Plaintiffs.  Merchant also testified that he made payments for the rental but stopped at some point.  Further, Merchant testified that he never sent an invoice for this sign rental to Plaintiffs.

125.    Mumtaz confirmed that the highway sign went up in 2005 and that PAA Investment, Inc. ran the store at the time and made sure that the payments were being made.

126.    Later in her testimony, however, Mumtaz testified that there was no highway sign for the Lucky Food Mart when she took over the property in 2011 and that she did not receive any notices for payments of the sign rental.  Merchant also testified later that he did not recall if there was ever a highway sign for the Lucky Food Mart prior to 2010.

127.   Defendants' Exhibit G attaches only one rental agreement for a highway sign with Lonestar Logos & Signs.  This agreement was signed September 29, 2010, by Merchant.

128.   Merchant confirmed that, on November 12, 2004, he signed an agreement to install signs for the Lucky Food Mart with Aetna Sign Group.  (Def. C).  Three money orders totaling $1,300 were also paid to Aetna Sign Group on behalf of Lucky Food Mart.

## VIII.   Operation and Events at Fiesta Food Mart (later Fort Sam Grocery) from 1998 to 2010

129.   Aziz admitted that, in 2004, there was a criminal charge against him regarding the Fiesta Food Mart.  He received deferred adjudication in 2006, however, so there was never a conviction against him on this charge.

130.   In 2006, the original 1998 lease for Fiesta Food Mart—signed by Aziz—terminated on its own terms.  At that time, Mumtaz signed a new lease for the property with the same landlord, Bill Eng, and changed the name of the store to Fort Sam Grocery.  (Pl. 14 & 189).

## IX.   Other Events From 1999 through 2010

131.   In 2000, Aziz purchased the Hillcrest Grocery business and leased the real property.  Aziz testified that Merchant assisted him in purchasing the business by acting as a broker and introducing the property to Plaintiffs.

132.   Aziz testified that he initially had a partner in the Hillcrest Grocery business who operated the store and that Aziz sold his investment to this partner in 2002.

133.   Aziz testified that, in 1999 or 2000, Plaintiffs also purchased Kay's Convenience business and leased the real property.

## X.   Plaintiffs' Sales Taxes and Refunds Until 2010

134.   The parties agree that, until their falling out in April 2010, Merchant prepared the sales tax forms and other corporate documents for Plaintiffs' businesses.

135.    Merchant claims that he made sales tax payments on behalf of Plaintiffs' businesses and that those payments constitute a loan for which he seeks repayment in Proof of Claim No. 15. (Def. I).

136.    Merchant testified that sales tax payments were made monthly (on the twentieth of every month) and that installment payments began as part of an agreement with the Comptroller's Office.

137.    Attached to Proof of Claim No. 15, Merchant provided the following photocopies of checks he purportedly paid to the taxing authorities on behalf of Plaintiffs' companies for their sales tax:

| Date | Check No. | Amount | On behalf of | Check paid from account of |
|---|---|---|---|---|
| 08/19/2007 | 9013 | $683.00 | MAASB | Electro Sales & Service, Inc. |
| 09/20/2007 | 9017 | $584.00 | MAASB | Electro Sales & Service, Inc. |
| 11/20/2007 | 9028 | $1,206.00 | MAASB | Electro Sales & Service, Inc. |
| 02/20/2007 | 9030 | $1,622.00 | MAASB | Electro Sales & Service, Inc. |
| 02/20/2008 | 9035 | $2,087.00 | MAASB | Electro Sales & Service, Inc. |
| 03/20/2008 | 9040 | $2,356.25 | MAASB | Electro Sales & Service, Inc. |
| 04/20/2008 | 9043 | $2,583.75 | MAASB | Electro Sales & Service, Inc. |
| 05/20/2008 | 5114 | $2,310.75 | MAASB | Shopper's Mart |

138.    Merchant also attached a list of the payments for which he claims he is owed in the form of a chart.  (Def. I).  Although copies of these checks were not provided in Proof of Claim No. 15, Merchant included on this chart Check Nos. 9016 and 9027—two checks which are also claimed as proof of repayment for the down payment loan amount from Aziz for the Lucky Real Property in Proof of Claim No. 9.  (Def. C) (Pl. 49 – Chart attached to Proof of Claim No. 15).

139.    Merchant testified that he filed tax returns on behalf of Plaintiffs but stated that he kept no documentation of these filings.  Merchant testified that, when he web-filed a return, he gave copies of the confirmation pages to the client but did not keep any record for himself.  Rather, Merchant testified that the only proof he has that he paid the sales tax is his bank account records and check copies.  Merchant further testified that he could not tell how his checks were applied to tax liabilities within Plaintiffs' entities without a print-out from the Comptroller's Office.  That is, when multiple checks were written in one month, Merchant could not testify at trial whether the payment was for a franchise or sales tax or what month the payment actually applied to.  Merchant could also not tell whether any of the checks written were to pay for part of an installment.

140.    Theresa Britts testified as an expert witness and CPA for Plaintiffs.  She testified that good accounting practices would require an accountant keep records for at least three years because regulatory statutes of limitations are at least three years.

141.    Mumtaz testified that she never received copies of any web-file receipts, sales tax reports or tax returns from Merchant for any of Plaintiffs' entities.

142.    Mumtaz testified that she asked Merchant to advance her money by a couple of days for the sales tax payments during a time when she was switching banks and did not have an account from which she could write a check or make a payment.  Mumtaz testified that she repaid the advanced amounts within two to three days.  She testified that this arrangement went on for four or five months in 2009.

143.    Merchant testified that he performed accounting work for MAASB Enterprises, Inc. for at least years 2007 through 2010.  (Pl. 58).

144.    Aziz testified that before the twentieth of every month, he would provide all documents (including z-tapes and purchase invoices) to Merchant so that Merchant could prepare the sales tax report.  Aziz stated that this documentation was never returned to him.  Mumtaz testified that Merchant said he would put the documents in a safe so that they would have the documents if Plaintiffs needed them.

145.    Plaintiffs testified that there was never a signed, written agreement for Merchant's retention to do the accounting work.

146.    Plaintiffs testified that they would always pay Merchant in cash each month ($100/mo. times the number of stores) but that they never received a receipt.  Plaintiffs also testified that they never received an invoice or past due notice from Merchant for the accounting fees.

147.    Aziz testified that Merchant never gave Aziz copies of the sales tax returns he prepared.

148.    Merchant testified that most of the time any "payment" he received was in the form of paying the bill for meals.  Merchant testified that he did not go to dinner with Plaintiffs during the time for which he seeks payment or, if he did, payment of the dining bills alternated between the parties.

## XI.    $75,000 Check from Plaintiffs to Merchant

149.    Plaintiffs' Exhibit 21 contains a copy of a check from Aziz to "Merchant Tax Services" dated March 30, 2009, in the amount of $75,000.[10]   Merchant testified that Merchant Tax Services is his business and that he deposited the check into his business account.

150.     Aziz testified that, in 2009, Merchant asked to borrow "whatever you have" from Aziz. Aziz testified that he wrote this check for $75,000 to Merchant and that the money came from Mumtaz's recent lottery winnings of $100,000.  Mumtaz confirmed that the loan was made from her winnings but testified that she was not present for the conversation between Merchant and

---

[10] Plaintiffs also provided a copy of the $75,000 check in Plaintiffs' Exhibit 69.

Aziz.  Aziz also testified that Merchant was aware that Mumtaz had won the lottery when he asked for the loan.

151.     Merchant gives more than one story regarding the $75,000 check in his testimony.  First, in his Proof of Claim No. 14, Merchant seems to concede that this $75,000 check was a loan and then purports to give a number of checks that were made out to either Greenway Grocery or G.G. Trading, LLC to show repayment and overpayment of the loan.  Merchant filed his Proof of Claim No. 14 as an attempt to recapture the alleged overpayment.  In his testimony, Merchant admitted that the alleged repayment of this loan was mixed in with weekly loans he was making to Plaintiffs for their check cashing business.  Later in his testimony, Merchant also stated that the $75,000 check was not actually a loan from Aziz to Merchant, but rather, was a repayment of a gambling debt owed by Aziz to an individual named Kareem Narsinghani.  Merchant testified that the check went through Merchant so that Narsinghani could be paid in cash.

152.     Plaintiffs deny the existence of a gambling debt ever being owed to Narsinghani.

153.     Plaintiffs' Exhibit 267 shows bank statements for Merchant's account.   The bank statement for March 30, 2009, shows a counter deposit for $75,000 that represents the $75,000 check deposit at issue.  The ending balance for the March 2009 bank statement is $77,005.91. (Pl. 267, p. 52).   The following statement for April 2009 reflects that a counter check of $48,142.53 taken out on April 2, 2009.  (Pl. 267, p. 92).  A copy of the withdrawal for this counter check shows that this was a payment from Merchant Tax Service to the Comptroller of Public Accounts.  (Pl. 267, p. 105).  Merchant testified that this payment was made for a sales tax audit liability owed by another one of Merchant's clients.  Merchant admitted that this money came out of the $75,000 given by Aziz to Merchant.

154.     Plaintiffs' Exhibit 56 also shows checks written from Merchant's account in April 2009 which Merchant admitted came from the $75,000 worth of funds loaned from Aziz.  All four checks in this exhibit were written to the Comptroller's Office.

155.     Mumtaz testified that she asked for repayment of the money after six months had passed and at least twice before April 2010.  Mumtaz testified that Merchant never paid Plaintiffs back but always said he needed more time.

156.     The parties agree that there was no written agreement for repayment of the $75,000 loan. Further, Aziz admits that he did not keep records of how much he is owed and how much he owes other individuals but rather stated that he had relied on "trust."

157.     Merchant attached to Proof of Claim No. 14 photocopies of the following checks written from Merchant's Electro business account and alleged to be in repayment of Plaintiffs' $75,000 loan:

| DATE WRITTEN | CHECK NO. | AMOUNT | TO ORDER OF: |
|---|---|---|---|
| 11/05/2009 | 9328 | $5,400.00 | G.G. Trading, LLC |
| 10/28/2009 | 9327 | $6,500.00 | G.G. Trading, LLC |
| 10/22/2009 | 9326 | $8,000.00 | Greenway Grocery |
| 09/24/2009 | 9322 | $9,000.00 | Greenway Grocery |
| 09/03/2009 | 9317 | $9,800.00 | Greenway Grocery |
| 08/13/2009 | 9315 | $8,000.00 | Greenway Grocery |
| 07/08/2009 | 9301 | $6,500.00 | Greenway Grocery |
| 07/27/2009 | 9307 | $1,500.00 | Greenway Grocery |
| 06/25/2009 | 9507 | $6,100.00 | Greenway Grocery |
| 04/15/2009 | 9403 | $5,000.00 | Greenway Grocery |

| 04/15/2009 | 9402 | $4,000.00 | Aziz Ali |
| 04/09/2009 | 9401 | $6,000.00 | Greenway Grocery |
| 08/06/2009 | 9312 | $5,000.00 | Greenway Grocery |

(Def. K).

158.    At trial, Aziz testified that these checks were not repayments of the $75,000 loan.  At his 2012 deposition, Aziz did testify that he received checks worth $82,700 from Merchant.  The deposition questioning, however, does not conclusively show that Aziz admitted to being paid back the $75,000 but rather, is in line with Aziz's testimony that the checks were unrelated to the $75,000 loan.

## XII.    "Weekly Loans" from Merchant to Plaintiffs

159.    The parties testified that there was an arrangement between them for numerous and frequent loans given from Merchant to Plaintiffs.  At trial, the parties referred to these frequent loans as "weekly loans."  For the sake of consistency, the Court shall also refer to these check payments as "weekly loans."

160.    The parties disagree on the purpose for the weekly loans.  Merchant states that his motivation to make the weekly loans was to prevent Aziz's business from failing.  Merchant asserts that he was afraid Aziz would not pay him at all for the money that Merchant had loaned to Aziz if the business failed.  Aziz, on the other hand, states that these weekly loans were for the purpose of floating the check cashing business through the weekend until cash could be received from presentment on the checks cashed by Aziz's business.

161.    Proof of Claim No. 7 provides photocopies of the following checks written from Merchant's Electro business account that Merchant claims were weekly loans to Plaintiffs that remain unpaid:

| POST DATE | CHECK NO. | AMOUNT | TO ORDER OF: |
|---|---|---|---|
| 01/11/2010 | 1004 | $6,750.00 | Greenway |
| 01/19/2010 | 1005 | $8,400.00 | Greenway |
| 02/01/2010 | 1006 | $8,150.00 | G.G. Trading, LLC |
| 01/25/2010 | 1007 | $8,750.00 | Ft. S.G. Inc. |
| 02/08/2010 | 1008 | $8,550.00 | G.G. Trading, LLC |
| 02/16/2010 | 1009 | $8,950.00 | Greenway |
| 03/01/2010 | 1010 | $14,000.00 | G.G. Trading, LLC |
| 02/22/2010 | 1011 | $10,300.00 | G.G. Trading, LLC |
| 03/08/2010 | 1012 | $14,400.00 | G.G. Trading, LLC |
| 03/15/2010 | 1013 | $16,900.00 | G.G. Trading, LLC |

162.    The total amount loaned to Plaintiffs according to the check copies provided in Proof of Claim No. 7 is $80,450.

163.    Merchant testified that he loaned money to Aziz and his companies regularly in the form of checks.  Merchant also admitted that there was no written agreement for repayment of these loans or for interest accrual.

164.    Merchant testified that the process for making these weekly loans was the following: (1) Aziz would be short on cash and ask for a loan; (2) Merchant would give Aziz a blank check with just Merchant's signature on the check; (3) Aziz would then call Merchant and tell him the amount he wrote the check for; and (4) Merchant would then check his bank statement.

165.    Merchant's testimony regarding Plaintiffs' repayment of the loans was much less clear. Merchant testified that Aziz would repay him by depositing cash or a check directly into Merchant's business account.  In addition to these transactions for repayment, Merchant testified

that Aziz would also come to his office and pick up cash or checks from Merchant. Aziz would then take Merchant's cash and checks to the bank and make a deposit into Merchant's business account for him. Merchant admitted that he did not keep a ledger of loans made or amounts repaid. Rather, he would use "a paper" to keep track of the loans and repayment but would destroy these papers usually about a year after payments were made. Given Merchant's testimony, there appears to be discrepancies regarding which deposits made by Aziz into Merchant's business account were repayments and which were deposits of Merchant's own funds.

166. Merchant also testified that Aziz would keep all the original deposit slips; a fact that Mumtaz confirmed. Merchant testified that he did not require a deposit slip from Aziz but would take his word that he had deposited the money. In Proof of Claim No. 7, Merchant admits through notations on one of the submitted charts that Plaintiffs repaid $37,930.

167. Aziz testified that these weekly loans began sometime in 2009 and were loans for check cashing from Friday to Monday. Aziz testified that process for making these loans and repayment was as follows: (1) Aziz sold money orders during the week and determined how much cash they would need for check cashing on Fridays; (2) Aziz received a blank check from Merchant and completed it based on the amount of money orders sold that week; (3) Aziz cashed the check from Merchant and conducted check cashing for customers over the weekend; (4) Aziz then presented the checks they had cashed over the weekend for payment; and (5) Aziz then took the cash received from presentment of the checks and deposited cash into Merchant's business account as repayment from the check written the previous week. Aziz testified that all the weekly loans were repaid and that he provided most (but not all) of the deposit slips as proof.

168.    Mumtaz testified that she was not directly involved in the weekly loan arrangement but only learned about it later from her husband.

## XIII.    The "Falling Out" of April 2010

169.    The parties all agree that the "falling out" occurred shortly after April 15, 2010.  The reasons for the falling out are varied.

170.    Aziz testified that, in approximately March 2009, one of his customer's checks came back returned and this prompted Aziz to examine the Greenway Grocery bank account.  Aziz testified that at this time he discovered that Merchant had been transferring funds from Aziz's bank account to his own.  Aziz stated that he confronted Merchant at that time and Merchant admitted to taking the money but said he either had already put the money back or would be putting it back into Aziz's account.

171.    Aziz then testified that, approximately two to three weeks before April 15, 2010, an individual warned Plaintiffs that Merchant had been taking that individual's tax refunds when he prepared his taxes.  Aziz testified that, after hearing this rumor, Plaintiffs went to the Comptroller's Office and looked up MAASB's tax account.  Aziz testified that it was at this time Plaintiffs discovered that Merchant was receiving the sales tax refunds for MAASB.

172.    Aziz also testified that, prior to April 15, 2010, Plaintiffs had been requesting repayment of the $75,000 loan they made to Merchant.

173.    Mumtaz testified that she also went to the Comptroller's Office in early April 2010 and discovered that Merchant had been receiving tax refunds for MAASB.

174.    The parties agree that Merchant prepared Plaintiffs' individual tax returns for submission in 2010.

175. Plaintiffs testified that they went to Merchant's office on April 15, 2010, and collected the completed tax returns. Thereafter, Plaintiffs testified that they confronted Merchant regarding repayment of the $75,000 loan and regarding the tax refunds for MAASB. Plaintiffs testified that Merchant denied owing Plaintiffs $75,000 and denied the allegation that he had been taking their tax refund checks. Aziz admitted that, despite finding out that Merchant was allegedly stealing tax refunds, Aziz still signed and submitted his 2010 federal tax return which Merchant had prepared.

176. Mumtaz testified that Plaintiffs fired Merchant in person on April 20, 2010, after he failed to satisfactorily explain his retention of tax refund checks.

## XII. Events of April 2010 through December 2010

177. <u>Comptroller's Investigation:</u> Mumtaz testified that she sent a letter to the Texas Comptroller of Public Accounts in April 2010, stating her suspicion that Merchant had been keeping refunds issued to MAASB Enterprises, Inc. and depositing them into his personal accounts.

178. Plaintiffs' Exhibit 170 is a letter from Mumtaz to the Comptroller's Office dated May 9, 2010, stating that she fired Merchant on April 20, 2010.

179. After receiving Mumtaz's letter dated May 9, 2010, (Pl. 170), the Comptroller's Office conducted an investigation of Merchant and issued the "Investigative Report" provided in Plaintiffs' Exhibit 60. Officer Phelan met with Mumtaz and Aziz several times throughout the Comptroller's Office investigation and ultimately, both Plaintiffs and Shahab Butt signed Prosecution Affidavits on September 22, 2010, on behalf of MAASB and GG Trading LLC. No prosecution of Merchant has been pursued or is pending at this time.

42

180.    The Comptroller's Office investigative report contains notes and documents relating to alleged offenses of (1) Misapplication of Fiduciary Duty and (2) Money Laundering.  Officer Martin Phelan testified as the Investigator for the Comptroller's Office.  Officer Phelan testified that Merchant completed an address change for MAASB's Taxpayer Account on May 21, 2009, changing the address to 3941 Eisenhauer Road, San Antonio, Texas 78218.  (Pl. 60).

181.    Mumtaz testified that the Eisenhauer Road address is Merchant's address.  Mumtaz also denied that she gave permission to Merchant to complete the address change.  As a result of this address change, refund checks to MAASB for franchise and sales tax refunds were now sent to Merchant's address.

182.    Plaintiffs' Exhibit 3 provides copies of fifteen payments from the Texas Comptroller to Plaintiffs' entities.  All fifteen checks were endorsed by Merchant on the back.  Below is a table of the attached checks:

| Dated | Check (Warrant) No. | Payable To | Amount |
|---|---|---|---|
| 01/13/2005 | 107541248 | GG Trading LLC | $52.50 |
| 04/13/2005 | 108246511 | AM Fiesta Food Mart Inc. | $50.03 |
| 11/14/2006 | 112719443 | Fort Sam Grocery Inc. | $39.83 |
| 02/28/2007 | 113504474 | AM Fiesta Food Mart Inc. | $150.00 |
| 03/22/2007 | 113717079 | Fort Sam Grocery Inc. | $25.74 |
| 02/22/2008 | 116465540 | Fort Sam Grocery Inc. | $125.15 |
| 02/22/2008 | 116465532 | GG Trading LLC | $104.92 |
| 03/14/2008 | 116606686 | Fort Sam Grocery Inc. | $40.49 |
| 03/11/2008 | 119175700 | MAASB Enterprises Inc. | $3,453.14 |
| 06/30/2009 | 119919464 | MAASB Enterprises Inc. | $2,123.09 |

| 07/09/2009 | 120125044 | MAASB Enterprises Inc. | $101.90 |
| 09/15/2009 | 120588621 | MAASB Enterprises Inc. | $316.77 |
| 10/02/2009 | 120714944 | MAASB Enterprises Inc. | $950.93 |
| 10/09/2009 | 120764201 | GG Trading LLC | $728.31 |
| 12/08/2009 | 121178691 | MAASB Enterprises Inc. | $426.04 |

183.    Merchant admitted that he took at least one of these checks, signed and deposited it into his account because he alleges he had paid the sales tax in the first place.  Merchant admits that he filed the corresponding returns for these sales tax payments so he knew exactly how much was owed at the time.

184.    <u>Audits of Plaintiffs' Entities:</u>  At the same time that Plaintiffs were raising issues with the Comptroller's Office regarding Merchant, on May 3, 2010, Merchant sent a letter to the Texas Comptroller of Public Accounts stating: "I am buying the following business and would like to have 'CERTIFICATE OF NO TAX DUE' preferable audited."  His letter then lists the following three entities: (1) MAASB Enterprises, Inc. DBA Kay's Convenience store; (2) Fort Sam Grocery Inc. DBA Fort Sam Grocery; and (3) GG Trading LLC DBA Greenway Grocery.  (Pl. 1).

185.    At trial, Merchant admitted that he was not actually buying any of these entities.

186.    On May 5, 2010, Merchant sent a second letter to the Audit Division Headquarters referencing his May 3, 2010, letter and requesting the office perform a detailed audit.  His letter states: "I have information from their employees and other sources that they are not paying actual sales tax collected, and the difference is very high."  (Pl. 1).

187.    On May 6, 2010, the Comptroller's Office responded to Merchant's letter and indicated that "[t]he account must be audited before a certificate can be issued."  (Pl. 1).

188.    Emma Fuentes, an employee of the Comptroller's office for 25 years and previous auditor and supervisor within that office, testified that not all requests for Certificates of No Tax Due would trigger an audit by the Comptroller.  Fuentes testified that the two letters could have triggered an audit of the three entities named.  Fuentes also testified that, in her opinion, but for the requests by Merchant, an audit would not have been conducted in this case at that time.

189.    MAASB, GG Trading and Fort Sam Grocery were all audited in 2010 with the audits reaching back four years under the applicable statutes of limitation.  The results of those audits were that no taxes were found to be due.

190.    Merchant testified that he asked for the Certificate of No Sales Tax Due because he had judgments and he wanted to know if there were sales taxes he would have to pay for if he chose to enforce his judgments.  Merchant also testified that he does not know whether the Certificate of No Sales Tax Due is only effective if an audit is conducted but that he specifically requested an audit.  (Pl. 1).

191.    <u>Demand on Greenway Real Property Second Mortgage Note:</u>  Plaintiffs testified that Merchant also made his first demand for payment on the Second Mortgage Note for the Greenway Real Property in May 2010 by a letter sent from Merchant's attorney.  (Def. D – Demand letter dated May 5, 2010).  Plaintiffs testified that this was the first time Merchant asked for payment on the Second Mortgage Note.  According to Plaintiffs, this is also the first time that they knew a Second Mortgage Note for the Greenway Real Property existed.

192.    Merchant testified that he made his first verbal demand for payment on the Second Mortgage Note sometime in 2005 and continued to make several other verbal demands between 2005 and 2010.  Merchant also testified that he did not receive payment on the Second Mortgage Note during those years but that Aziz kept telling him money was tight and to wait.

193.     Merchant's prior deposition and testimony in state court is at odds with these statements, however.  In his prior deposition testimony, Merchant admitted that he did not ask for payment on the Second Mortgage Note in 2005, 2006, 2007, 2008 or 2009.  Additionally, in his state court foreclosure hearing on June 23, 2010, Merchant admitted that he did not demand payment on the Second Mortgage Note because Plaintiffs were friends and needed the financial help.

194.     <u>Events Involving Lucky Food Mart:</u>  Plaintiffs' Exhibit 26 includes a "Texas Franchise Tax Public Information Report" that the Comptroller's Office received on July 9, 2010.  The Report changes the officer on record for PAA Investment, Inc. with the Texas Secretary of State's Office from Butt to Aziz.  The Report is signed by Butt and dated January 1, 2010.

195.     At the beginning of 2010, Shahab Butt remained an officer of PAA Investment Inc.  Merchant testified that, in January 2010, Butt contacted him saying that he had received an audit notice for PAA Investment, Inc. and that he wanted his name removed from the corporate documents.  Merchant also testified that Butt asked him to handle the audit and to take over the Lucky Food Mart.

196.     Butt testified that, when he received the Report from Merchant, the form was incomplete but he signed it at Merchant's direction.  Merchant, however, testified that he prepared the Report on or about January 1, 2010, and gave it to Butt to be signed.  Merchant testified that he did not submit the Report to Comptroller's Office but speculated that Butt must have mailed in the form on his own.  Merchant contests the allegation that he urged Butt to sign the Report in incomplete form but rather, argued that Butt could not have signed a blank form because everything else on the form was typed and printed.

197.     Merchant's testimony regarding when he took over the Lucky Food Mart varied throughout trial.  First, Merchant testified that he took over the Lucky Food Mart in January

2010, when Butt first contacted him about the audit notice for PAA Investment Inc. Merchant also testified that, at this time, he purchased inventory from Butt in the amount of $15,000 and reimbursed Butt by paying off any bills that Butt owed in the running of the Lucky Food Mart and then remitted the balance to Butt himself. Merchant stated that he took this action without speaking to Aziz and admits that he has produced no documentation evidencing the $15,000 he paid to Butt for the inventory. Second, Merchant testified that he did not take over the Lucky Food Mart until after the falling out with Plaintiffs occurred in April 2010. Merchant testified that he took over the Lucky Food Mart in June 2010 and operated under the entity SA Lucky Food Mart, Inc. Merchant further testified that Amin Makhani physically operated the Lucky Food Mart for him until Plaintiffs reclaimed possession in 2011.

198.    Plaintiffs' Exhibit 39 is a Real Estate Lease for the Lucky Food Mart dated September 1, 2010, between Electro[11] (as Landlord) and SA Lucky Food Mart, Inc. (as Tenant). The lease purports to create $1,000 monthly installments and a lease term of September 1, 2010, to May 31, 2025. The lease is signed by Merchant for Electro and by Merchant for SA Lucky Food Mart, Inc.

199.    Merchant testified that a copy of the Real Estate Lease for Lucky Food Mart was required for the application to get a license to sell beer and that he prepared the lease for that purpose. Merchant admitted that he signed the lease for both Landlord and Tenant.

200.    Merchant also testified that Amin Makhani installed "eight-liner" machines at the Lucky Food Mart while Makhani operated the store. Merchant testified that neither he, nor the entity SA Lucky Food Mart, Inc., received profits from these machines. Merchant also testified that he did not have a written agreement with Amin Makhani regarding the machines and never received an accounting for them.

---

[11] The Court notes that Electro was not yet the owner pursuant to Merchant's Warranty Deed transfer until 2011.

201.    On November 8, 2010, Mumtaz transferred Amin Pirani's interest in Lucky Food Mart to their mother, Shabnam Pirani. (Def. C – Warranty Deed). Mumtaz testified that she had Amin Pirani's Power of Attorney to do so. Mumtaz also testified that her brother was back in the United States at the time she transferred his interest.

### XIII.    Events of January 2011 through December 2011

202.    Events Involving Lucky Real Property and Food Mart:  Merchant testified that, after January 2011, he ceased making the mortgage payments for the Lucky Real Property because Plaintiffs "were trying to take over the business." Merchant later testified, however, that Plaintiffs first tried to "take over" Lucky Food Mart in May 2011, then later filed a state court action for possession.

203.    Plaintiffs' Exhibit 38 is a Warranty Deed executed May 23, 2011, wherein Merchant sought to convey the Lucky Real Property from himself to his company, Electro Sales & Service, Inc., for consideration of one dollar.

204.    Merchant testified that he drafted the Warranty Deed himself and stated that he just wanted to transfer his personal interest in the Lucky Real Property to Electro. Merchant stated that he drafted and signed the Warranty Deed because he was transferring all his property to his corporation.

205.    Plaintiffs' Exhibit 40 is an Agreement to Sell and Buy Real Estate and Business relating to the Lucky Real Property and Lucky Food Mart that was signed by Merchant and Amin Makhani, stating a closing date to be scheduled prior to December 31, 2011. The Agreement itself is undated.

206.    Merchant testified that he attempted to sell the Lucky Food Mart and Lucky Real Property to Makhani without permission from Aziz and Amin Pirani. Merchant stated that he

did not seek permission from Amin Pirani because Merchant did not know where Pirani was located at the time. Merchant stated that he did not seek permission from Aziz because they were not speaking to one another.

207. Aziz testified that he first saw the Agreement to Sell and Buy after Makhani gave him a copy "when the deal didn't go through."

208. Plaintiffs initiated a state court suit for possession of the Lucky Real Property and Food Mart under Cause No. 11-03-00098-CVF in the 218th Judicial District Court of Frio County, Texas.[12] Plaintiffs contended that Merchant was attempting to sell the Lucky Real Property and Food Mart without their permission and had stopped paying the mortgage.

209. The parties agreed that, during this state court litigation, the court ordered appointment of a receiver. Merchant admits, however, that he never paid the receiver. As a consequence, Plaintiffs went back to state court asking to be awarded possession of the property personally.

210. On August 4, 2011, the parties entered into a Rule 11 Agreement regarding the Lucky Real Property and Food Mart in this case. (Pl. 212 & 232). The Rule 11 Agreement gives Plaintiffs the exclusive possessory rights and management rights to operate the Lucky Food Mart through trial and requires them to pay the mortgage during this time. The Agreement permits Merchant to be on the property if he is not disruptive or interfering with operation of the Lucky Food Mart. Under the Agreement, Merchant is not expected to fund any operation of the Lucky Food Mart during this time. The Agreement allows Plaintiffs to decide how money from Lucky Food Mart is spent but they must provide transparent accounting to Merchant, including cancelled checks, bank records, deposit receipts, payroll records and permit applications.

211. Aziz testified that he has no personal knowledge of what was happening within the Lucky Food Mart during 2010 and 2011, until Plaintiffs took over the operations pursuant to the Rule

---

[12] The parties did not provide or present evidence regarding the date of filing in Frio County, Texas.

11 Agreement.  Currently, Plaintiffs operate Lucky Food Mart under their entity AKG Investment, Inc.  Plaintiffs testified that Mumtaz is the one who personally operated the store after the Rule 11 Agreement.

212.    Mumtaz testified that, when Plaintiffs took control of the Lucky Food Mart in 2011, it was necessary for them to invest money back into the business.  Mumtaz also testified that the Lucky Food Mart was closed at this time and that it took approximately a month and a half to repair the store so that it could be opened on a minimal basis.  Mumtaz testified that it took almost a year for Lucky Food Mart to be cash-flow positive.

213.    Plaintiffs' Exhibit 270 provides receipts, invoices and tax statements totaling $53,000 that Plaintiffs allege they expended from their personal funds in order to get Lucky Food Mart up and running again in 2011.

214.    Plaintiffs testified that, when they reclaimed the Lucky Food Mart, items had been removed and appliances were not working.  Specifically, Plaintiffs testified that all inventory, ice box shelves and gondolas were gone and that the pumps, air conditioning and walk-in cooler were not working.

215.    Plaintiffs also testified that, after reclaiming possession of the Lucky Food Mart, they inspected the mobile home and found it destroyed.  Plaintiffs testified that the mobile home had been purchased "brand new" but that, when they reclaimed possession in 2011, the mobile home was without hot water, had a broken refrigerator and laundry, had damaged walls and tiles, and was generally, broken down.  Aziz testified that he had not seen the mobile home's condition before taking possession of the property.

216.    Mumtaz testified that she was responsible for repairing the Lucky Food Mart when Plaintiffs took it over in its depleted condition in 2011.  She stated that Plaintiffs provided most of her receipts in Plaintiffs' Exhibit 270.

217.    Richard Muzquiz testified that he witnessed Merchant and another unidentified man removing inventory from the Lucky Food Mart over the span of two days in the summer of 2011.

218.    Merchant admitted that he removed the inventory from Lucky Food Mart when he left the property in August 2011.  Merchant asserts that he owned the inventory because he originally purchased the $15,000 worth of inventory.  Merchant also gave varied testimony regarding what he did with the inventory upon removing it.  At one point, Merchant testified that Amin Makhani removed the inventory from the Lucky Food Mart on his behalf and that Makhani paid Merchant about $15,000 for the inventory.  At another point during trial, Merchant testified that he did not sell the inventory to Makhani at all.  Plaintiffs' counsel impeached Merchant on this assertion by pointing to his 2014 deposition, where Merchant stated that he took out the inventory and sold it to Makhani for about $8,000.

219.    <u>Events at Fort Sam Grocery:</u>  Merchant testified that he purchased the Fort Sam Real Property on June 7, 2011, from Bill Eng.  Merchant testified that he made the purchase because he desired to invest in another property.  Merchant also testified that he knew that Plaintiffs' lease expired after October 2011 and that they were behind on their rent payments to Eng.  Merchant admitted that, when he purchased the property, he planned to evict them if they did not pay the back rent owed and planned to run the Fort Sam Grocery business himself.

220.    Plaintiffs' Exhibit 190 is a Notice of Transfer of Ownership dated June 7, 2011, from Bill Eng and Merchant stating that Merchant had purchased the Fort Sam Real Property and was now

Plaintiffs' landlord with respect to this property.  The Notice also advises that Plaintiffs owed $3,161.60 in outstanding liabilities.

221.   Mumtaz testified that she first saw this Notice of Transfer on June 17, 2011, when an officer conducting a lockout—as directed by Merchant—gave it to her.  (Pl. 190).  Mumtaz also testified that she had been making rent payments of $1,500 per month but could not afford to make the full lease payments of $2,452 as required under the lease commending November 2010.  (Pl. 189).  Mumtaz admitted that she was short on rent as stated in Mr. Eng's undated letter contained in Plaintiffs' Exhibits 14 and 191.

222.   Merchant testified that he received his copy of the lease from the previous landlord, Bill Eng.

223.   Plaintiffs' Exhibit 14 is a Notice of Termination of Lease relating to the Fort Sam Grocery dated June 13, 2011.  The Notice of Termination states that Merchant wished to terminate Plaintiffs' lease immediately for: (1) non-payment of rent in the amount of $3,161.60; (2) non-payment of rent for the month of June 2011 plus a late penalty; (3) "[i]llegal activities on the lease premises ie [sic] running 8 liner [g]ambling devices;" (4) non-payment of Landlord's invoices totaling $23,300; and (5) not providing a copy of liability insurance policy indicating Landlord's name as additional insured.

224.   Merchant testified that he gave this Notice of Termination to one of Plaintiffs' employees on June 13, 2011, and that he sent a copy of the attached lease with the letter.  Later in his testimony, however, Merchant testified that he sent a letter on June 7, 2011, for the amount due but Plaintiffs did not respond.  Merchant testified that, as a consequence, he sent his second letter on June 13, 2011.  Merchant also testified that he did not read the lease before he sent this Notice of Termination to Plaintiffs.  Merchant further testified that he sent this Notice of Termination

for outstanding rent that was not paid to the previous landlord and affirmed that he terminated the lease only six days after purchasing the property.  Merchant also admitted that he did not know whether June rent had been paid to the previous owner already.

225.    Aziz testified that he first saw a copy of this Notice of Termination on June 13, 2011, when he received it from his employee and that this was the first notice he received from Merchant regarding the Fort Sam Grocery.

226.    Mumtaz confirmed that she received no prior notices or demands from Merchant regarding the Fort Sam Grocery but stated that the first time she saw this Notice of Termination was on June 17, 2011.  Plaintiffs testified that their receipt of this Notice of Termination was the first time that Plaintiffs learned that Merchant had purchased the Fort Sam Real Property and was now Plaintiffs' landlord.

227.    Regarding the non-payment of Landlord's invoices totaling $23,300 that Merchant stated in the Notice, Merchant testified that these invoices were for accounting work done by Merchant and does not relate to the Fort Sam Grocery Lease.  (Pl. 14).

228.    Plaintiffs testified that they had already paid June's rent for the Fort Sam Grocery to Eng and that such rent was mailed by the fifth of the month.

229.    On June 17, 2011, Merchant locked Plaintiffs out of the Fort Sam Grocery premises.

230.    Plaintiffs filed a Complaint for Writ of Re-entry on behalf of Fort Sam Grocery on June 21, 2011.  (Pl. 188).  An Order Granting Re-entry was also entered on June 21, 2011, permitting Plaintiffs forty-eight hours of access to the Fort Sam Grocery to remove property and request vendors remove their property.  (Pl. 188; Def. D & E).  Mumtaz testified that a constable came and had to break the locks Merchant had placed on the property.

231.   During their forty-eight hour window, Plaintiffs testified that they removed the following items which they alleged belonged to them or had been installed by them: gondolas, a large outdoor sign, air conditioner, inventory and cash register.  Plaintiffs also directed vendors to remove their property such as the refrigerated drinks, coolers and lottery machines.  Plaintiffs also testified that they left the counter and lighting installed and that there was never a water heater in the building, nor did Plaintiffs remove one.

232.   Aziz testified that the same inventory that was in the store at the time of lockout on June 17 was still there in the store on June 21 but that he could not take any of the business documents with him because these documents had been taken from the premises sometime after Merchant locked them out.  Aziz testified that he took the inventory at Fort Sam Grocery to Greenway Grocery and that some of the removed items eventually went to Lucky Food Mart after being placed in storage.  Aziz admitted that none of the separate entities running these stores paid Fort Sam Grocery for the inventory because they are all "just the same thing" as Aziz himself. Plaintiffs confirmed that the retail value of the inventory at this time was approximately $40,000 plus $10,000 cash.  (Def. E, pg. 6).

233.   On June 22, 2011, Defendants filed a Complaint for Forcible Detainer under Cause No. 30-E-11-02225-01 in the Justice Court Precinct No. 3 of Bexar County, Texas.  (Pl. 188).  The Complaint states that the address for Defendant is 2111 Harry Wurzbach Road, Terrell Hills, Texas 78209.  The Complaint also states that a written "Notice to Vacate" was served on the Defendant on June 13, 2011, "but Defendant willfully holds over and continues in possession of said premises without Plaintiff's permission."  Service upon Mumtaz was attempted on July 5, 2011, at "2111 Harry Wurzbach Rd. (Vacant) but could not be completed in person."  (Pl. 8 & 188).  The Constable's notes reflect that he taped the Citation to the door.  (Pl. 188).

234.    Merchant admitted that Plaintiffs did not have access to the Fort Sam Grocery location on July 5, 2011, because they had vacated the store and he possessed the only keys to Fort Sam Grocery.

235.    On July 13, 2011, the Justice Court Precinct No. 3 of Bexar County, Texas entered a default judgment of eviction in Cause No. 30-E-11-02225-01 against "Ms. Mumtaz Ali President Fort Sam Grocery Inc." and awarding $8,067.20 of rent.  (Pl. 6; Def. E).  The Justice of the Peace signed an Abstract of Judgment for this amount on July 19, 2011.  (Pl. 6). [13]

236.     Mumtaz testified that Plaintiffs did not seek to stay at the Fort Sam Grocery after the eviction because they could not afford the rent and because Plaintiffs did not want to remain a tenant with Merchant.

237.    On August 25, 2011, Defendants filed another Complaint against "Mumtaz Ali DBA Fort Sam Grocery" in the Small Claims Court, Precinct 3 for Bexar County, Texas under Cause No. 30-S-11-00481-01.  (Pl. 71).  The Complaint states that the address for Defendant is 2111 Harry Wurzbach Road, Terrell Hills, Texas 78209.

238.    Merchant admitted that he attempted to have Mumtaz served at the Fort Sam Grocery location at a time that he knew Plaintiffs had vacated the premises and Merchant possessed the only keys to the location.

239.    A Default Judgment was entered in Cause No. 30-S-11-00481-01 on February 22, 2012, in the amount of $7,358.40.  (Pl. 71; Def. F).  Merchant admitted at trial that this Default Judgment is a duplicate recovery of the amount awarded for rent for Fort Sam Grocery in Cause No. 30-E-11-02225-01.  (Def. E).

---

[13] The Court notes that the parties provided no evidence that the Abstract of Judgment was filed in the real property records or otherwise utilized to enforce the judgment debt.

240.    Merchant claims that Plaintiffs purposefully caused damage to the Fort Sam Grocery property and that he should be reimbursed for that damage. Merchant admitted that he did not assert claims for any of the alleged damage in either lawsuit he filed regarding the Fort Sam Grocery in 2011.

241.    Merchant admitted that he has no documentation and no personal knowledge of the condition of the Fort Sam Grocery when Plaintiffs first leased the premises in 1998. Merchant testified that an inspection was only done after he purchased the Fort Sam Grocery and approximately one and a half months after Plaintiffs were evicted in 2011.

242.    Aziz testified that the building is old and was just in "running" condition when Plaintiffs moved into the building in 1998. Aziz testified that there were no holes in the wall discovered until after coolers were removed. Aziz testified that he used the existing coolers that the previous tenants and vendors had installed prior to his own lease starting. Aziz also testified that he did not put asbestos into the building.

243.    Purchase of Greenway Real Property First Mortgage:  On November 15, 2011, Merchant transferred funds of $54,083.47 to American Business Lending, Inc., purchasing the First Mortgage Note on the Greenway Property. (Pl. 227). The First Mortgage Note was transferred to Merchant's name via Allonge dated December 8, 2011. (Pl. 227). Merchant testified that he purchased the First Mortgage Note on the Greenway Property because he owned the inferior lien and wanted to foreclose.

244.    On November 23, 2011, Merchant sent a letter to Mumtaz informing her that he had purchased the First Mortgage Note on the Greenway Property and directing her to mail the monthly mortgage payment to him before the fifth of every month. (Def. B, p. 34).

### XIV. January 2012 through Petition Date on March 20, 2013

245. On March 26, 2012, a second Abstract of Judgment in Cause No. 30-E-11-02225-01 in the Justice Court Precinct No. 3 of Bexar County, Texas was issued authorizing a post-judgment interest rate of 5% per annum.[14] (Def. E).

246. Also on March 26, 2012, an Abstract of Judgment in Cause No. 30-S-11-00481-01 in the Small Claims Court Precinct No. 3 of Bexar County, Texas was issued authorizing a post-judgment interest rate of 5% per annum.[15] (Def. F).

247. On May 21, 2012, Merchant obtained a Writ of Garnishment regarding Cause No. 30-S-11-00481-01, which was sent to at least fifteen individuals or entities including Plaintiffs' banks, other banks, suppliers, business partners, friends, CPA, colleagues, attorney and insurance agent. (Pl. 12 & 71).

248. Mumtaz testified that, after Merchant sent out the writ of garnishment, she tried to open a bank account at Frost Bank. They would not open an account for her, however, because they had already received a writ of garnishment from Merchant. Bank of America also garnished one of her accounts pursuant to the writ on June 27, 2012. (Pl. 13).

249. On May 23, 2012, Mumtaz filed an Original Petition for Bill of Review in Cause No. 30-E-11-02225-01 in the Justice Court Precinct No. 3 of Bexar County, Texas. (Pl. 188).

250. On December 13, 2012, a Small Claims Court in Travis County, Texas Precinct Five, awarded a Default Judgment against SA Lucky Food Mart, Inc. d/b/a Lucky Food Mart in the amount of $3,840.94. The judgment is in favor of Lonestar Logos & Signs, LLC ("Lonestar") and is on the basis of unpaid rent for a highway sign by Lucky Food Mart. (Pl. 232; Def. G).

---

[14] The Court notes that the parties provided no evidence that the Abstract of Judgment was filed in the real property records or otherwise utilized to enforce the judgment debt.

[15] The Court notes that the parties provided no evidence that the Abstract of Judgment was filed in the real property records or otherwise utilized to enforce the judgment debt.

251.    In regard to the suit by Lonestar, Merchant testified that he received prior notice that a suit would be filed if payment was not made for the highway sign.  Merchant also admitted that he received notice of the suit and trial date once the suit had been filed by Lonestar.  Merchant, however, chose not to appear and the Default Judgment was entered.  On June 7, 2012, Merchant sent a letter to the Small Claims Court advising the court that the business had been acquired by Aziz Ali and Shabnam Pirani by virtue of a Rule 11 Agreement.  Merchant also testified that he is of the opinion that the rental for the highway sign is an expense which Plaintiffs are required to pay under the Rule 11 Agreement.

252.    Plaintiffs testified that they never received notice of a lawsuit regarding payment for a sign or a demand for payment.

253.    On August 20, 2012, the Small Claims Court, Precinct 2, Place 2 of Bexar County, Texas entered a take-nothing judgment in Cause No. 21S1100302, a case in which Merchant sought an award of accounting fees from Plaintiffs for years 2007 through 2010.  (Pl. 16).  Merchant provided a single invoice prepared by Merchant on June 27, 2011, in the amount of $7,600.  (Pl. 16; Pl. 58).  Merchant testified that there were no records relating to the work he allegedly performed substantiating the fees and that this is the only invoice he produced for litigation.  Regarding the accounting fees, Merchant testified that he kept track of the fees owed in his head and did not keep billing records.

254.    Plaintiffs' Exhibit 57 is an undated invoice requesting only $3,800 for accounting work performed on behalf of MAASB Enterprises Inc. d/b/a Kays Convenience covering years 2007 through 2010.

255.    Merchant admitted that he only demanded payment for accounting services (including past services) when Plaintiffs questioned him during their April 2010 falling out.  Merchant admitted that he had no intention of billing Plaintiffs until after April 2010.

## XV.    Post-Bankruptcy Petition Date Actions

256.    Mumtaz testified that Plaintiffs' Exhibit 239 is a document that her oil supplier gave to her and said someone had faxed to their office.  It states that Greenway Grocery has filed bankruptcy and not to sell gas to Greenway Grocery.  Merchant admitted that he sent the fax contained in Plaintiffs' Exhibit 239 to Johnson Oil Company.

257.    Merchant also admitted that around April 22, 2013, he sent an email to the president of STMA warning them to be careful because Plaintiffs had filed bankruptcy.  Merchant testified that he sent the email because he did not think Plaintiffs had reported their bankruptcy filing and he thought STMA should know about it.

258.    Mumtaz testified that, after Plaintiffs filed bankruptcy, STMA did not want to do business with Plaintiffs and they had to give a personal guaranty in order to resume business.

259.    Merchant admitted that, on April 22, 2013, he filed a UCC Financing Statement with the Texas Secretary of State in regard to his claim for alleged money loaned to Plaintiff through overpayment of their $75,000 loan to Merchant.  (Proof of Claim No. 14; Def. K).

260.    Merchant admitted that, on April 22, 2013, he filed a UCC Financing Statement with the Texas Secretary of State in regard to his claim for alleged sales tax payments made on Plaintiffs' behalf.  (Proof of Claim No. 15; Def. I).

261.    Merchant admitted that, on April 22, 2013, he filed a UCC Financing Statement with the Texas Secretary of State in regard to his claim for damage to the Fort Sam Grocery property. (Proof of Claim No. 17; Def. K).

262.    On April 22, 2013, Merchant filed a UCC Financing Statement with the Texas Secretary of State in regard to his claim for the judgment for highway sign rent awarded to Lonestar Logos & Signs, LLC.  (Proof of Claim No. 13; Pl. 232; Def. G).

263.    Merchant also admitted that he filed a UCC Financing Statement with the Texas Secretary of State after the bankruptcy petition date in regard to his claim for the weekly loans. (Proof of Claim No. 7; Def. A).

264.    Merchant admitted that he knew Plaintiffs had filed bankruptcy at the time he filed the UCC Financing Statements.  Merchant also testified that he thought he could file UCC Financing Statements without violating the automatic stay but simply could not collect on the debts.

**Miscellaneous Evidence Presented**

265.    Plaintiffs' Exhibit 266 is a copy of Merchant's bank statements for his account ending in 1725 at Chase Bank from January 1, 2009 to July 31, 2010.

266.    Plaintiffs' Exhibit 277 is a copy of Merchant's bank statements for his account ending in 1189 at Frost Bank from January 1, 2009 to December 31, 2009.

## ANALYSIS OF DEFENDANTS' CLAIMS

I.    **Bankruptcy Court Jurisdiction & Authority**

267.    The Court concludes that it has subject matter jurisdiction over each of Defendants' claims and Plaintiffs' claims objections pursuant to 28 U.S.C. §§ 1334(a) & (b) (2015).

268.    This Court concludes that it has the statutory authority to enter final judgment regarding allowance or disallowance of each of Defendants' claims and Plaintiffs' claims objections because claims objections are core proceedings under 28 U.S.C. § 157(b)(2)(B) (2015) (allowance or disallowance of claims against the estate).

269.     This Court also concludes that it has constitutional authority to enter final judgment on each of Defendants' claims and Plaintiffs' claims objections because resolution of the underlying claims asserted are necessary to resolve that core proceeding of allowance or disallowance of Defendants' claims.  *See Stern*, 131 S. Ct. at 2611; *Exec. Benefits Ins. Agency v. Arkinson*, 134 S. Ct. at 2173.

## II.     Burden of Proof for Allowance of Claim

270.     This section shall constitute the Court's conclusions of law regarding the standard and burden of proof when analyzing whether a claim should be allowed in general.

271.     Section 101(5) of the Bankruptcy Code defines a "claim" as:

> (A)     right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or
>
> (B)      right to an equitable remedy for breach of performance if such breach gives rise to a right to repayment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

11 U.S.C. § 101(5) (2015).

272.     Sections 501 and 502 of the Bankruptcy Code govern the substantive basis for allowance of a claim, and Federal Rule of Bankruptcy Procedure Rule 3001 governs the procedure by which the Court determines whether a filed Proof of Claim is allowed.  11 U.S.C. §§ 501-502 (2015); Fed. R. Bankr. P. 3001.

273.     Under 11 U.S.C. § 502(a), a filed proof of claim is "deemed allowed, unless a party in interest … objects."  Once an objection is made, however, 11 U.S.C. § 502(b) directs that "the court, after notice and a hearing, shall determine the amount of such claim … as of the date of the filing of the petition, and shall allow such claim…."

274.    During the claims allowance process, the burden of proof rests on different parties at different times. *In re Leverett*, 378 B.R. 793, 798-99 (Bankr. E.D. Tex. 2007) (citing *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 354-55 (Bankr. S.D.N.Y. 1995)). Once an objection to claim is made, the claimant satisfies the initial burden by complying with Bankruptcy Rule 3001, which requires a proof of claim substantially conform with Official Form 10. *See* Fed. R. Bankr. P. 3001(a). Bankruptcy Rule 3001(f) permits a proof of claim that is executed and filed in accordance with Rule 3001 and Official Form 10 to constitute "prima facie evidence of the validity and amount of the claim." *Id*. "Rule 3001(f) permits the proof of claim itself to act like a verified complaint and have an independent evidentiary effect in a hearing on an objection to the claim." *Leverett*, 378 B.R. at 799 (citing *In re Cluff*, 313 B.R. 323, 340-43 (Bankr. D. Utah 2004); *Garner v. Shier (In re Garner)*, 246 B.R. 617, 622 (9th Cir. B.A.P. 2000)).

275.    Upon claimant's compliance, the burden of proof then shifts to the objecting party to produce "evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Leverett*, 378 B.R. at 799 (citing *Lundell v. Anchor Constr. Specialists, Inc. (In re Lundell)*, 223 F.3d 1035, 1041 (9th Cir. 2000); *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000)). If the objecting party is able to rebut the claim in this way, the burden of proof then shifts to the party who would bear the burden respecting this claim outside of bankruptcy. *Leverett*, 378 B.R. at 799 (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 26 (2000); *In re Promedco of Los Cruces*, 275 B.R. 499, 503 (Bankr. N.D. Tex. 2002)).

### III.     Proof of Claim No. 7-2 (Def. A)

A.      Parties' Contentions

276.    Electro filed an unsecured claim of $83,596 alleged to be on the basis of money loaned to Plaintiffs.  (Def. A).  At trial, Merchant testified that this claim represents what is owed based on the weekly loans from Merchant to Plaintiffs.

277.    In support of Electro's claim, Defendants offered a table showing the alleged running balance of the weekly loans beginning on May 31, 2010, with interest accruing at 6%. Defendants also offered a table showing the alleged amounts paid out by Merchant between January 7, 2010, and March 9, 2010, as well as the alleged repayments made by Plaintiffs for the weekly loans.  Merchant testified that he prepared these tables himself.

278.    In additional support of Electro's claim, Defendants offered photocopies of checks written from Merchant's Electro business account totaling $105,150.  (Def. A).  Merchant also testified regarding handwritten notes on the submitted check copies and asserted that the handwritten notes substantiated the amounts repaid by Plaintiffs on the weekly loans.

279.    Plaintiffs dispute that this is a debt owed by Plaintiffs because the alleged loans were made to Plaintiffs' business; not to Plaintiffs themselves.  Plaintiffs also dispute the amount of the alleged loans and argue that, to the extent any money was lent, all of the funds have been repaid.[16]

280.    In response, Plaintiffs offered deposit slips they allege represent repayments to Defendants for the weekly loans.  (Pl. 266-267).  Plaintiffs also employed certified public

---

[16] Plaintiffs also allege that the original filed Proof of Claim No. 7-1 charged usurious interest of 24% and that Defendants violated the automatic stay by filing a U.C.C. Financing Statement relating to this debt after the Petition Date.  The Court will address Plaintiffs' claims regarding usury and violation of the automatic stay in a later section of this opinion.  *Infra* at pp. 122-34.

accountant and expert witness, Theresa Britts, to prepare an analysis of the checks claimed as weekly loans from Merchant and the deposit slips claimed as repayments by Plaintiffs. (Pl. 261).

   B.   Findings of Fact, Conclusions of Law & Analysis

281.   The parties agree that the checks contained in Proof of Claim No. 7 constitute loans. Defendants, by the filing of the Proof of Claim No. 7, appear to assert personal liability of Plaintiffs for the weekly loans. Plaintiffs deny personal liability because all of the weekly loan checks were made to the order of one of Plaintiffs' business entities; not Plaintiffs' themselves.

282.   Under Texas law, members in limited liability companies (LLCs) and shareholders in for-profit corporations generally may not be held personally liable for the debts or obligations of the business entity. *See* Tex. Bus. Orgs. Code § 101.114 (2015); Tex. Bus. Orgs. Code § 21.223 (2015). Therefore, the first question the Court must answer is whether Plaintiffs may be held personally liable for the weekly loan checks written out to the order of Plaintiffs' business entities.

283.   The Court finds that each check contained in Proof of Claim No. 7 is written to the order of one of Plaintiffs' business entities; not to Plaintiffs' personally.

284.   The Court finds the parties agreed that when Merchant gave the checks in Proof of Claim No. 7 to Aziz, the checks were blank except for Merchant's signature.

285.   The Court finds the parties also agreed that Aziz completed the remainder of each check, including the amount of the check and the designation to which entity the check was paid.

286.   When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim. ***Leverett***, 378 B.R. at 799. The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

287.    The Court finds that Plaintiffs are personally liable for the weekly loans for several reasons.  First, it is undisputed that Merchant gave the blank checks to Aziz and did not designate that the loans were for Plaintiffs' entities.  Second, it is undisputed that Aziz completed the checks and designated that the funds would go to his entities rather than his own personal account.  Given these facts, the Court finds that the weekly loans were given to Plaintiffs and that Plaintiffs, not Merchant, directed the funds to their entities.  The privity in this oral loan agreement lies between Merchant and Aziz; not between Merchant and Plaintiffs' third party entities.  It would be unreasonable to hold only Plaintiffs' entities liable for this specific debt when the borrower—not the lender—determined which entity or person the check would be written to without apparent input from the lender.

288.    Second, the Court must determine the extent of Plaintiffs' personal liability for the weekly loans.

289.    The Court finds that the tables prepared by Merchant were not kept contemporaneously with the weekly loans and repayments but rather, were prepared for litigation purposes.  As such, except as proof of admissions by Defendants, the Court finds that the assertions in these tables are unreliable without further supporting documentation.

290.    The Court finds that Merchant's handwritten notes on the photocopies of the checks provided with Proof of Claim No. 7 are also unreliable.

291.    The Court finds that the copies of deposit slips provided in Plaintiffs' Exhibits 266 and 267 are insufficient proof of cash repayment to Defendants because there is no identifying information contained on the deposit slip to show the source of the funds being deposited or who the person making the deposit actually was.  As such, the Court will not rely on the evidence of deposit slips alone to prove Plaintiffs repayment of the weekly loans.

292.    As a consequence, the Court also finds that it is unable to rely on Britt's analysis of Proof of Claim No. 7 because she relied on these same bank statements and records that are insufficient proof of repayment to reach her calculation.

293.    Examining the copies of checks provided as evidence of weekly loans made to Plaintiffs, the Court finds that Defendants wrote checks worth $105,150 in connection with Proof of Claim No. 7.

294.    Examining Merchant's admitted repayments by Plaintiffs contained in his charts in Proof of Claim No. 7, the Court finds that Merchant admitted that Plaintiffs repaid $37,930 in connection with Proof of Claim No. 7.

295.    The Court finds that the principal amount of weekly loans remaining unpaid is $67,220.

296.    Defendants also seek to charge 6% interest on the unpaid amount from the time of the last weekly loan to the Petition Date. Defendants, however, must first show that there was an oral contract for interest on the loan amount.

297.    Under Texas law, "the elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of a contract with the intent that it be mutual and binding." *Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). "In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications." *Prime Products*, 97 S.W.3d at 636 (citing *Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App.—San Antonio 1999, pet. denied)).

298.    Defendants never raised the argument and presented no evidence that Plaintiffs consented to pay any interest on the weekly loans or that payment of interest was a condition of the loan agreement.   Defendants, rather, presented no evidence or argument to establish entitlement to interest in any amount.

299.    As such, the Court finds that Defendants are not entitled to any interest in relation to Proof of Claim No. 7.

        C.    Conclusion

300.    For the aforementioned reason, the Court concludes that Defendants' Claim No. 7 for the weekly loans shall be allowed in the amount of $67,220.00 as an unsecured claim.   All additional amounts claimed by Defendant in Claim No. 7 are disallowed.

## IV.    Proof of Claim No. 8-2 (Def. B)

        A.    Parties' Contentions

301.    Merchant filed a secured claim in the amount of $40,817.78 alleged to be on the basis of a First Mortgage Note for the Greenway Real Property, which Merchant purchased from American Business Lending in 2011.   Merchant states that the basis for perfection of the Note is "real estate & inventory" and the interest rate asserted on the proof of claim form is a 6% variable interest rate.

302.    Merchant testified that the balance on the First Mortgage Note as of November 15, 2011, was $54,083.17.   Merchant also pointed to the documentation attached to his proof of claim as proof of the debt's balance when Merchant took over the First Mortgage Note in November 2011.

303.    Attached to his Proof of Claim, Merchant also provided a chart that appears to be a statement of the account at the Petition Date and alleges to show payments made and interest

accrued from the time Merchant purchased the First Mortgage Note in November 2011.  The interest stated on this chart is "3.75 + 2.75" totaling 6.5%.  Additionally, Merchant provided documentation of a funds transfer payment in the amount of $54,083.47 to American Business Lending, Inc. for the purchase of the First Mortgage Note as evidence of the balance owed on the First Mortgage Note.

304.    Plaintiffs dispute the amount of the claim alleging that it states the incorrect interest rate and does not account for all payments and credits made.

305.    In response, Plaintiffs provided expert testimony from Britts, who stated that she reviewed bank records and receipts for payments made by Plaintiffs on the first lien note.  According to her report, Britts determined the amount owed on the First Mortgage Note after allocating all payments and credits is $36,474.74.  Britts report also states that the account balance at the time Merchant purchased the First Mortgage Note was $53,695.32; not $54,083.47.

B.    <u>Findings of Fact, Conclusions of Law & Analysis</u>

306.    The parties agree that Plaintiffs are liable for the First Mortgage Note but disagree on the amount owed on the First Mortgage Note and the interest rate charged as of the Petition Date.  The parties also agree that, after Merchant purchased the property, Plaintiffs made fifteen payments in the amount of $1,399 each to Merchant.

307.    When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim.  ***Leverett***, 378 B.R. at 799.  The burden now rests on Defendants to prove the amount of the debt owed on the First Mortgage Note and the applicable interest rate.

308.    The Court finds that the chart provided by Merchant purporting to be a statement of the account as of the Petition Date was not kept contemporaneously with repayment of the First Mortgage Note but rather, was prepared for litigation purposes only—as can be seen in the heading of the chart.  As such, except as proof of admissions by Defendants, the Court finds that the assertions in these tables are unreliable without further supporting documentation.

309.    The Court further finds that Merchant's offered proof of the amount he paid to American Business Lending, Inc. to acquire the First Mortgage Note is insufficient proof of what Plaintiffs owed on the Note at the time of Merchant's purchase.

310.    The Court also finds that the chart provided in Britts report (Pl. 261) at Attachment 2 is unreliable because no evidence or testimony was presented regarding the origin of this document.  Britts simply testified that Attachment 2 shows payments made while the bank held the Note.  As such, except as proof of admissions by Plaintiffs, the Court finds that the assertions in Attachment 2 are unreliable without further supporting documentation.

311.    Likewise, the Court finds that the chart provided in Britt's report (Pl. 261) at Schedule A is unreliable because the underlying alleged proof on which Schedule A's calculations rely were not offered into evidence.  As such, the Court is unable to verify the veracity of the statements in Schedule A.  As a result, except as proof of admissions by Plaintiffs, the Court finds that the assertions in Schedule A are unreliable without further supporting documentation.

312.    The Court finds that Defendants did not meet their burden of proof to show the balance amount of the First Mortgage Note at the time Merchant purchased it from American Business Lending, Inc. in November 2011.  Although Merchant provided proof of the amount he paid American Business Lending, Inc. to purchase the Note, he offered no evidence that the amount he paid was the balance remaining unpaid by Plaintiffs at the time he purchased the Note.  As

such, the Court shall use, as a starting point, Plaintiffs' admission that Plaintiffs owed $53,695.32 on the First Mortgage Note as of November 1, 2011.

313.    In calculating the rate of interest, Plaintiffs assert that 6.00% should be used and Defendants assert that 6.50% should be used.

314.    Under the terms of the First Mortgage Note, the applicable interest rate is a variable rate of the Prime Rate plus 2.75%.  The Prime Rate is defined in the Note as "the prime rate in effect on the first business day of the month in which a change occurs, as published in the Wall Street Journal on the next business day."

315.    The Court takes judicial notice that the prime rate in effect on November 1, 2011, as published in the Wall Street Journal on November 2, 2011, was 3.25% and this rate remained constant through the Petition Date.

316.    The Court, therefore, finds that the applicable interest rate under the terms of the First Mortgage Note was 6.00% (3.25% prime rate + 2.75%).

317.     Given that the Court finds the appropriate starting balance at the time Merchant purchased the First Mortgage Note was $53,695.47 and the applicable interest rate through the Petition Date was 6.00%, the Court finds that Proof of Claim No. 8 shall be allowed in the amount of $36,474.74, thereby reflecting the amount Plaintiffs owed on the First Mortgage Note on the Petition Date.

       C.    Conclusion

318.    For the aforementioned reasons, the Court concludes that Defendants' Claim No. 8 for the First Mortgage Note shall be allowed as a secured claim in the amount of $36,474.74.  All additional amounts claimed by Defendant in Claim No. 8 are disallowed.

## V.     Proof of Claim No. 9-3 (Def. C)

### A.     Parties' Contentions

319.    Electro filed a secured claim of $101,661.29 alleged to be on the basis of a lien created by the purchase of real estate and business.  (Def. C).  The interest rate asserted is a 6% fixed rate.

320.    Although Defendants' basis for the claim amount is far from clear, it appears that Defendants seek to claim repayment for the $50,000 deposit that Merchant alleges he alone paid at the purchase of the Lucky Real Property.  Defendants also seek to claim 6% interest on the $50,000 deposit from 1996 through the Petition Date.  Defendants allege that this amount equals $101,661.29.

321.    Defendants also appear to argue that the basis to now collect this amount, and to treat it as secured, is that Plaintiffs have possession of the Lucky Real Property and Food Mart pursuant to the Rule 11 Agreement entered in the pending state court litigation.

322.    Plaintiffs respond that the Lucky Real Property and Food Mart was purchased by a partnership comprised of Merchant, Aziz and Amin Pirani, with each partner owning equal shares.[17]

323.    Plaintiffs, therefore, argue that Defendants are not entitled to repayment of Merchant's down payment, or interest thereon, and that any compensation due to Defendants upon dissolution of the partnership should be decided in Plaintiffs' claims for Suit to Quiet Title and Dissolution of Partnership.

---

[17] Plaintiffs also filed claims for Breach of Partnership, Suit to Quiet Title and Dissolution of Partnership in the Adversary Proceeding.  The Court will address these claims later in the opinion.  *Infra* at p. 127.  Their outcome, however, does not affect the Court's determination regarding whether Proof of Claim No. 9 should be allowed.

B.     Findings of Fact, Conclusions of Law & Analysis

324.    When examining whether each party has met their burden of proof regarding this claim, the Court finds that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim. *Leverett*, 378 B.R. at 799. The burden of proof now rests on Defendants to prove the basis for the claim and the amount.

325.    Under Texas law, "the elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of a contract with the intent that it be mutual and binding." *Prime Products*, 97 S.W.3d at 636 (citing *Angelou*, 33 S.W.3d at 278). "In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications." *Id.* (citing *Copeland*, 3 S.W.3d at 605).

326.    The Court finds that the Warranty Deed with Vendor's Lien executed on September 12, 1996, conveys the Lucky Real Property to Salim Merchant, Aziz Ali and Amin Pirani. This written document does not obligate any of the owners to repay another owner for any down payment amount.

327.    The Court finds that no written agreement among Merchant, Aziz and Pirani exists regarding the purchase of the Lucky Real Property.

328.    The Court finds that Merchant offered no proof or testimony that any agreement—oral or written—exists obligating Plaintiffs to repay Merchant any amount of the down payment for the Lucky Real Property.

329.    The Court, therefore, finds that Plaintiffs have no obligation to repay Defendants for any amount of the down payment for the Lucky Real Property. Merchant may not simply decide that he wants his money back because Plaintiffs now maintain possession pursuant to a Rule 11

Agreement, to which he is a party, and assert entitlement to repayment now that Plaintiffs have filed bankruptcy.

330.    The Court further finds that ownership of the Lucky Real Property and Food Mart and any amounts owed from one joint owner to another are the subject of pending state court litigation in which the Rule 11 Agreement has been entered and which still controls the relationship of the parties in reference to the Lucky Real Property.  This Court shall not interfere with the state court's jurisdiction and authority over this already pending litigation.

331.    Given that the Court finds that Plaintiffs have no obligation to repay Defendants for Merchant's down payment for the Lucky Real Property, the Court finds that Proof of Claim No. 9 shall be disallowed in its entirety.

        C.      Conclusion

332.    For the aforementioned reasons, the Court concludes that Defendants' Claim No. 9 for repayment and interest upon a down payment for the Lucky Real Property shall be disallowed in its entirety.

**VI.     Proof of Claim No. 10-3 (Def. D)**

        A.      Parties' Contentions

333.    Merchant filed a secured claim in the amount of $321,467.83 alleged to be on the basis of the Second Mortgage Note for the Greenway Real Property.  The Proof of Claim states that the basis for perfection of the Note is "real estate & business" and asserts an 18% variable interest rate.

334.    Although admitting that Plaintiffs signed the Second Mortgage Note at the closing, Plaintiffs nonetheless argue that the claim should be disallowed because Merchant breached his fiduciary duty to Plaintiffs and fraudulently induced Plaintiffs into signing the Second Mortgage

Note.  Plaintiffs argue that Merchant's actions should result in the Second Mortgage Note being deemed void.[18]

335.    Plaintiffs additionally argue that, because Merchant admitted that the Greenway Real Property only appraised for $200,000, the Second Mortgage Note should be void for lack of consideration.

336.    Plaintiffs further argue that the statute of limitations to enforce the Note has expired because Merchant made no demands for payment on the Note or claimed that any money was owed for over a ten year period.

337.    Plaintiffs also assert that the interest rate claimed is the incorrect rate of interest under the terms of the Note.

338.    Lastly, Plaintiffs argue that, to the extent the Note is deemed valid, the debt should be offset by payments and loans made to Merchant by Plaintiffs as well as any damages awarded against Merchant for Plaintiffs' adversary claims.  To support their contention that payments and loans were made to Merchant by Plaintiffs, Plaintiffs rely on the analysis provided in expert witness Britt's report.

   B.    Findings of Fact, Conclusions of Law & Analysis

      i.    *Statutes of Limitations*

339.    Section 16.035 of the Texas Civil Practice and Remedies Code provides the statute of limitations for enforcement of a lien in certain scenarios, stating:

> (a) A person must bring suit for the recovery of real property under a real property lien or the foreclosure of a real property lien not later than four years after the day the cause of action accrues.

---

[18] This Court determines in a later section of this opinion that Plaintiffs' causes of action for breach of fiduciary duty and fraudulent inducement related to the Second Mortgage Note are barred by the applicable statutes of limitations. *Infra* at pp. 101-14.  As such, Plaintiffs' assertions that the Second Mortgage Note should be deemed void based on those adversary claims are unavailing.

(b) A sale of real property under a power of sale in a mortgage or deed of trust that creates a real property lien must be made not later than four years after the day the cause of action accrues.

(c) The running of the statute of limitations is not suspended against a bona fide purchase for value, a lienholder, or a lessee who has no notice or knowledge of the suspension of the limitations period and who acquires an interest in the property when a cause of action on an outstanding real property lien has accrued for more than four years, except as provided by:

(1)  Section 16.062, providing for suspension in the event of death; or
(2)  Section 16.063, providing for recorded extensions of real property liens.

(d)  On the expiration of the four-year limitations period, the real property lien and a power of sale to enforce the real property lien become void.

(e)  If a series of notes or obligations or a note or obligation payable in installments is secured by a real property lien, the four-year limitations period does not begin to run until the maturity date of the last note, obligation or installment.

(f)  The limitations period under this section is not affected by Section 3.118, Business & Commerce Code.

Tex. Civ. Prac. & Rem. Code § 16.035(a)-(f) (2015).  Thus, Texas state law provides a four-year

limitations period on enforcement of a real property lien once the cause of action has accrued.

*Id.*

340.  Section 3.118(a) of the Texas Business and Commerce Code provides the statute of

limitations to enforce the obligation of a party to pay on a note payable at a definite time, stating:

(a) Except as provided in Subsection E [relating to certificate of deposits], an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date.

Tex. Bus. & Com. Code § 3.118(a) (2015).  Thus, Texas state law provides a six-year

limitations period on enforcement of the Note itself from the due date or accelerated due date, if

applicable.

341.   The Court finds that the terms of the Second Mortgage Note provide:

> Principal and interest shall be due and payable in monthly installments of One Thousand, Six Hundred Fourteen and 00/100 Dollars ($1,614.00) or more each, commencing on August 1, 2005, and continuing regularly and monthly thereafter on the first (1st) day of each and every succeeding calendar month until October 1, 2011 (the "Maturity Date"). When the entire amount of the indebtedness evidenced hereby, Principal and accrued but unpaid interest, shall be due and payable . . .

> If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

(Pl. 82).

342.   Under the terms of the Second Mortgage Note, the Court finds that the Note provides an optional acceleration clause wherein the Noteholder may accelerate the debt upon notice of default. If default is not cured, acceleration occurs so that the entire unpaid balance and earned interest is immediately due—regardless of the original maturity date.

343.   Texas state law provides for specific notice requirements that a lender must satisfy in order to effectively accelerate a debt. Effective acceleration requires two actions by the lender: (1) notice of intent to accelerate; and (2) notice of acceleration. *In re Shree Mahalaxmi, Inc.*, 505 B.R. 794, 802 (Bankr. W.D. Tex. 2014) (citing *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001)). Both of these notices must be "clear and unequivocal." *Shree Mahalaxmi*, 505 B.R. at 802 (quoting *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 892 (Tex. 1991)). Where the remedy of acceleration is optional, default does not

automatically trigger acceleration of the debt but requires the lender to clearly and unequivocally exercise its option. *Shree Mahalaxmi*, 505 B.R. at 802 (citations omitted).

344. Parties to a contract may choose to waive the above notice requirement but such waiver must be clear and unequivocal. *Id.* A party "must specifically and separately" state the rights waived so that waiver of "notice" or "notice of acceleration" is insufficient to waive a notice of intent to accelerate because it is a separate right. *Id.* (quoting *Shumway*, 801 S.W.2d at 893).

345. The Court finds that the Second Mortgage Note effectively waived Plaintiffs' separate rights to a notice of intent to accelerate and notice of acceleration because the terms of the Note separately waive each of these rights.

346. The Court finds that Merchant made his first demand for payment and notice of intent to accelerate the Second Mortgage Note on May 5, 2010. (Def. D – Letter dated May 5, 2010). The demand letter states that, if payment in full of the past-due installments, plus interest, was not received by May 19, 2010, then the "Noteholder will thereafter accelerate the maturity of the unpaid balance of the principal of the Note, and the entire unpaid principal balance plus all unpaid and accrued interest will become immediately due and payable as of that time without further notice, demand, or other action." The letter also advised Plaintiffs that the interest rate would increase to 18% under the terms of the Note at that time.

347. The Court finds that Plaintiffs did not offer evidence that they paid the past due amounts and interest on the Second Mortgage Note by May 19, 2010.

348. The Court, therefore, finds that Merchant accelerated the Second Mortgage Note on May 19, 2010.

349. As such, the cause of action for collection or enforcement of the Second Mortgage Note and real property lien accrued on the accelerated maturity date of May 19, 2010.

350.    The Court finds that Merchant filed the original Proof of Claim No. 10-1 on May 15, 2013.

351.    The Court, therefore, concludes that neither the four-year statute of limitations to enforce the real property lien under Section 16.035 of the Texas Civil Practice and Remedies Code nor the six-year statute of limitations to enforce the underlying obligation on the note pursuant to Section 3.118(a) of the Texas Business and Commerce Code have expired.

### ii.    Consideration Given

352.    Plaintiffs also allege that the Second Mortgage Note is void for lack of consideration.

353.    Under Texas law, "a complete failure of consideration constitutes a defense to an action on a written agreement." *Suttles v. Thomas Beardon Co.*, 152 S.W.3d 607, 614 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

354.    Consideration exists if a note is issued for value. *Id.* (citing *Windham v. Alexander, Weston & Poehner, P.C.*, 887 S.W.2d 182, 184 (Tex. App.—Texarkana 1994, writ denied) ("Under common law, as long as something of real and legally cognizable value is given in exchange for a promise to pay under a promissory note, the note is supported by adequate consideration.").

355.    To be deemed inadequate consideration, the general rule holds that the consideration must be deemed "so grossly inadequate as to shock the conscience, being tantamount to fraud." *Windham*, 887 S.W.2d at 184 (citing *Birdwell v. Birdwell*, 819 S.W.2d 223 (Tex. App.—Fort Worth 1991, writ denied)).

356.    Here, the Court finds that Plaintiffs did not present convincing evidence that the Second Mortgage Note lacked adequate consideration so as to shock the conscience and be tantamount to fraud.

357.    Plaintiffs argue, and the Court agrees, that the evidence shows Merchant purchased the Greenway Real Property in 1999 for $210,000 and that the property appraised for $200,000 prior to the sale.  The fact that Merchant purchased the property and then sold it for a profit, however, does not in itself support a claim of inadequate consideration for the Second Mortgage Note.

358.    The Court finds that Plaintiffs have not provided evidence showing that total consideration of $295,000 for the Greenway Real Property is a shocking increase or shows fraud. Rather, Plaintiffs agree that the Greenway Grocery was empty and not operating at the time Merchant first purchased the Greenway Real Property.  Plaintiffs argue that they funded the initial set-up and operation of the Greenway Grocery; however, no written or documentary evidence of the funding could be provided to the Court.  Although Plaintiffs point to Mumtaz's signing of the gas pump leases as evidence, Plaintiffs admit that Mumtaz did not know Plaintiffs would be purchasing the Greenway Real Property at the time and her testimony reflects that she signed the leases because Merchant had credit issues.  Without evidence to show further contributions by Plaintiffs to the Greenway Grocery set-up, Mumtaz's signing of the gas pump leases merely shows a continuation of the loose and largely undocumented business dealings that are indicative of most transactions in this case.

359.    Based on the evidence presented, the Court cannot conclude that the Greenway Grocery being operable and stocked at the time of the sale to Plaintiffs did not add some value to the price of the Greenway Real Property.  The Court further concludes that Plaintiffs did not meet their burden to show that the value of the Greenway Real Property was "so grossly inadequate as to shock the conscience, being tantamount to fraud" compared to the total price of $295,000.

### iii. *Amount of Claim*

360. Based on the Court's findings and conclusions that the Second Mortgage Note remains a valid claim, the Court must determine the amount of the claim.[19]

361. Plaintiffs assert that the amount of indebtedness should be decreased by the refund checks and by the $75,000 loan made to Merchant on March 30, 2009.

362. The Court finds that Plaintiffs' testimony and evidence presented does not support a finding that these amounts were payments made on the Second Mortgage Note. Although the refund checks from the State Comptroller's Office and the $75,000 check paid from Plaintiffs to Merchant may be an amount for which Merchant is liable to Plaintiffs, there is no evidence in the record to show that these amounts should be applied to the Second Mortgage Note indebtedness. In fact, Plaintiffs argued at trial that they did know about or think they owed any amount on the Second Mortgage Note at the time Merchant received the refund checks and the $75,000 check from Plaintiffs.

363. The Court finds that the applicable interest rate from June 26, 2000, to the accelerated maturity date of May 19, 2010, is 8%.

364. The Court finds that the interest accrued from June 26, 2000, through May 19, 2010, (3,614 days) at a rate of 8% is $75,250.41.

365. The Court finds that the applicable interest rate on the matured, unpaid amounts from the accelerated maturity date of May 19, 2010, to the Petition Date of March 20, 2013, is 18%.

---

[19] Pursuant to the Court's finding that Defendants' claim to enforce the lien on real property is not barred by the applicable four-year statute of limitations, the Court finds that Plaintiffs did not object to Claim No. 10's designation as a secured claim. This Court was not asked to determine the value of the property so as to determine the extent of the secured claim and shall not do so in this Memorandum Opinion.

366.    The Court finds that the interest accrued from the first date under the accelerated maturity rate of May 20, 2010, to the Petition Date of March 20, 2013, (1,035 days) at a rate of 18% is $48,489.04.

367.    The Court, therefore, finds that the total amount allowed under Defendants' Claim No. 10 is $218,739.45.

C.    Conclusion

368.    For the aforementioned reason, the Court concludes that Defendants' Claim No. 10 is allowed in the amount of $218,739.45 as a secured claim.

**VII.    Proof of Claim No. 11-2 (Def. E)**

A.    Parties' Contentions

369.    Merchant filed an unsecured claim in the amount of $8,762.24 alleged to be on the basis of a State Court Judgment for unpaid rent on the Fort Sam Grocery.

370.    Plaintiffs dispute that this is a debt owed by Plaintiffs because the tenant on the lease agreement is Fort Sam Grocery, Inc., with Mumtaz only operating as president.  Plaintiffs argue that there is no personal guaranty in the lease agreement.

371.    Plaintiffs also assert that the underlying State Court Judgment was fraudulently obtained by Merchant when he committed abuse of process by purposefully serving Plaintiffs at a location where he knew Plaintiffs could not be located.[20]

B.    Findings of Fact, Conclusions of Law & Analysis

372.    As an initial matter, the Court finds that Plaintiffs' contention that it should look to the liable party on the lease first is incorrect.  The proof of claim filed by Defendants is based on a

---

[20] Plaintiffs also allege that the original filed Proof of Claim No. 11-2 charged usurious interest of 24%, and that Defendants violated the automatic stay by filing a U.C.C. Financing Statement relating to this debt after the Petition Date.  The Court will address Plaintiffs' claims regarding usury and violation of the automatic stay in a later section of this opinion. *Infra* at pp. 122-34.

State Court Judgment. Therefore, the Court shall first look to the responsible party according to the State Court Judgment to determine whether either Plaintiff is personally liable for the judgment amount.

373. Under Texas law, members in limited liability companies (LLCs) and shareholders in for-profit corporations generally may not be held personally liable for the debts or obligations of the business entity. *See* Tex. Bus. Orgs. Code § 101.114; Tex. Bus. Orgs. Code § 21.223.

374. The Court finds that the State Court Judgment in Cause No. 30-E-11-02225-01, upon which Proof of Claim No. 11 is based, is against "Ms. Mumtaz Ali President Fort Sam Grocery Inc."

375. When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim. ***Leverett***, 378 B.R. at 799. The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

376. The Court finds that Mumtaz is not liable for the State Court Judgment amount because the judgment is not against Mumtaz in her individual capacity. Rather, the Court finds that the State Court Judgment is a liability of Fort Sam Grocery, Inc. alone because the judgment was only entered against Mumtaz in her capacity as president of Fort Sam Grocery, Inc.

C.    Conclusion

377. For the aforementioned reasons, the Court concludes that Defendants' Claim No. 11 for the State Court Judgment in Cause No. 30-E-11-02225-01 is disallowed in its entirety.

## VIII.  Proof of Claim No. 12-2 (Def. F)

### A.  Parties' Contentions

378.  Merchant filed a fully-secured claim in the amount of $7,857.23, alleged to be on the basis of a State Court Judgment for unpaid rent on the Fort Sam Grocery.  The Proof of Claim states that the basis for perfection is "Rent Balance" and asserts a fixed interest rate of 5%.

379.  Plaintiffs dispute that this is a debt owed by Plaintiffs because the tenant on the lease agreement is Fort Sam Grocery, Inc., with Mumtaz only operating as president.  Plaintiffs argue that there is no personal guaranty in the lease agreement.

380.  Plaintiffs also assert that the underlying State Court Judgment was fraudulently obtained by Merchant when he committed abuse of process by purposefully serving Plaintiffs at a location where he knew Plaintiffs could not be located.[21]  Plaintiffs argued that a finding of abuse of process would render the State Court Judgment void.

### B.  Findings of Fact, Conclusions of Law & Analysis

381.  As an initial matter, the Court finds that Plaintiffs' contention that it should look to the liable party on the lease first is incorrect.  The Proof of Claim filed by Defendants is based on the State Court Judgment in Cause No. 30-S-11-00481-01.  Therefore, the Court shall first look to the responsible party according to the State Court Judgment to determine whether either Plaintiff is personally liable for the judgment amount.

382.  The Court finds that the basis for the underlying State Court Judgment in this Proof of Claim is the same debt as that asserted in Defendants' Proof of Claim No. 11-2 for unpaid rent related to the Fort Sam Grocery.

---

[21] Plaintiffs also allege that the original filed Proof of Claim No. 12-1 charged usurious interest of 24%, and that Defendants violated the automatic stay by filing a U.C.C. Financing Statement relating to this debt after the Petition Date.  The Court will address Plaintiffs' claims regarding usury and violation of the automatic stay in a later section of this opinion. *Infra* at pp. 122-34.

383.    The Court, however, notes that the person against whom the State Court Judgment is entered in this claim differs from that of Proof of Claim No. 11-2.  The judgment in this claim is entered against "Mumtaz Ali DBA Fort Sam Grocery."

384.    When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim.  ***Leverett***, 378 B.R. at 799.  The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

385.    In analyzing whether Defendants have met their burden, the Court must determine: (1) First, whether the state court judgment is a personal liability of Plaintiffs; (2) Second, whether a finding of abuse of process could render the State Court Judgment void; and (3) Third, if valid, whether the State Court Judgment debt is secured.

### i.    *Is Mumtaz Ali personally liable for the State Court Judgment?*

386.    First, the Court determines that Mumtaz is personally liable for the State Court Judgment asserted in Proof of Claim No. 12-2.  Unlike the State Court Judgment asserted in Proof of Claim No. 11-2, this judgment was taken against "Mumtaz Ali DBA Fort Sam Grocery" which implicates Mumtaz Ali in her individual capacity, rather than simply her capacity as president of a corporation.

387.    Therefore, the Court finds that Defendants have met their initial burden to prove that one Plaintiff is personally liable for the judgment debt.

### ii.    *Would a finding of abuse of process render the State Court Judgment void?*

388.    The Court concludes that, even if the Court determines Merchant committed abuse of process to obtain the State Court Judgment, the *Rooker-Feldman* doctrine precludes this Court from voiding the State Court Judgment.

389.    Under the *Rooker-Feldman* doctrine, "federal district courts lack jurisdiction to entertain collateral attacks on state court judgments." **Liedtke v. State Bar of Tex.**, 18 F.3d 315, 317 (5th Cir. 1994).[22]

390.    Although applied in limited circumstances, the *Rooker-Feldman* doctrine governs challenges in federal district court "… brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district review and rejection of those judgments." **Exxon Mobil Corp. v. Saudi Basic Indus. Corp.**, 544 U.S. 280, 284 (2005). "A state court's judgment is attacked for purposes of the *Rooker-Feldman* doctrine … if the losing party in state court is 'seeking what in substance would be appellate review of the state judgment in a United States district court.'" **Weaver v. Tex. Capital Bank N.A.**, 660 F.3d 900, 903 (5th Cir. 2011) (quoting **Johnson v. De Grandy**, 512 U.S. 997, 1005-06 (1994)); *see also* **Liedtke**, 18 F.3d at 317 ("[F]ederal district courts, as courts of original jurisdiction, lack appellate jurisdiction to review, modify, or nullify final orders of state courts.").[23]

391.    Within the Fifth Circuit, courts consistently hold that, to the extent that the relief sought by Plaintiff is to void or overturn a state-court judgment, the *Rooker-Feldman* doctrine bars such claim for lack of subject-matter jurisdiction. *See e.g.,* **Aguiluz v. Bayhi (In re Bayhi)**, 528 F.3d 393, 402 (5th Cir. 2008) (bankruptcy court had no authority to vacate state court judgment); **In**

---

[22] Although cited cases refer to the federal district courts when applying the *Rooker-Feldman* doctrine, the Court notes that its bankruptcy authority derives from the United States District Court of the Western District of Texas's Order of Reference. As such, this Bankruptcy Court maintains no authority beyond what the district court itself possesses and thus, the *Rooker-Feldman* doctrine equally restrains this Bankruptcy Court.

[23] The Court notes that the *Rooker-Feldman* doctrine does not apply to an "independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he [the plaintiff] was a party …." **Exxon Mobil Corp. v. Saudi Basic Indus. Corp.**, 544 U.S. 280, 284 (2005) (quoting **GASH Assocs. v. Rosemont**, 995 F.2d 726, 728 (7th Cir. 1993)). The Court will address whether Plaintiffs' assertions of abuse of process in the context as an adversary claim are independent or barred by the *Rooker-Feldman* doctrine in a later portion of this opinion. *Infra* at pp. 114-22.

*re Nazu, Inc.,* 350 B.R. 304, 320-22 (Bankr. S.D. Tex. 2006) (debtor's request that bankruptcy court review a default judgment denied under *Rooker-Feldman*); *In re Anderson,* 357 B.R. 404, 407-08 (Bankr. S.D. Tex. 2006) (relief requested in debtor's motion would effectively reverse judgment of Texas state court and thus, *Rooker-Feldman* is applicable); *Morris v. Am. Home Mortg. Servicing, Inc.,* 443 Fed. Appx. 22, 24 (5th Cir. 2011) (unpublished) (claims that foreclosure judgment or writ of possession was unlawful are barred because complaining of injuries caused by state court judgments); *Magor v. GMAC Mortg. L.L.C.*, 456 Fed. Appx. 334, 335-36 (5th Cir. 2011) (unpublished) (plaintiff's claims are barred because object of claims is state foreclosure judgment itself and reversal of state's judgment is necessary part of relief requested); *Lee v. Weill*, 2015 WL 224816, at *3 (S.D. Miss. January 15, 2015) (plaintiff's claim against judicial defendants for injuries flowing from their judicial acts, and seeking order that would overturn the state-court judgment was barred by *Rooker-Feldman*).

392.    Here, Plaintiffs seek to have Defendants' claim based on the State Court Judgment disallowed on the basis that it was obtained by abuse of process.  The Court finds that, under the *Rooker-Feldman* doctrine, this Court lacks the subject matter jurisdiction to void or overturn the State Court Judgment—even if this Court finds Defendants committed an abuse of process.  The proper forum for overturning a state court judgment is in the state court.

393.    As a result of this Court's determination that it will not overturn the State Court Judgment, the Court finds that Defendants have met their burden to prove a claim based on the State Court Judgment in the amount of $7,358.40 plus court costs of $99.00 and interest of 5.00% per annum from the date of judgment on February 22, 2012, awarded by the Abstract of Judgment, through the Petition Date on March 20, 2013.

394.    The Court finds that the total amount of $7,857.23 in Claim No. 12-2 is allowed.

### iii.    Is the State Court Judgment debt secured?

395.    Defendants indicate on Proof of Claim No. 12-2 that the claim is secured by "Other" and describes the property as "Fort Sam Grocery" valued at $50,000.

396.    Defendants' original Proof of Claim No. 12-1 indicates that the claim is secured by "Other" and describes the property as "Arsh Investments Inc dba Kays Convenience – Inventory & Furniture/Fixtures" valued at $50,000.

397.    The only evidence that a judgment lien was created by the State Court Judgment is an undated UCC Financing Statement attached to the original Proof of Claim No. 12-1, stating that the State Court Judgment covers collateral of "Property Address: 15922 Tampke Place, San Antonio, TX 78232."  (Def. F).

398.    A UCC Financing statement is filed with the Secretary of State under Chapter 9 of the Texas Business and Commerce Code to perfect security interests and agricultural liens.  Tex. Bus. & Comm. Code § 9.310 (2015).  Chapter 9 of the Texas Business and Commerce Code, however, does not apply to "the creation or transfer of an interest in or lien on real property …." Tex. Bus. & Comm. Code § 9.109(d)(11) (2015) (exceptions not applicable).

399.    Here, Defendants have not supplied the Court with proof that the State Court Judgment is secured as a lien on any of Plaintiffs' property.  Rather, the only evidence provided to the Court purporting to show a judgment lien is a UCC Financing Statement that is ineffective to create a lien or interest in the real property which it lists.

400.    Therefore, the Court finds that Defendants have not met their burden of proof to show that the amount owed under the State Court Judgment is secured.

C.    Conclusion

401.    For the aforementioned reasons, the Court concludes that Defendants' Claim No. 12 for the State Court Judgment in Cause No. 30-S-11-00481-01 is allowed as an unsecured claim in the amount of $7,857.23.

IX.    **Proof of Claim No. 13-2 (Def. G)**

A.    Parties' Contentions

402.    Merchant filed a secured claim in the amount of $3,840.94 alleged to be on the basis of a State Court Judgment entered in Cause No. 072267 in Small Claims Court, Precinct 5 of Travis County, Texas against "SA Lucky Food Mart, Inc. DBA Lucky Food Mart" for the cost of a highway sign advertisement.  The Proof of Claim states that the basis of perfection is "Hwy Sign Advertisement" and asserts a fixed interest rate of 6%.

403.    Plaintiffs assert that the underlying State Court Judgment is entered against SA Lucky Food Mart, Inc.—a company owned by Merchant.  Plaintiffs assert that they have no interest in the company and have never had an interest in the company.

404.    Plaintiffs also allege that the original filed claim (Claim No. 13-1) charged incorrect interest of 12% when the interest rate on the face of the judgment is 5%.[24]

405.    Merchant responds by asserting that a Rule 11 Agreement entered into between the parties in Cause No. 11-03-00098-CVF in the 218th Judicial District Court of Frio County, Texas states that Plaintiffs agreed to pay all expenses and bills relating to the Lucky Food Mart convenience store.  Merchant also agreed to reduce the interest rate to 5%.

---

[24] Plaintiffs also allege that Defendants violated the automatic stay by filing a UCC Financing Statement relating to this debt after the Petition Date.  The Court will address Plaintiffs' claim regarding violation of the automatic stay in a later section of this opinion.  *Infra* at pp. 127-34.

B.     Findings of Fact, Conclusions of Law & Analysis

406.    The Court finds that the underlying State Court Judgment for Claim No. 13-2 against "SA Lucky Food Mart, Inc. DBA Lucky Food Mart" is not a debt owed by Plaintiffs for several reasons.

407.    As an initial matter, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim. *Leverett*, 378 B.R. at 799.    The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

408.    First, on its face, the State Court Judgment is not a liability of Plaintiffs because the judgment is not taken against either Plaintiff.

409.    Second, the Rule 11 Agreement does not require Plaintiffs to pay for judgments against Merchant's entities—even if he used those entities to operate the Lucky Food Mart.  The Court will also note that, according to Plaintiffs' most current Statement of Financial Affairs, the state court litigation in which the Rule 11 Agreement is entered remains ongoing.

410.    Third, Defendants lack standing to assert this Proof of Claim because the State Court Judgment is awarded in favor of Lonestar Logos & Signs, LLC; not Merchant or Electro.

411.    Merchant testified that he received invoices regarding the highway sign while the Rule 11 Agreement was in effect and chose not to forward those invoices to Plaintiffs so that they could be paid.  Additionally, Merchant testified that he received notice of the lawsuit, chose not to alert Plaintiffs of the pending suit, and failed to appear at the time of trial—thereby causing entry of a default judgment.

412.    The Court finds that Merchant's contention that Plaintiffs owe him (not Lonestar Logos & Signs, LLC) the amount of this judgment is incredulous.

C.    Conclusion

413.    For the aforementioned reasons, the Court concludes that Defendants' Claim No. 13 for the State Court Judgment against "SA Lucky Food Mart, Inc. DBA Lucky Food Mart" in Cause No. 072267 in Small Claims Court, Precinct 5 of Travis County, Texas is disallowed in its entirety.

X.    Proof of Claim No. 14-2 (Def. H)

A.    Parties' Contentions

414.    Electro filed an unsecured claim in the amount of $15,281.00 alleged to be on the basis of money loaned to Plaintiffs.  (Def. H).  At trial, Merchant testified that this claim represents an overpayment to Plaintiffs on the $75,000 loan that Plaintiffs made to Electro.  The Proof of Claim does not state an interest rate charged but the attachments to Defendants' claim allege that the overpaid loan amount is $12,700.00 with interest accruing from November 5, 2009, through the Petition Date of March 20, 2013, at 6% interest.

415.    In support of Electro's claim, Defendants offered a table showing the check numbers and amounts alleged to have been paid to satisfy the $75,000 loan from Plaintiffs and the amount that was overpaid.  Merchant testified that he prepared these tables himself.

416.    In additional support of Electro's claim, Defendants offered photocopies of checks written from Merchant's Electro business account totaling $80,800. (Def. H).

417.    Plaintiffs originally objected under the impression that the amount asserted was based on weekly loans (akin to those asserted in Claim No. 7) to several of Plaintiffs' business entities. Plaintiffs assert that they are not liable for those business debts.

418.    Plaintiffs also assert that, to the extent money was loaned, all funds have been repaid.[25]

---

[25] Plaintiffs also allege that the original filed Proof of Claim No. 14-1 charged usurious interest of 24%, and that Defendants violated the automatic stay by filing a UCC Financing Statement relating to this debt after the Petition

419.    Once Defendants' clarified in their Response to Plaintiffs' Objection that the amount claimed was related to overpayment of the $75,000 loan made by Plaintiffs, Plaintiffs continue to maintain in their proposed Findings of Fact and Conclusions of Law that Defendant is claiming weekly loans made only to Plaintiffs' business entities.  (Adv. ECF No. 66).

420.    In response, Plaintiffs also offered deposit slips from Merchant's bank records to represent repayments to Defendants for what Plaintiffs perceived to be weekly loans claimed in Claim No. 14.  (Pl. 266-267).  Plaintiffs also employed certified public accountant and expert witness Theresa Britts to prepare an analysis of the checks claimed as weekly loans from Merchant and the deposit slips claimed as repayments by Plaintiffs.  (Pl. 261).

B.      Findings of Fact, Conclusions of Law & Analysis

421.    The parties disagree regarding the purported basis for the debt claimed in Proof of Claim No. 14.  Plaintiffs respond as though the full amount of the debt claimed is alleged to be weekly loans akin to those claimed in Proof of Claim No. 7.  Defendants assert that the debt represents an overpayment to Plaintiffs in repayment of a $75,000 loan they made to Merchant.

422.    As previously noted in the Evidence Presented, Merchant offered a variety of stories and reasons to explain why Plaintiffs gave Merchant a $75,000 check.  Plaintiffs consistently argued that this $75,000 check was a loan.[26]

423.    The Court finds that the $75,000 check was a loan—albeit one without a written agreement to repay.  Plaintiffs claim that this $75,000 loan was never repaid.[27]

---

Date.  The Court will address Plaintiffs' claims regarding usury and violation of the automatic stay in a later section of this opinion.  *Infra* at pp. 122-34.

[26] *Supra* at pp. 35-38.

[27] Plaintiffs have not filed a cause of action for repayment of the $75,000 loan in this bankruptcy case or adversary proceeding.

424.     Puzzlingly, Merchant claims that he did repay this $75,000 loan (although his testimony reflected that he did not know if this was really ever a loan) and, in fact, overpaid the loan. Merchant also admitted that he wrote the repayment checks at the same time that he was making the weekly loans to Plaintiffs claimed in Proof of Claim No. 7.

425.     In the attachments to Electro's Claim No. 14-2, the chart prepared by Merchant reflects a check total of $87,700.  When examining the check copies provided, however, Check No. 9305 in the amount of $6,900.00 is included on the chart but no copy of that check is provided.

426.     The Court finds that the tables prepared by Merchant were not kept contemporaneously with the loans or repayments but rather, were prepared for litigation purposes.  As such, except as proof of admissions by Defendants, the Court finds that the assertions in these tables are unreliable without further supporting documentation.

427.     The Court finds all but one check contained in Proof of Claim No. 14 is written to the order of one of Plaintiffs' business entities; not to Plaintiffs' personally.  Check No. 9402 is written to "Aziz Ali."

428.     At trial, Merchant testified that some of the checks contained in Proof of Claim No. 14 were given to Plaintiffs in blank, with just his signature, while others Merchant completed fully before giving the check to Plaintiffs.  Plaintiffs did not testify whether they completed any of the checks contained in Proof of Claim No. 14, like they did in Claim No. 7.[28]

429.     When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim.  ***Leverett***, 378 B.R. at 799.  The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

---

[28] *Supra* at pp. 39-40.

430.    The Court finds that Plaintiffs are not personally liable for the any of the checks that are written to the order of Plaintiffs' business entities.

431.    Under Texas law, members in limited liability companies (LLCs) and shareholders in for-profit corporations generally may not be held personally liable for the debts or obligations of the business entity.  *See* Tex. Bus. Orgs. Code § 101.114; Tex. Bus. Orgs. Code § 21.223.

432.    The Court finds that Defendants have not met their burden to prove that any of the checks written to Plaintiffs' entities were completed by Plaintiffs themselves.  Therefore, unlike those checks completed by Plaintiffs in Claim No. 7, the Court finds there is insufficient evidence to show that Plaintiffs directed the funds to their entities; rather, the evidence shows that Merchant determined to which entity or person the checks contained in Claim No. 14 were directed.

433.    Check No. 9402 is paid to the order of "Aziz Ali" and therefore, is the only check for which Plaintiffs may be personally liable.

434.    The Court finds, however, that given the chronology of the check payments, Defendants admit that Check No. 9402 was used to pay off a portion of the $75,000 loan from Plaintiffs.  As such, Plaintiffs have no liability on Check No. 9402 because it does not constitute any part of Defendants' alleged overpayment on the $75,000 loan.

435.    The Court finds that the amount overpaid by Defendants to the $75,000 loan was $5,800.

436.    The Court finds that the checks which constitute the $5,800 overpayment were made payable to Plaintiffs' entities and are not a personal liability of Plaintiffs.   As such, the Court finds that the overpayment amount of $5,800 may not be asserted as a personal liability in Plaintiffs' bankruptcy case.[29]

---

[29] Because the Court finds that Plaintiffs' are not personally liable for Defendants' alleged overpayment amount, the Court is not required to reach the rate of interest alleged or whether Plaintiffs' expert report is reliable.

C.    Conclusion

437.   For the aforementioned reasons, the Court concludes that Defendants' Claim No. 14-2 is disallowed in its entirety.

## XI.    Proof of Claim No. 15-3 (Def. I)

A.    Parties' Contentions

438.   Electro filed an unsecured claim in the amount of $63,649.00 alleged to be on the basis of money loaned to Plaintiffs in the form of tax payments made to the taxing authorities on behalf of Plaintiffs' entities.

439.   In support of Electro's claim, Defendants offered photocopies of checks Merchant purportedly paid to the taxing authorities on behalf of Plaintiffs' entities totaling $13,432.75. Defendants also attached a chart alleging to show the running total of amount owed to Defendants on account of the sales tax loans plus 6% interest; however, no documentation is provided to corroborate the information in this table. The table indicates that a large number of web payments were made but proofs of those web payments were not provided to the Court and are not in evidence.

440.   Defendants also provided the "Plaintiff's Original Petition" in Cause No. 201001-19382 filed in the 150th Judicial District Court of Bexar County, Texas on November 19, 2010. [30] In the petition, Merchant alleges that he "made 12 payments of taxes to the comptroller directly on behalf of the Defendants from May 2008 until February 2010. [Merchant] additionally loaned [Plaintiffs] $6,500 in March of 2010."

---

[30] Defendants also attached numerous state court filings to Proof of Claim No. 15 that appear unrelated to this claim.

441. Plaintiffs assert that the money allegedly loaned would have actually been to Plaintiffs' businesses and in payment for the business tax debt. Therefore, Plaintiffs are not liable for the debts of the business.

442. Plaintiffs further dispute the amount of the alleged loan and, to the extent the loan was made, asserts that all funds have been repaid. Plaintiffs further assert that Claimant seeks to charge interest that was not agreed to.[31]

443. Plaintiffs further assert that the claim is time-barred by the statute of limitations for collection of a debt and is unenforceable pursuant to 11 U.S.C. § 502(b)(1).

B.    Findings of Fact, Conclusions of Law & Analysis

444. When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim. *Leverett*, 378 B.R. at 799. The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

445. The Court finds that the only proof of indebtedness on account of sales tax loans offered by Defendants are the check copies provided with Proof of Claim No. 15. (Def. I).

446. Pursuant to Texas Civil Practice & Remedies Code § 16.004(a), the statute of limitations in which a person must bring suit on a debt is four years.

447. The Court finds that Defendants' claims for Check Nos. 9013, 9017, 9028, 9030, 9035, 9040 and 9043 have expired under the applicable statute of limitations. Under the four year statute of limitations of § 16.004(a), the final days to assert indebtedness for each of these checks expired from August 19, 2011 (No. 9013) through April 20, 2012 (No. 9043), respectively.

---

[31] Plaintiffs also allege that the original filed Proof of Claim No. 14-1 charged usurious interest of 24%, and that Defendants violated the automatic stay by filing a UCC Financing Statement relating to this debt after the Petition Date. The Court will address Plaintiffs' claims regarding usury and violation of the automatic stay in a later section of this opinion. *Infra* at pp. 122-34.

Defendants did not institute litigation to collect on those allege debts within the four years because the only evidence of litigation filed within that time frame by Merchant did not relate to those debts occurring before May 2008. Plaintiffs filed their bankruptcy petition on March 20, 2013, and Defendants' only evidence that they asserted these debts was not until filing of their original Proof of Claim No. 15 on May 15, 2013.

448.    Although Defendants did not provide specific information regarding the debts claimed in its Original Petition filed in Bexar County, for purposes of discussion this Court may construe that the Original Petition attached to Proof of Claim No. 15 includes the remaining Check No. 5114 written on May 20, 2008, to the order of MAASB.

449.    Under Texas law, members in limited liability companies (LLCs) and shareholders in for-profit corporations generally may not be held personally liable for the debts or obligations of the business entity. *See* Tex. Bus. Orgs. Code § 101.114; Tex. Bus. Orgs. Code § 21.223.

450.    To the extent that Defendants seek repayment for Check No. 5114 from Plaintiffs, the Court finds that Defendants have not met their burden of proof to show that this debt is a personal liability of Plaintiffs' and not simply a debt of the MAASB corporation.

451.    Therefore, the Court finds that Plaintiffs are not personally liable for repayment of Check No. 5114 because it is an alleged debt of MAASB Enterprises, Inc. for sales tax Merchant alleges he paid on behalf of the entity. Additionally, Defendants' remaining claims for repayment based on various sales tax loans are either barred by the applicable four-year statute of limitations or Defendants' did not provide sufficient evidence to support the existence of their claim.

C.  Conclusion

452.  For the aforementioned reasons, the Court concludes that Defendants' Claim No. 15-3 is disallowed in its entirety.

**XII. Proof of Claim No. 16-1 (Def. J)**

A.  Parties' Contentions

453.  Merchant filed a claim in the amount of $7,600.00 on the alleged basis of accounting, income tax and other fees owed.  The Proof of Claim does not state whether the debt is alleged to be secured or unsecured.

454.  In support of Merchant's claim, Defendants offer an invoice dated June 27, 2011, seeking fees for accounting work from 2007 through 2010, in the total amount of $7,600.

455.  Plaintiffs argue that the alleged debt is for accounting services provided to Plaintiffs' businesses and are business debts.  Therefore, Plaintiffs assert that they are not liable for the debts of the business.

456.  Plaintiffs also assert that a Justice of the Peace court already determined that Plaintiffs are not liable for this debt.  Merchant was appealing this ruling at the time of the bankruptcy filing.

457.  Plaintiffs further assert that the claim is time-barred by the statute of limitations for collection of a debt and is unenforceable pursuant to 11 U.S.C. § 502(b)(1).

B.  Findings of Fact, Conclusions of Law & Analysis

458.  As an initial matter, the Court notes that a take-nothing judgment entered by the Justice of the Peace Court is not considered a final judgment under Texas Civil Practice and Remedies Code § 31.005 and Texas Rule of Civil Procedure 506 where such judgment has been appealed to the county court and perfection of the appeal to county court occurred.  Tex. R. Civ. P. 506.3 (2015) (appeal from justice court must be tried de novo in county court and entire case is

presented as if there had been no previous trial); *see* **Villalon v. Bank One**, 176 S.W.3d 66, 69-70 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("[I]t is well-settled that perfection of an appeal to a county court from a justice court for trial de novo vacates and annuls the judgment of the justice court.").

459.    Under the *Rooker-Feldman* doctrine, this Court may therefore exercise subject matter jurisdiction because no final state court judgment remains entered on this issue.

460.    When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim.  **Leverett**, 378 B.R. at 799.  The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

461.    The Court finds that Merchant has not met his burden of proof to show that Plaintiffs owe any debt relating to accounting fees.  At trial, Merchant admitted that he has no records relating to the work he allegedly performed for Plaintiffs, and that he only has this one invoice which was produce for litigation seeking to collect four years' worth of accounting fees.  Merchant also testified that he only kept track of the fees in his head and did not keep billing records.

462.    The Court therefore finds that Merchant has failed to provide any evidence beyond a conclusory invoice statement, that Merchant admits was prepared in anticipation of litigation, to substantiate his claim for accounting fees.

    C.    Conclusion

463.    For the aforementioned reasons, the Court concludes that Defendants' Claim No. 16-1 is disallowed in its entirety.

### XIII.   Proof of Claim No. 17-1 (Def. K)

   A.      Parties' Contentions

464.   Electro filed an unsecured claim in the amount of $25,140.64 on the alleged basis of amounts owing for damage to the Fort Sam Grocery property.  Defendants allege that Plaintiffs owe the amount pursuant to the Fort Sam Grocery lease agreement and that Mumtaz signed the lease in her individual capacity.  Therefore, Defendants claim that Mumtaz is personally liable for the repair costs.

465.   Plaintiffs allege that any debt for repairs to Fort Sam Grocery is against Plaintiffs' business and Plaintiffs are not liable for the debts of the business.

466.   Plaintiffs further allege that Claimant already obtained a default judgment against Plaintiffs related to this property and evicted them.  If the Court finds the default judgment valid, then Plaintiffs argue that the doctrine of res judicata precludes Defendants from seeking new damages.

467.   Plaintiffs also dispute the amount owed and that there was any damage done to the property that was not pre-existing.[32]

   B.      Findings of Fact, Conclusions of Law & Analysis

468.   When examining whether each party has met their burden of proof regarding this claim, the Court determines that Plaintiffs offered sufficient proof to rebut the original presumption of *prima facie* validity afforded to the filed claim.  ***Leverett***, 378 B.R. at 799.  The burden now rests on Defendants to prove that this debt is valid and is a personal liability of Plaintiffs.

---

[32] Plaintiffs also allege that Defendants violated the automatic stay by filing a UCC Financing Statement relating to this debt after the Petition Date.  The Court will address Plaintiffs' claim regarding violation of the automatic stay in a later section of this opinion.  *Infra* at pp. 127-34.

469.     The Court finds that Defendants have not met their burden to prove that Mumtaz is personally liable on the Fort Sam Grocery lease.

470.     First, the Court finds that the lease lists the tenant as "Fort Sam Grocery, Inc." The copy given from the original landlord to Merchant reflects that the lease at one time stated "Mumtaz Ali d/b/a Fort Sam Grocery, Inc." as tenant but that "Mumtaz Ali" was lined through sometime prior to Merchant's purchase of the property.

471.     Second, the Court finds that Mumtaz signed the lease as "President."

472.     Third, Merchant provided no evidence that the crossing out of Mumtaz's name occurred after his purchase of the property. Neither could Merchant testify at trial whether the lease ever imputed personal liability to Mumtaz. The only evidence Merchant presented is the lease as he inherited it from the original landlord—and that lease does not impose personal liability on Plaintiffs.

473.     Lastly, as Plaintiffs correctly point out, the Fort Sam Grocery lease does not contain a personal guaranty upon the corporation's officers. The original landlord chose not to include this provision and Merchant, as successor landlord, is bound by those terms.

474.     Under Texas law, members in limited liability companies (LLCs) and shareholders in for-profit corporations generally may not be held personally liable for the debts or obligations of the business entity. *See* Tex. Bus. Orgs. Code § 101.114; Tex. Bus. Orgs. Code § 21.223.

475.     The Court finds that Defendants have not met their burden of proof to show that the claimed damages to the Fort Sam Grocery are a personal liability of Plaintiffs under the lease.

        C.     Conclusion

476.     For the aforementioned reasons, the Court concludes that Defendants' Claim No. 17-1 is disallowed in its entirety.

## ANALYSIS OF PLAINTIFFS' ADVERSARY CLAIMS

**I.     Breach of Fiduciary Duty**

A.     <u>Parties' Contentions</u>

477.    Plaintiffs contend that Merchant owed Plaintiffs a duty of care as a fiduciary in his capacities as: (1) accountant; (2) partner in the Lucky Food Mart & Real Estate; (3) financial and personal advisor; and (4) agent and attorney of fact in the Greenway Real Property sale.

478.    Plaintiffs argue that Merchant breached his fiduciary duty in four ways:

(1)  Merchant lied about the sale price of the Greenway Real Property to induce Plaintiffs to enter into a purchase agreement to Plaintiffs' detriment and Merchant's benefit;

(2)  Merchant filed false tax returns, forged Plaintiffs' signatures on personal and corporate documents, filed false statements with the Comptroller's office, and changed the official address for Plaintiffs' entities to his own;

(3)  Merchant attempted to sell partnership property in the form of the Lucky Food Mart and Real Property without Plaintiffs' knowledge and consent; and

(4)  Merchant filed numerous frivolous lawsuits in order to harass Plaintiffs.

480.    Plaintiffs contend that they justifiably relied on Merchant as their fiduciary to their detriment.

481.    Plaintiffs also allege that they have suffered financial harm in the form of accounting fees, attorney fees, liability on the Second Mortgage Note owed to Merchant, loss of partnership assets and profits.   Plaintiffs additionally argue that Merchant received a benefit from his breaches in the form of monetary gain and holding of the Second Mortgage Note on the Greenway Real Property.

482.    Defendants respond by first asserting that Plaintiffs' claims for breach of fiduciary duty are barred by the four year statute of limitations in Texas Civil Practice and Remedies Code § 16.004(a)(5).  Plaintiffs argue that the discovery rule applies to Plaintiffs' breach of fiduciary duty claims so that the statute of limitations has not expired.

483.    Defendants argue the following in response to each of Plaintiffs' specific allegations of breach:

(1)  Merchant did not lie about the sale price for the Greenway Real Estate, the Second Mortgage Note was listed on the closing statement, Plaintiffs signed the Second Mortgage Note and Deed of Trust, and Plaintiffs simply forgot about the Second Mortgage Note because payments did not begin for five years.  Merchant argues that he did not act as Plaintiffs' agent nor attorney in fact in negotiating the mortgage arrangement for the Greenway Real Estate.

(2)  Merchant did not file false sales tax returns but states that he filed reports for Plaintiffs and was helping them pay the sales tax when they could not afford it.  Merchant argues that refunds were issued sometimes based on his overpayment so that he kept those refunds.  Merchant also stated that he sent letters to the Comptroller's Office stating that he was buying the businesses because he was concerned about having successor liability if he foreclosed his liens.

(3)  Merchant argues that he is not Plaintiffs' business partner in the Lucky Food Mart because the parties did not purchase the property together and carry on the business for profit.  Merchant states that the parties were solely joint owners of the real estate and never operated the business for profit.

(4)    Merchant denied filing frivolous and harassing litigation in an attempt to collect a debt.

B.    Jurisdiction & Authority

484.    The Court determines it has subject matter jurisdiction over all of Plaintiffs' breach of fiduciary duty claim pursuant to 28 U.S.C. § 1334(b).

485.    The Court determines that it does not have statutory authority to enter a final judgment on Plaintiffs' breach of fiduciary duty claim related to allegations that Merchant filed false tax returns, forged signatures, filed false statements, and changed Plaintiffs' address with the Comptroller's Office because such claim is not a core proceeding under 28 U.S.C. § 157(b) and is not necessary to resolve a core proceeding.  The Court, however, finds that this claim is "otherwise related to" this bankruptcy case and submits the following proposed findings of fact and conclusions of law to the district court for entry of final order or judgment.

486.    The Court determines that it does not have statutory authority to enter final judgment on Plaintiffs' breach of fiduciary duty claim related to allegations that Merchant attempted to sell partnership property without Plaintiffs' knowledge and consent because such claim is not a core proceeding under 28 U.S.C. § 157(b) and is not necessary to resolve a core proceeding.  The Court, however, finds that this claim is "otherwise related to" this bankruptcy case and submits the following proposed findings of fact and conclusions of law to the district court for entry of final order or judgment.

487.    The Court determines that it does not have statutory authority to enter final judgment on Plaintiffs' breach of fiduciary duty claim related to allegations that Merchant filed numerous frivolous lawsuits in order to harass Plaintiffs because such claim is not a core proceeding under 28 U.S.C. §157(b) and is not necessary to resolve a core proceeding.  The Court, however, finds that this claim is "otherwise related to" this bankruptcy case and submits the following proposed findings of fact and conclusions of law to the district court for entry of final order or judgment.

488. The Court determines, however, that it does have the requisite statutory authority to enter a final judgment on Plaintiffs' breach of fiduciary duty claim related to allegations that Merchant lied about the sales price and induced Plaintiffs to purchase the Greenway Real Property at a price that was to Plaintiffs' detriment and Defendants' benefit.  The Court finds that this breach of fiduciary duty claim is core proceeding under § 157(b)(2)(B) (allowance or disallowance of claims). The Court also finds that it maintains constitutional authority to enter a final judgment on Plaintiffs' breach of fiduciary duty claim because resolution of this claim is necessary to resolve whether Defendants' Claim No. 10, representing the Second Mortgage Note on the Greenway Real Property, is allowed.

C.    Findings of Fact & Conclusions of Law

489. Pursuant to Texas Civil Practice and Remedies Code § 16.004(a)(5), the statute of limitations to bring a suit for breach of fiduciary duty is no later than four years after the day the cause of action accrues.

490. The general rule, under Texas law, is that "[c]auses of action accrue and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 675 (5th Cir. 2013) (quoting *Exxon Corp v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 202 (Tex. 2011)).

491. Under the "injury rule," Texas law states that "a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Priester*, 708 F.3d at 675 (quoting *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003)).

492. Texas law does recognize an exception to the general "injury rule" for accrual of the cause of action and permits the "discovery rule" to extend the statute of limitations. *Priester*,

708 F.3d at 675.  The discovery rule exception, however, is a "'very limited exception to statutes of limitations,' which defers the accrual of the cause of action until the injury was or could have reasonably been discovered."  ***Shell Oil Co. v. Ross***, 356 S.W.3d 924, 929-30 (Tex. 2011) (quoting ***Computer Assocs. Int'l, Inc. v. Altai, Inc.***, 918 S.W.2d 453, 455-56 (Tex. 1996)).

493.  "The discovery rule applies 'only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable.'"  ***Shell Oil Co.***, 356 S.W.3d at 930 (quoting ***Wagner & Brown, Ltd. v. Horwood***, 58 S.W.3d 732, 734 (Tex. 2001)); *see also* ***Priester***, 708 F.3d at 675 (citing ***S.V. v. R.V.***, 933 S.W.2d 1, 6-7 (Tex. 1996)) ("The Texas courts have set the 'inherently undiscoverable' bar high, to the extent that the discovery rule will only apply where it is nearly impossible for the plaintiff to be aware of his injury at the time he is injured.").

494.  Where there is a fiduciary duty alleged, Texas courts have held that the injured party is presumed to possess less information than the fiduciary and that, as part of the "inherently undiscoverable" element, facts which might normally require investigation may not "excite suspicion where a fiduciary relationship is involved."  ***Computer Assocs.***, 918 S.W.2d at 456. The person owed a fiduciary duty, however, still maintains "some responsibility to ascertain when an injury occurs." ***Id.***; *see also* ***Courseview, Inc. v. Phillips Petroleum Co.***, 312 S.W.2d 197, 205 (Tex. 1957) ("The fiduciary relationship is therefore one of the circumstances to be considered in determining whether fraud might have been discovered by the exercise of reasonable diligence.  It may excuse the defrauded party from taking action that would be required in an arm's length transaction or from making as prompt or searching investigation as might otherwise be expected….We are not prepared to say, however, that one in a relationship of

trust and confidence is always justified as a matter of law in neglecting every precaution until something occurs to arouse his suspicions.").

495. The Court finds that, in order to determine what statute of limitations analysis is applicable, the Court must first determine whether a fiduciary relationship exists between the parties. This is also a requisite element Plaintiffs must prove to prevail on their claim for breach of fiduciary duty. *See **In re Antone's Records, Inc.**,* 445 B.R. 758, 780 (Bankr. W.D. Tex. 2011); *see also **Heritage Gulf Coast Props., Ltd. v. Sandalwood Apartments, Inc.**,* 416 S.W.3d 642, 650 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("The elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship existed between the plaintiff and the defendant, (2) the defendant breached its fiduciary duty, and (3) the breach resulted in injury to the plaintiff or benefit to the defendant.") (citations omitted).

496. Here, Plaintiffs allege a number of roles in which Merchant's relationship with Plaintiffs could constitute a fiduciary relationship. Those roles are as accountant, financial and personal advisor, agent and attorney of fact.[33]

497. "A fiduciary relationship may be based on formal or informal relations in which one person places special confidence in another who, in equity and good conscience, is bound to act in good faith and with due regard for the interest of the person placing the confidence." ***In re Antone's Records***, 445 B.R. at 780-81 (citing ***Texas Bank & Trust Co. v. Moore***, 595 S.W.2d 502, 507 (Tex. 1980); ***Lacy v. Ticor Title Ins. Co.***, 794 S.W.2d 781, 788 (Tex. App.—Dallas 1990), writ denied, 803 S.W.2d 265 (Tex. 1991)).

498. Under Texas law, there are two types of fiduciary relationships: formal and informal relationships. Formal relationships arise as a matter of law and include attorney-client,

---

[33] The Court finds in another section of this opinion that the parties are not partners in the Lucky Food Mart & Real Estate endeavors. *Supra* at pp. 71-73. As such, no fiduciary relationship could have been based on a partnership role.

partnership, trustee, and principal-agent relationships. *In re Estate of Abernethy*, 390 S.W.3d 431, 437 (Tex. App. – El Paso 2012, no pet.). Informal fiduciary relationships arise from moral, social, domestic or personal relationships. *Id.* at 437-38 (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593-94 (Tex. 1992) [superseded by statute on other grounds as noted in *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-26 (Tex. 2002)]; *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)).

499.    Here, the possible fiduciary relationships alleged all fall within the informal fiduciary relationship designation. The accountant-client relationship has been held to not always involve a fiduciary duty. *See Abernethy*, 390 S.W.3d at 438; *Squyres v. Christian*, 253 S.W.2d 470, 471 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.). Further, to the extent that an attorney-in-fact relationship is alleged, Plaintiffs presented no documentary evidence of a power of attorney given to Merchant. For this reason, the Court shall only consider whether any attorney-in-fact relationship alleged meets the standards to constitute an informal fiduciary relationship.

500.    "Whether a fiduciary duty exists in an informal relationship is to be determined from the actualities of the relationship between the persons involved." *Abernethy*, 390 S.W.3d at 438 (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962); *Dominguez v. Brackey Enters., Inc.*, 756 S.W.2d 788, 791 (Tex. App.—El Paso 1988, writ denied)).

501.    "[A]n informal fiduciary relationship may be created where a special confidence is placed in one person who is bound to act in good faith and with due regard to the interests of the one reposing confidence." *In re Antone's Records,* 445 B.R. at 781.

502.     A fiduciary relationship, however, is "an extraordinary one and will not be created lightly." *Abernethy*, 390 S.W.3d at 438 (citing *In re Estate of Kuykendall*, 206 S.W.3d 766, 771 (Tex. App.—Texarkana 2006, no pet.)).

503.     Further, a subjective trust held by one party in another does not in and of itself create a fiduciary relationship. *Abernethy*, 390 S.W.3d at 438; *see also* *Crim Truck*, 823 S.W.2d at 595 ("[M]ere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship.").

504.     Rather, a party must be justified in its reliance on another party in order for an informal fiduciary relationship to arise. *Abernethy*, 390 S.W.3d at 438.  Such justification may arise based on the dealings of parties continuing for a long period so that one party is "accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship as well as personal friendship." *Id.* (citations omitted).

505.     The fact that the parties have maintained a lengthy and cordial relationship, however, does not necessarily create a fiduciary duty. *Id.* (citing *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston [1st Dist.] 1996, no pet.)).

506.     In this case, the Court finds that Merchant did not owe a fiduciary duty to Plaintiffs.  Based on the lengthy testimony and evidence presented at trial, it is clear to this Court that the parties have a long relationship that was at least cordial until approximately 2010.  It is also clear, however, that the relationship between these two parties was not a relationship involving one-sided reliance.  Throughout their interactions, Plaintiffs have relied on Merchant, at times, and Merchant has likewise relied on Plaintiffs.  The Court cannot find that the dealings of the parties show that Plaintiffs were so "accustomed to being guided by the judgment or advice" of

Merchant that the extraordinary designation of an informal fiduciary duty is appropriate. In fact, Plaintiffs testified to precisely the opposite when describing their business decisions. The testimony is clear that Merchant was a friend and business acquaintance; however, Plaintiffs' reliance on Merchant's advice or representations in the instances where a breach of fiduciary duty is alleged was not justified by the parties' bilaterally dependent relationship.

507.    As such, the Court concludes that Plaintiffs did not prove that Merchant owed Plaintiffs a fiduciary duty and therefore, no duty existed to be breached.

D.    Conclusion

508.    For the aforementioned reasons, the Court specifically concludes that Plaintiffs' claim for breach of fiduciary duty related to the Greenway Real Property closing and sale price fails because no fiduciary relationship existed.

509.    For the aforementioned reasons, the Court submits its findings that Plaintiffs' remaining claims for breach of fiduciary duty also fail because no fiduciary relationship existed.

II.    **Fraud in the Inducement**

A.    Parties' Contentions

510.    Plaintiffs allege that Merchant made material misrepresentations to them in the sale of the Greenway Real Property when he kept the sales price in the closing documents at $295,000 and took a Second Mortgage Note for himself in the amount of $95,000 after the bank would not loan the full requested amount. Plaintiffs assert that the new sales prices should have been $200,000 and that Merchant purposely intended to induce Plaintiffs to close on the Greenway Grocery without reflecting the appropriate sales price on the closing documents.

511.    Plaintiffs also allege that they reasonably relied upon the representations by Merchant prior to closing on the Greenway Real Property and on Merchant's representations in the closing documents so that they did not read the documents at the closing themselves.

512.    Plaintiffs argue that they incurred financial injury as a result of Plaintiffs being bound to the Second Mortgage Note, valued at $95,000, on the Greenway Real Property and seek to have the Second Mortgage Note vitiated.

513.    Defendants respond by first asserting that Plaintiffs' claims for fraudulent inducement are barred by the four year statute of limitations in Texas Civil Practice and Remedies Code § 16.004(a)(4).   Plaintiffs argue that the discovery rule applies to Plaintiffs' fraudulent inducement claims so that the statute of limitations has not expired.

514.    Defendants further respond that Plaintiffs knew the sales price of $295,000 for the Greenway Real Property and were aware of that price before signing the closing documents. Merchant contends that Plaintiffs knew that the Second Mortgage Note was part of the closing documents and asserts that Plaintiffs simply forgot about its existence until he demanded payment.

B.    <u>Jurisdiction & Authority</u>

515.    The Court determines it has subject matter jurisdiction over Plaintiffs' fraudulent inducement claim pursuant to 28 U.S.C. § 1334(b) (2015).

516.    The Court determines that it does have the requisite statutory authority to enter a final judgment on Plaintiffs' fraudulent inducement claim related to allegations that Merchant lied about the sales price and induced Plaintiffs to purchase the Greenway Real Property at a price that was to Plaintiffs' detriment and Defendants' benefit.  The Court finds that the fraudulent inducement claim is core proceeding under § 157(b)(2)(B) (allowance or disallowance of

claims). The Court also finds that it maintains constitutional authority to enter a final judgment on Plaintiffs' fraudulent inducement claim because resolution of this claim is necessary to resolve whether Defendants' Claim No. 10, representing the Second Mortgage Note on the Greenway Real Property, is allowed.

C.      Findings of Fact & Conclusions of Law

517.    Pursuant to Texas Civil Practice and Remedies Code § 16.004(a)(4), the statute of limitations to bring a suit for fraud is no later than four years after the day the cause of action accrues.

518.    The general rule, under Texas law, is that "[c]auses of action accrue and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Priester*, 708 F.3d at 675 (quoting *Emerald Oil*, 348 S.W.3d at 202).

519.    Under the "injury rule," Texas law states that "a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Priester*, 708 F.3d at 675 (quoting *Provident Life*, 128 S.W.3d at 221).

520.    Texas law does recognize an exception to the general "injury rule" for accrual of the cause of action and permits the "discovery rule" to extend the statute of limitations. *Priester*, 708 F.3d at 675. The discovery rule exception, however, is a "'very limited exception to statutes of limitations,' which defers the accrual of the cause of action until the injury was or could have reasonably been discovered." *Shell Oil Co.*, 356 S.W.3d at 929-30 (quoting *Computer Assocs.*, 918 S.W.2d at 455-56).

521.    "The discovery rule applies 'only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable.'" *Shell Oil Co.*, 356 S.W.3d at 930

(quoting *Wagner & Brown*, 58 S.W.3d at 734); *see also Priester*, 708 F.3d at 675 (citing *S.V. v. R.V.*, 933 S.W.2d at 6-7) ("The Texas courts have set the 'inherently undiscoverable' bar high, to the extent that the discovery rule will only apply where it is nearly impossible for the plaintiff to be aware of his injury at the time he is injured.").

522. The doctrine of fraudulent concealment also prevents a defendant from raising limitations as a defense where the defendant has hidden evidence of the injury or harm from the plaintiff so that the plaintiff could not discover the injury until a later time. *See Priester*, 708 F.3d at 676.

523. The policy behind preventing a defendant from raising a limitations defense where fraudulent concealment of the injury has occurred is to prevent the defendant from "avoid[ing] liability for his actions by deceitfully concealing wrongdoing until the limitations has run." *Id.* (quoting *S.V.*, 933 S.W.2d at 6).

524. Where fraudulent concealment has occurred, the limitations are tolled "until the claimant, using reasonable diligence, discovered or should have discovered the injury." *Priester*, 708 F.3d at 676 (quoting *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999)).

525. The elements of fraudulent concealment are: "(1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception." *Priester*, 708 F.3d at 676 (quoting *Holland v. Thompson*, 338 S.W.3d 586, 596 (Tex. App.—El Paso 2010, pet. denied) (citations omitted).

526. Here, the Court finds that Merchant did not fraudulently conceal the alleged fraudulent inducement and did not fraudulently conceal the alleged injury.

527. The Court finds that Plaintiffs were present at the closing.

528. The Court also finds that the closing documents reflected Merchant's asserted sale price of $295,000 plainly.

529. The Court also finds that Plaintiffs admitted to receiving a copy of the closing documents either at the closing or shortly thereafter.

530. The Court finds that Plaintiffs chose not to read the closing documents either at the actual closing at the title company or after they received their copy of the closing documents.

531. Although Plaintiffs argue that they trusted Merchant enough not to read the closing documents, even if the Court assumes that Merchant did not tell them the truth about the sales price, the Court finds that Plaintiffs' reliance on Merchant and failure to read the closing documents at the closing or after receiving their copy from the closing company was not reasonable.

532. As such, even if this Court assumes that the first two elements for fraudulent concealment are met, the Court does not find that Merchant attempted to conceal the alleged tort. Likewise, the Court does not find that Plaintiffs' reliance on Merchant's alleged representations when they possessed the closing documents disclosing the $295,000 sale price was reasonable.

533. Therefore, the discovery rule and doctrine of fraudulent concealment do not toll the statute of limitations on Plaintiffs' claim for fraudulent inducement.

534. The Court finds that the closing for the Greenway Real Property occurred on June 26, 2000. Therefore, the statute of limitations expired on June 26, 2004, and Plaintiffs' claim for fraudulent inducement is barred.

D.    Conclusion

535.    For the aforementioned reasons, the Court finds that Plaintiffs' claim for fraudulent inducement is barred by the applicable statute of limitations.

**III.   Abuse of Process**

    A.    Parties' Contentions

536.    Plaintiffs contend that Merchant committed abuse of process in four ways. First, Plaintiffs allege that Merchant committed abuse of process by endorsing and depositing tax refund checks issued to Plaintiffs' companies by the Comptroller into his own company accounts. Second, Plaintiffs allege that Merchant committed abuse of process by serving process on Plaintiffs only at the Fort Sam Grocery location after he had locked them out of the property and knew they were not present at the Fort Sam Grocery. Additionally, Plaintiffs allege that Merchant knew where Plaintiffs lived and could have served them at their home address. Third, Plaintiffs allege that Merchant committed abuse of process by serving a writ of garnishment on Plaintiffs' vendors and representatives for social organizations that could not have reasonably been done for the purpose of collecting on the State Court Judgments. Finally, Plaintiffs allege that Merchant filed numerous frivolous lawsuits and made false statements to the Comptroller's Office in order to have Plaintiffs and their businesses audited and to harass Plaintiffs.

537.    Merchant denies that he sent false correspondence to the Comptroller's Office, TABC or Secretary of State in an attempt to force payment of Plaintiffs' debts. Merchant also denies filing frivolous or harassing litigation and asserts he did not file documents in an attempt to have Plaintiffs audited. Merchant also denies stealing money from Plaintiffs by filing fraudulent tax returns and then depositing the refunds to his own account. Likewise, Merchant denies

purposefully serving Plaintiffs at the Fort Sam Grocery location when he knew they were not there but argues that the clerk's office told him to serve that address.

        B.     <u>Jurisdiction & Authority</u>

538.    As indicated previously in considering Defendants' Proof of Claim No. 12-2, there is a question regarding whether this federal bankruptcy court has subject matter jurisdiction to decide Plaintiffs' abuse of process claim based on Plaintiffs' second allegation that Merchant purposefully served Plaintiffs at the Fort Sam Grocery, where he knew they were no longer located in order to obtain a default judgment.

539.    Under the *Rooker-Feldman* doctrine, this Court could not overturn or void the state court default judgment that has already been entered.[34]  Likewise, this Court lacks the jurisdiction to simply nullify a state court default judgment.  *See e.g.* **In re Anderson**, 357 B.R. at 407-08.

540.    In **Exxon Mobil Corp. v. Saudi Basic Indus. Corp.**, the Supreme Court held that a federal court has subject matter jurisdiction to consider an independent claim, even if that claim "denies a legal conclusion that a state court has reached in a case" to which the plaintiff was a party.  544 U.S. at 284.  If the plaintiff is seeking relief other than to appeal the state court judgment, and if the injuries were caused by the defendant or some other party rather than by the judgment itself, then the claim is most likely an independent action not barred by *Rooker-Feldman*.  *See* **Truong v. Bank of Am., N.A.,** 717 F.3d 377, 382-85 (5th Cir. 2013); *see also* **Weaver,** 660 F.3d at 904 (determining whether a state court default judgment was fully satisfied pursuant to Chapter 11 plan provisions does not "require appellate-type review or invalidation of the Texas Judgment" and therefore, does not deprive the federal court of jurisdiction pursuant to the *Rooker-Feldman* doctrine).

---

[34] *Supra* at pp. 84-86.

541.    Under Texas common law, the elements of an abuse of process claim include: "(1) an illegal, improper or perverted use of process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damages as a result of the illegal act. ***Preston Gate, LP v. Bukaty***, 248 S.W.3d 892, 897 (Tex. App.—Dallas 2008, no pet.) (citing ***Graham v. Mary Kay Inc.***, 25 S.W.3d 749, 756 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)).

542.    In the adversary proceeding, Plaintiffs state that they seek actual and exemplary damages, mental anguish damages, attorneys' fees for abusive litigation, treble damages, and costs of court.

543.    In relation to Plaintiffs' claim that Merchant committed abuse of process by serving Plaintiffs' at the Fort Sam Grocery location, however, the Court finds that Plaintiffs did not present any evidence that injury or damages resulted from the service on the alleged wrong location beyond entry of the default judgment and issuance of a writ of garnishment pursuant to that default judgment.

544.    As such, the only damage which Plaintiffs offered evidence regarding is damage which this Court lacks the subject matter jurisdiction to remedy under the *Rooker-Feldman* doctrine. Plaintiffs seek a judgment of this Court effectively nullifying the State Court Default Judgments. Under the *Rooker-Feldman* doctrine, this Court lacks the subject matter jurisdiction to decide Plaintiffs' abuse of process claims relating to the State Court Default Judgments.

545.    This Court does, however, maintain subject matter jurisdiction to decide the remainder of Plaintiffs' abuse of process allegations.

546.    This Court must also determine whether it maintains statutory and constitutional authority to enter a final judgment on Plaintiffs' abuse of process claims. The Court finds that it

does not maintain the statutory authority to enter final judgment on Plaintiffs' abuse of process claims and shall submit the following findings of fact and conclusions of law.

547.    First, the Court finds that, because it lacks of subject matter jurisdiction to void the state court judgments upon which Defendants' Claims Nos. 11 and 12 are based, Plaintiffs' abuse of process claims are not core proceedings under 28 U.S.C. § 157(b)(2).

548.    Second, the Court finds that, under 28 U.S.C. § 157(c)(1), Plaintiffs' abuse of process claims are "otherwise related to" this bankruptcy case and submits the following proposed findings of fact and conclusions of law to the district court for entry of final order or judgment on Plaintiffs' abuse of process claims.

C.    Findings of Fact, Conclusions of Law & Analysis

549.    Under Texas common law, the elements of an abuse of process claim include: "(1) an illegal, improper or perverted use of process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damages as a result of the illegal act. *Preston Gate*, 248 S.W.3d at 897 (citing *Graham*, 25 S.W.3d at 756).

550.    "To constitute an abuse of process, the process must have been used to accomplish an end which is beyond the purview of the process and which compels a party to do a collateral thing which he could not be compelled to do." *Preston Gate*, 248 S.W.3d at 897 (citing *Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 379 (Tex. App.—Texarkana 1989, no writ)).

551.    Although the original issuance of process is justified, abuse of process requires that the process itself is later used for purpose for which it was not intended. *Preston Gate*, 248 S.W.3d at 897 (citing *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *Hunt v. Baldwin*, 68 S.W.3d 117, 130 (Tex. App.—Houston [14th Dist.] 2001, no

pet.)). When the process, however, is used for the purpose for which it was intended, no abuse of process may occur. **Preston Gate**, 248 S.W.3d at 897.

552. "'Process' is traditionally defined as the writ, summons, mandate, or other process which is used to inform the defendant of the institution of judicial proceedings against him and to compel his appearance in court." **Snyder v. Byrne**, 770 S.W.2d 65, 69 (Tex. App.—Corpus Christi 1989, no writ).

553. To prove injury, the plaintiff must show a wrongful seizure of property or actual interference with the plaintiff's person. **RRR Farms Ltd. v. Am. Horse Protection Ass'n, Inc.** 957 S.W.2d 121, 133 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).

554. An abuse of process claim cannot be sustained if the plaintiff cannot show damages other than those "necessarily incident to filing a lawsuit." *See* **Martin v. Trevino**, 578 S.W.2d 763, 769 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.); **Pitts & Collard, L.L.P. v. Schechter**, 369 S.W.3d 301, 333 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

### i. *Merchant's endorsement and depositing of tax refund checks do not constitute abuse of process.*

555. The Court finds that Merchant did endorse tax refund checks from the Texas Comptroller's Office that were made payable to Plaintiffs' entities and that Merchant deposited one or more of those tax refund checks into his own account.

556. The Court finds that Merchant's actions in endorsing and depositing the checks do not constitute abuse of process because the tax refund checks do not meet the traditional definition of "process." *See* **Snyder**, 770 S.W.2d at 69. Tax refund checks are not a "writ, summons, mandate, or other process" used to "inform the defendant of the institution of judicial proceedings against him and to compel his appearance in court." **Id.** Rather, tax refund checks

do not involve judicial proceedings on their own and do not compel a defendant's court appearance.

557. Therefore, the Court finds that Plaintiffs' allegation that Merchant committed abuse of process by endorsing and depositing tax refund checks into his own account fails as a matter of law.

### ii. Merchant's filing numerous lawsuits and correspondence with the Texas Comptroller's Office does not constitute abuse of process.

558. Under Texas law, "it is critical to a cause of action for abuse of process that the process be improperly used *after* it has been issued." **Bossin**, 894 S.W.2d at 33. When a wrongful or malicious intent causes the process to be issued in the first place, the correct claim is for malicious prosecution—not abuse of process. **Id.** (citing **Martin**, 578 S.W.2d at 769).

559. The Court finds that Merchant's filing of numerous lawsuits—even if deemed frivolous—do not constitute an abuse of process because the forms of process issued in those lawsuits were used to accomplish the purpose for which they were intended; that is, to give a defendant notice of the pending suit. *See* **Baubles & Beads**, 766 S.W.2d at 378-79.

560. Here, Plaintiffs allege that the filing of the numerous lawsuits themselves amount to an abuse of process. The Court finds, however, that such filing is not an abuse of process because the process issued as a consequence of the filing was properly used. If the filing is indeed frivolous, then the correct claim would be one for malicious prosecution; which Plaintiffs do not allege here.

561. Additionally, the Court finds that Merchant's correspondence with the Texas Comptroller's Office does not constitute an abuse of process because, like the tax refund checks, such correspondence does not meet the traditional definition of "process" informing a defendant of judicial proceedings or compelling his presence in court.

119

562.    Therefore, the Court finds that Plaintiffs' allegation that Merchant committed abuse of process by filing frivolous lawsuits and by correspondence with the Texas Comptroller's Office fails as a matter of law.

### iii.    Merchant's service of a writ of garnishment on Plaintiffs' vendors and social organization representatives

563.    "Texas has generally recognized a cause of action for abuse of process in situations where the original process, such as a writ of garnishment or writ of sequestration, has been abused to accomplish an end other than that which the writ was designed to accomplish." *Lozano v. Tex-Paint, Inc.*, 606 S.W.2d 40 (Tex. Civ. App.—Tyler 1980, no writ) (citing *Peerless Oil & Gas Co. v. Teas*, 138 S.W.2d 637 (Tex. Civ. App.—San Antonio 1940) affirm'd 158 S.W.2d 758 (1942); *Rogers v. O'Barr & Dinwiddie*, 76 S.W. 593 (Tex. Civ. App. 1903, no writ)).

564.    Under Texas law, a garnishment is "a statutory proceeding brought by a judgment creditor (the garnishor) whereby the property, money, or credits of the judgment debtor (the debtor) in the possession of another (the garnishee) may be applied to payment of the final judgment against the debtor." *Zeecon Wireless Internet, LLC v. Am. Bank of Tex., N.A.*, 305 S.W.3d 813, 816 (Tex. App.—Austin 2010, no pet.).

565.    "In a garnishment proceeding, the purpose of the writ is to cite the garnishee to appear at the time designated and to answer the inquiries upon oath, and also to impound the assets or property of a debtor in the hands of the garnishee." *Roy Campbell & Co. v. Roots*, 60 S.W.2d 896, 897 (Tex. App.—Amarillo 1933, writ dismissed).

566.    At trial, Mumtaz testified that Merchant prepared the application for Writ of Garnishment and requested the writs be served on banks where she was not a customer, wholesalers, family, friends, her CPA, members of her own business entities, and the president of the South Texas

Merchant's Association.  At trial, Merchant was not asked about the entities which he served the Writ of Garnishment on and did not shed any light as to his reasons for serving any entity.

567.    Under Texas law, the first element to an abuse of process claim is "an illegal, improper or perverted use of process, neither warranted nor authorized by the process."  *See **Preston Gate***, 248 S.W.3d at 897.

568.    To establish the first element in this case, the Court finds that Plaintiffs must show that the parties which Merchant served with the writ of garnishment could not have been calculated to be possible debtors to the judgment creditor—here, Mumtaz Ali DBA Fort Sam Grocery—so that service of the writ of garnishment on those parties could only serve as a perverted use of the writ of garnishment process.

569.    Plaintiffs allege specifically that service of the writ of garnishment on their vendors and on the president of the South Texas Merchant Association were an improper use of the garnishment process.

570.    The Court finds that Plaintiffs did not present sufficient evidence that Merchant could not have calculated that Plaintiffs' vendors or the South Texas Merchant Association might be indebted to Plaintiffs at the time or that they might be holding property of Plaintiffs subject to garnishment.

571.    Rather, the Court finds that the testimony at trial indicated that Plaintiffs vendors often required establishment of credit or cash payment in order to purchase inventory or supplies. Additionally, testimony at trial illuminated that the South Texas Merchant's Association also serves to assist its members in establishing a good credit history or credibility with certain suppliers.  Plaintiffs offered no proof that any of these entities would never be in possession of

Plaintiffs' property or owe money to Plaintiffs.  To the contrary, it appears to this Court that these relationships would lend themselves to bilateral obligations of payment to either party.

572.    Therefore, the Court finds that Merchant's service of the writ of garnishment on Plaintiffs' vendors and the South Texas Merchant's Association was not a perverted use of the garnishment process.  As such, Plaintiffs have not proved the first element for abuse of process and their claim must fail on factual grounds.

D.    Conclusion

573.    For the aforementioned reasons, the Court concludes that it lacks subject matter jurisdiction to consider Plaintiffs' claim for abuse of process relating to service of process where State Court Default Judgments have been entered and submits that Plaintiffs' remaining abuse of process claims each fail for insufficient evidence or as a matter of law.

IV.    **Usury**

A.    Parties' Contentions

574.    Plaintiffs contend that Defendants' claimed usurious interest under Texas law in their original filed proofs of claim in Claims Nos. 7, 8, 9, 10, 11, 12, 13, 14, and 15.

575.    Plaintiffs allege that notice was provided to Defendants by way of Plaintiffs' Objections to Claim that the claim contained usurious interest and that Defendants did not timely correct the usury within sixty days, as required by statute.

576.    It is unclear exactly what amounts or remedies Plaintiffs seek as a consequence of Defendants' alleged usury violations.  At some points, Plaintiffs seem to argue for statutory damages and at other times, Plaintiffs request invalidation of the underlying debt claimed by Defendants.

577.     Defendants admit that the amounts listed on Defendants' original proofs of claim were in excess of Texas state usury laws but argue that the amounts asserted in the proofs of claim are not "charges" under the Texas usury statutes so that filing of the proofs of claims do not fall under the purview of the usury penalties.

B.     Jurisdiction & Authority

578.     The Court determines it has subject matter jurisdiction over Plaintiffs' usury claims pursuant to 28 U.S.C. § 1334(b).

579.     The Court determines that it does not have statutory authority to enter a final judgment on Plaintiffs' usury claim because such claims are not core proceedings under 28 U.S.C. § 157(b) and are not necessary to resolve a core proceeding. Although Plaintiffs assert in their objections that the remedy for a successful usury claim is nullification of the underlying debt, the Court finds no statutory basis for such assertion. As such, the usury claims are each independent of the underlying Proofs of Claim and are necessary to determine the amount of the asserted proofs of claim. The Court, however, finds that the usury claims are "otherwise related to" this bankruptcy case and submits the following proposed findings of fact and conclusions of law to the district court for entry of final order or judgment.

C.     Findings of Fact & Conclusions of Law

580.     The Court starts with the baseline that Defendants admitted that they filed proofs of claim alleging interest in excess of Texas usury laws by attempting to charge interest in excess of court-ordered judgment interest rates and loan documents and by attempting to charge interest amounts that were not agreed to by the parties. As such, the Court shall begin its analysis with whether the filing of a proof of claim with a usurious interest rate is a "charge" within the meaning of the Texas Finance Code.

581.    The Court finds that the filing of a proof of claim with a usurious interest rate falls within the definition of a "charge" under the Texas Finance Code.  In ***Zer-Ilan v. Frankford (In re CPDC, Inc.)***, 337 F.3d 36 (5th Cir. 2003), the Fifth Circuit found that the timely amendment of a proof of claim filed in a bankruptcy proceeding to eliminate a usurious charge of interest was sufficient to preclude the creditor's liability under the Texas usury statutes.  Likewise, this Court held in ***Ingalls v. Cunningham (In re Weaver)***, 2007 WL 3046593 (Bankr. W.D. Tex. Oct. 16, 2007), that the filing of an amended proof of claim to seek less money and exclude an alleged usurious provision was sufficient to avoid liability under the Texas usury statutes if filed within sixty days of receiving notice of the usurious interest.  Both of these cases indicate that the initial filing of a proof of claim, therefore, constitutes a charge for purposes of the Texas usury statutes such that correction of the proof of claim could resolve the alleged usury violation.

582.    This Court must then decide whether Plaintiffs gave Defendants written notice of the alleged usury violation as required by Texas Finance Code § 305.006.

583.    Pursuant to Texas Finance Code § 305.006, before filing a cause of action for usury, an obligor is required to give a creditor written notice—stating in reasonable detail the nature and amount of violations – not later than the sixty-first day before the obligor files suit.  Tex. Fin. Code § 305.006(b) (2014).[35]  Subsection (c) states that "[a] creditor who receives notice under this section may cure the violation during the period beginning on the day the notice is received

---

[35] While Texas Finance Code § 305.006 is silent in defining what constitutes written notice, Texas Finance Code § 305.103 gives a detailed definition of written notice.  Tex. Fin. Code § 305.103(c) (2014).  It is clear that a claim objection would not meet the requirement of written notice under Texas Finance Code § 305.103(c).  ***See id.***  Texas Finance Code § 305.103 does not govern an obligor filing suit, however.  This court must look to Texas Finance Code § 305.006 to determine the requirement of written notice of the violation of a usury claim was met.  This is where ambiguity exists in the statute.  Here, the Court interprets the inclusion of a detailed definition of written notice in Texas Finance Code § 305.103 and the exclusion of such a detailed definition in Texas Finance Code § 305.006 (which is the controlling statute here) to mean that the legislature intended for the requirement of written notice under Texas Finance Code § 305.006 to be general enough to include a claim objection as proper written notice.

and ending on the 60th day after that date." *Id.* at § 305.006(c). "A creditor who corrects a violation as provided by this section is not liable to an obligor for the violation." *Id.*

584. Because usury statutes are penal in nature, they are to be strictly construed and interpreted in favor of the lender whenever any ambiguity occurs. *Thrift v. Estate of Hubbard*, 44 F.3d 348, 359 (5th Cir. 1995).

585. The Court finds that Defendants filed their original Proofs of Claim Nos. 7-1, 8-1, 9-1, 10-1, 11-1, 12-1, 13-1, 14-1, and 15-1 on May 15, 2013, containing the interest Defendants admit is in excess of Texas usury limits.

586. The Court finds that Plaintiffs filed their original Objections to Claim Nos. 7, 8, 9, 10, 11, 12, 13, 14, and 15 on August 16, 2013.

587. The Court finds that Plaintiffs stated in reasonable detail the nature and amount of the usury violations or that incorrect interest was stated on the proof of claim in their Objections to Claims No. 7, 8, 10, 11, 12, 13, 14, and 15. The Court, however, finds that Plaintiffs did not state any allegations of usury violations or incorrect interest in their Objection to Claim No. 9.

588. The Court finds that Defendants amended all their Proofs of Claims between December 30, 2013, and January 7, 2014.

589. The Court, therefore, finds that—even at the earliest amendment date—Defendants did not amend their Proofs of Claim to correct any alleged usurious interest charges within the 60-day notice requirement under Texas Finance Code § 305.006.

590. Accordingly, the Court finds that Defendants violated Texas usury laws by filing Proofs of Claims with admittedly usurious rates and not curing the usurious interest within 60 days of notice received from Plaintiffs.

591.   The Court must then determine the amount of damages to be awarded to Plaintiffs based on Defendants' usury violations.

592.   Plaintiffs direct the Court to Texas Finance Code § 349.001 for determination of liability for contracting for, charging or receiving excessive amounts in commercial transactions of the type between Plaintiffs and Defendants.

593.   Texas Finance Code § 349.001(a) provides:

> A person who violates this subtitle by contracting for, charging, or receiving interest or time price differential greater than the amount authorized by this subtitle is liable to the obligor for an amount equal to:
>
> (1) twice the amount of the interest or time price differential contracted for, charged or received; and
>
> (2) reasonable attorney's fees set by this court.

594.   The Court finds that Plaintiffs did not present any evidence or testimony to prove the amount of interest that is usurious under Texas law.  The burden is on Plaintiffs to show that amount of damages or liability of Defendants.  Plaintiffs, however, merely made conclusory statements to the Court in filed documents and at trial that the interest charged *was* usurious but did not provide this Court with the necessary facts to determine *to what extent* the interest charged was usurious and accordingly, did not show the amount upon which statutory damages under § 349.001(a) of the Texas Finance Code should be based.

595.   As such, the Court finds that Plaintiffs have failed to meet their burden of proof in regards to damages and cannot award damages to Plaintiffs based on Defendants' usurious charges in their original proofs of claims.

D.    Conclusion

596.    For the aforementioned reasons, the Court submits that Defendants charged usurious interest in violation of Texas usury law but finds that Plaintiffs failed to prove the basis for the amount of damages that should be awarded for the usurious charges.

## V.    Breach of Partnership, Accounting of Partnership & Suit to Quiet Title

597.    Pursuant to the Court's findings when considering Defendants' Proof of Claim No. 9, this Court declines to consider Plaintiffs' claims for breach of partnership, accounting of partnership and suit to quiet title because this Court finds that ownership of the Lucky Real Property and Food Mart and any amounts owed from one joint owner to another are the subject of pending state court litigation in which the Rule 11 Agreement has been entered and which still controls the relationship of the parties in reference to the Lucky Real Property.  This Court shall not interfere with the state court's jurisdiction and authority over this already pending litigation.

598.    Further, pursuant to the Court's findings when considering Defendants' Proof of Claim No. 9, this Court finds that it could only submit findings of fact and conclusions of law to the district court because Plaintiffs' claims for breach of partnership, accounting of partnership and suit to quiet title are not core proceedings under 28 U.S.C. § 157(c)(1).

## VI.    Violation of the Automatic Stay

A.    Parties' Contentions

599.    Plaintiffs contend that Defendants violated the automatic stay in place under 11 U.S.C. § 362 in two ways: (1) by filing UCC financing statements relating to Proofs of Claim Nos. 7, 11, 12, 13, 14 and 17, with the Texas Secretary of State's Office after the Petition Date; and (2) by encouraging vendors and creditors to cease supplying Plaintiffs with supplies after the Petition Date.

127

600.    Defendants admit that the actions alleged by Plaintiffs were taken but denies that these actions violate the automatic stay.[36]

B.    Jurisdiction & Authority

601.    This Court finds that it has the statutory authority to enter final judgment regarding Defendants' alleged violations of the automatic stay because they are core proceedings under 28 U.S.C. §§ 157(b)(2)(G) (motions to terminate, annul, or modify the automatic stay) and pursuant to 11 U.S.C. § 362(k) (permitting recovery for a willful violations of the automatic stay).

602.    This Court also finds that it has constitutional authority to enter final judgment because such authority is necessary to enforce protection of debtors pursuant to the automatic stay created under 11 U.S.C. § 362.

C.    Findings of Fact & Conclusions of Law

    *i.    Merchant violated the automatic stay by filing UCC liens.*

603.    Sections 362(a)(4) & (5) of the Bankruptcy Code states:

Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title … operates as a stay, applicable to all entities, of –

. . .

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title . . .

604.    Under 11 U.S.C. § 362(k), a debtor "injured by any willful violation of the automatic stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages."

---

[36] Defendants do not provide any legal argument to support their contention that their actions do not violate the automatic stay but simply offer a blanket denial. *See* Defendants' Answer (Adv. ECF No. 28) for admissions.

605.    A willful violation of the automatic stay

> does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's action which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.

***Brown v. Chestnut (In re Chestnut)***, 422 F.3d 298, 302 (5th Cir. 2005) (quoting ***Tsafaroff v. Taylor (In re Taylor)***, 884 F.2d 478, 482 (9th Cir. 1989) (citations omitted) (citing 11 U.S.C. § 362(h) which was recodified into 11 U.S.C. § 362(k) per the Bankruptcy Abuse Prevention Consumer Protection Act of 2005)).

606.    There are three elements for a claim under 11 U.S.C. § 362(k): "(1) the defendant must have known of the existence of the stay; (2) the defendant's acts must have been intentional; and (3) these acts must have violated the stay."

607.     In the Fifth Circuit, in order to award punitive damages under 11 U.S.C. § 362(k), the defendant's conduct must be egregious and intentional. ***Young v. Repine (In re Repine)***, 536 F.3d 512, 521 (5th Cir. 2008).

608.    Whether conduct is egregious and intentional requires the Court to look at the factual circumstances surrounding the violations. *See e.g.* ***Collier v. Hill (In re Collier)***, 410 B.R. 464, 479-80 (Bankr. E.D. Tex. 2009) (finding that sending a demand letter on incorrect assumptions that could have been corrected by simply calling the Court for information regarding the bankruptcy filing was reckless disregard and posting a sign on a public thoroughfare in small community reference the unpaid debt was especially egregious conduct); ***Burrell v. Auto-Pak-USA, Inc. (In re Burrell)***, 2012 WL 3727130, *13 (S.D. Tex. August 27, 2012) (finding that choosing to backdate a bill of sale instead of returning a vehicle repossessed in violation of the automatic stay was egregious conduct); ***Dolan v. Dolan***, 2012 WL 371631, * 3 (S.D. Tex.

February 2, 2012) (Egregious conduct exhibits "a complete disregard for the bankruptcy process, and intentionally act[ing] to punish the debtor for seeking bankruptcy protection.").

609. The Court finds that Merchant admitted that he knew about Plaintiffs' bankruptcy filing and therefore, the existence of the automatic stay. As such, the first element for violation of the automatic stay is met.

610. The Court finds that Merchant intentionally acted by filing the UCC financing statements with the Texas Secretary of State. As such, the second element for violation of the automatic stay is met.

611. The Court finds that Defendants' actions of filing UCC financing statements relating to Proofs of Claim Nos. 7, 11, 12, 13, 14 and 17, with the Texas Secretary of State's Office after the Petition Date are violations of the automatic stay under 11 U.S.C. §§ 362(a)(4) & (5). As such, all elements for violation of the stay are satisfied.

612. The Court, however, finds that Defendants' actions of communicating with vendors and creditors to encourage them to cease supplying Plaintiffs with supplies after the Petition Date is not, in itself, a violation of the automatic stay under 11 U.S.C. § 362 because such communications were not in an attempt to collect a debt.

613. Plaintiffs specifically elicited testimony and evidence from Merchant confirming that he sent a fax to one of Plaintiffs' oil suppliers after the petition date stating "Greenway Grocery is in bankruptcy & forecloser [sic], be careful." Merchant also admitted to sending an email to the president of the South Texas Merchants Association warning them to be careful because Plaintiffs had filed bankruptcy. Plaintiffs testified that these actions caused them problems with the STMA suppliers.

614.    Merchant's communications with suppliers, however, do not constitute a violation of the automatic stay because Plaintiffs offered no evidence that such communications were made in an attempt to collect a pre-petition debt. *See e.g.* ***In re Collier***, 410 B.R. at 474-75 (distinguishing the posting of a sign on roadway reading "WILL YOU PLEASE COME PAY ME!" from actions taken for mere embarrassment within a community shared by debtor and creditor). Additionally, Merchant's communications were simply incorrect because Greenway Grocery has not actually filed bankruptcy and the stay only protects the debtors—Aziz and Mumtaz Ali.

   *ii.*    ***Damages***

615.    Under 11 U.S.C. § 362(k), a debtor "injured by any willful violation of the automatic stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages."

616.    Here, Plaintiffs seek actual damages for the cost of their attorney's fees to contest the UCC filings in this Court and punitive damages based on the totality of Merchant's actions.

617.    "Even if the evidence establishes the existence of a willful stay violation, a debtor must still establish actual damages, though the damage provisions of 11 U.S.C. § 362(k) are stated in mandatory terms." ***Collier***, 410 B.R. at 476 (citing ***All Trac Transp., Inc. v. Transp. Alliance Bank (In re All Trac Transp., Inc.)***, 223 Fed. Appx. 299, 302 (5th Cir. 2006); ***In re Perrin***, 361 B.R. 853, 856 (6th Cir. B.A.P. 2007); ***L'Heureux v. Homecomings Fin. Network, Inc. (In re L'Heureux)***, 322 B.R. 407, 411 (8th Cir. B.A.P. 2005)).

618.    In order to recover actual damages under 11 U.S.C. § 362(k), the damages must be proven with reasonable certainty and may not be speculative or based on conjecture. ***Repine***, 536 F.3d at 521-22; ***Collier***, 410 B.R. at 476.

619.    The Supreme Court has held that awards of punitive damages may be imposed in order to further "legitimate interests in punishing unlawful conduct and deterring its repetition." ***BMW of N. Am., Inc. v. Gore***, 517 U.S. 559, 568 (1996). The amount of punitive damages, however, is limited by the Due Process Clause which "prohibits the imposition of grossly excessive or arbitrary punishments." ***State Farm Mut. Auto Ins. Co. v. Campbell***, 538 U.S. 408, 416 (2003).

620.    In determining the amount of punitive damages to award, the Supreme Court instructs courts to "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded … and the civil penalties authorized or imposed in comparable cases." ***Id.*** at 418.

621.    The Court first determines that Plaintiffs are entitled to recover actual damages in the amount of the attorneys' fees incurred for prosecuting Defendants' stay violations and to the extent, if any, that such prosecution was required to contest a proof of claim that was incorrectly filed as secured as a consequence of Defendants' wrongful UCC filings.

622.    The Court finds that the appropriate amount of attorneys' fees attributed to prosecuting Defendants' stay violations and to contesting the allegations of secured status of a claim based on those violations in Claim Nos. 11, 12 and 13 is $5,000.00.[37]

623.    The Court second determines that Plaintiffs have not proven that Defendants' conduct in filing the UCC financing statements was egregious and intentional as to warrant imposition of punitive damages.

---

[37] The fee applications provided by Plaintiffs' attorney (Pl. 264 and 265) are not categorized in a manner by which this Court may determine the exact amount of time attributed to prosecuting Defendants' violations of the automatic stay. As a result, although not scientific, the Court determined that an hourly rate of $225 times approximately 22 hours of estimated work for the filing and prosecution of these claims is a reasonable estimation given the enormity of claims alleged and evidence presented at trial.

624.    The Court finds that the burden of proof is on Plaintiffs to show the level of egregious conduct undertaken by Defendants *in their violation of the automatic stay* so as to warrant punitive remedies.

625.    Here, Plaintiffs allege that the totality of Defendants' actions throughout their relationship and, in particular, in his attempts to collect debts warrant punitive damages. This assertion, however, is incorrect so far as Plaintiffs' allegations relate only to pre-petition conduct or conduct that is not a violation of the automatic stay.

626.    This Court has determined that the only stay violation committed by Merchant was in the filing of his UCC liens. Plaintiffs have not proven facts indicating that these filings post-petition were egregious or intentional to a point that punitive damages are warranted. Unlike the repeated violating conduct in *Collier* and *Burrell*, Plaintiffs have not shown that Merchant continued to engage in conduct beyond filing the initial UCC liens that exhibited "a complete disregard for the bankruptcy process" or intentional action taken "to punish the debtor for seeking bankruptcy protection." *Dolan*, 2012 WL 371631, *3 (citing *Knaus v. Concordia Lumber Co., Inc.* (*In re Knaus*), 889 F.2d 773, 775-76 (8th Cir. 1989) (egregious conduct may be established where knowing violation of the stay continues)); *see also Collier*, 410 B.R. at 479-80; *Burrell*, 2012 WL 3727130, *13.

627.    Plaintiffs have not offered evidence that the UCC liens remain on record in violation of the automatic stay or that Merchant has taken any action after filing to enforce those liens. Because Plaintiffs bear the burden of proving the egregiousness of Defendants' conduct, this Court cannot find that the actions proven by Plaintiffs were egregious if Defendants simply filed the UCC financing statements after the Petition Date.[38] Likewise, evidence that Defendants told

---

[38] The Court's finding that evidence has not been proven to show that the UCC liens remain does not permit Defendants to continue their violation of the automatic stay if it is the case that the UCC liens have not yet been

other people about Plaintiffs' bankruptcy filing is not sufficient to prove that those communications were in an attempt to collect on a debt. As such, although the actions may have been in poor taste, the communications to third parties about Plaintiffs' bankruptcy filing is not a violation of the automatic stay and therefore, cannot mitigate in favor of an award of punitive damages.

D.     Conclusion

628.   For the aforementioned reasons, the Court concludes that Defendants violated the automatic stay by filing six UCC liens with the Texas Secretary of State after the Petition Date. The Court awards $5,000.00 in attorneys' fees for actual damages incurred for prosecuting Defendants' stay violations and for prosecution required to contest a proof of claim that was incorrectly filed as secured as a consequence of Defendants' wrongful UCC filings. The Court concludes that punitive damages are not warranted at this time.

## CONCLUSIONS

629.   For the aforementioned reasons, the Court concludes the following regarding Defendants' Claims:

a.     Proof of Claim No. 7-2 is allowed in the amount of $67,220.00 as an unsecured claim;

b.     Proof of Claim No. 8-2 is allowed in the amount of $36,474.74 as a secured claim;

c.     Proof of Claim No. 9-3 is disallowed in its entirety;

d.     Proof of Claim No. 10-3 is allowed in the amount of $218,739.45 as a secured claim;

---

rescinded. Because the Court finds that the filing and existence of the UCC liens violates the automatic stay provision of 11 U.S.C. § 362, a continued violation could warrant an award of further actual damages and punitive damages in the future.

e.      Proof of Claim No. 11-2 is disallowed in its entirety;

f.      Proof of Claim No. 12-2 is allowed in the amount of $7,857.23 as an unsecured claim;

g.      Proof of Claim No. 13-2 is disallowed in its entirety;

h.      Proof of Claim No. 14-2 is disallowed in its entirety;

i.      Proof of Claim No. 15-3 is disallowed in its entirety;

j.      Proof of Claim No. 16-1 is disallowed in its entirety; and

k.      Proof of Claim No. 17-1 is disallowed in its entirety.

630.    For the aforementioned reasons, the Court concludes that Plaintiffs' breach of fiduciary duty claim relating to the Greenway Real Estate closing and sale price fails because no fiduciary relationship existed.  The Court determined that it maintains constitutional authority to enter final judgment on this breach of fiduciary duty claim.

631.    For the aforementioned reasons, the Court concludes Plaintiffs' fraudulent inducement claim is barred by the applicable statute of limitations.  The Court determined that it maintains constitutional authority to enter final judgment on the fraudulent inducement claim.

632.    For the aforementioned reasons, the Court concludes that it lacks subject matter jurisdiction to consider Plaintiffs' claim for abuse of process relating to service of process on Plaintiffs at an alleged wrong location and subsequent entry of default judgment and writ of garnishment.  As such, the Court *sua sponte* dismisses Plaintiffs' claim.

633.    For the aforementioned reasons, the Court concludes that Plaintiffs' claims for breach of partnership, accounting of partnership and suit to quiet title are the subject of pending state court litigation in which a Rule 11 Agreement has been entered and which still controls the relationship of the parties in reference to the Lucky Real Property.  The Court further concludes

that resolution of these causes of action are not necessary for the resolution of allowance of Defendants' Claims. As such, the Court shall not interfere with the state court's jurisdiction and authority over this already pending litigation. Therefore, the Court *sua sponte* abstains from entering judgment on Plaintiffs' breach of partnership, accounting of partnership and suit to quiet title causes of action.

634. For the aforementioned reasons, the Court concludes that Defendants violated the automatic stay provisions of 11 U.S.C. § 362 and awards $5,000.00 in attorneys' fees for actual damages.

635. For the aforementioned reasons, the Court submits its Proposed Findings of Fact and Conclusions of Law to the District Court for *de novo* review pursuant to Federal Rule of Bankruptcy Procedure 9033 on the following causes of action:

      a.      **Breach of Fiduciary Duty**. The Court submits that Plaintiffs' claims for breach of fiduciary duty related to allegations that Merchant filed false tax returns, forged signatures, filed false statements, changed Plaintiffs' address with the Comptroller's Office, attempted to sell partnership property without Plaintiffs' knowledge and consent, and filed numerous frivolous lawsuits in attempts to harass Plaintiffs fail because no fiduciary relationship existed.

      b.      **Abuse of Process.** The Court submits that Plaintiffs' abuse of process claim relating to Merchant's endorsement and depositing of tax refund checks fails as a matter of law.

      c.      **Abuse of Process.** The Court submits that Plaintiffs' abuse of process claims relating to Merchant's filing numerous lawsuits and Merchant's correspondence with the Texas Comptroller's Office fail as a matter of law.

      d.      **Abuse of Process.** The Court submits that Plaintiffs' abuse of process claim relating to Merchant's service of a writ of garnishment on Plaintiffs' vendors and social

organization representatives fails on factual grounds because Plaintiffs did not prove a perverted use of the garnishment process.

e.    **Usury**.  The Court submits that Defendants charged usurious interest in violation of Texas Usury law but that Plaintiffs failed to prove the basis for the amount of damages that should be awarded for the usurious charges.

636.    A separate order on each Objection to Claim will be entered in conformity with this Memorandum Opinion.

637.    A separate Partial Final Judgment on the adversary causes of action in which this Court determined it maintains constitutional authority to enter final judgment will be entered in conformity with this Memorandum Opinion.

638.    A separate order submitting Proposed Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 9033 on the adversary causes of action in which this Court determined it does not maintain constitutional or statutory authority to enter final judgment will be entered in conformity with this Memorandum Opinion.  All applicable deadlines for objection shall be stated in the Court's separate Order.

639.    All relief not granted herein is denied.

# # #